# IN THE UNITED STATES DISTRICT COURT FOR
# THE WESTERN DISTRICT OF OKLAHOMA

[1] ANDREW BRIDGE, by his next friends and
parents, ELI BRIDGE and AYSHA PRATHER;

[2] MARK MILES, by his next friends and
parents, MAX MILES and MIA MILES; and

[3] SARAH STILES, by her next friends and
parents, STEVE STILES and SUE STILES,

    *Plaintiffs*,

    v.

[1] OKLAHOMA STATE DEPARTMENT OF
EDUCATION;

[2] JOY HOFMEISTER, in her official capacity
as the State Superintendent of Public Instruction;

[3] CARLISHA BRADLEY,
[4] JENNIFER MONIES,
[5] ESTELA HERNANDEZ,
[6] BRIAN BOBEK,
[7] TRENT SMITH,
[8] SARAH LEPAK, in their official capacities as
members of the Oklahoma Board of Education;

[9] JOHN O'CONNOR, in his official capacity as
Oklahoma Attorney General;

[10] INDEPENDENT SCHOOL DISTRICT NO.
40 OF CLEVELAND COUNTY, OKLAHOMA
a/k/a NOBLE PUBLIC SCHOOLS;

[11] INDEPENDENT SCHOOL DISTRICT NO.
2 OF CLEVELAND COUNTY, OKLAHOMA
a/k/a MOORE PUBLIC SCHOOLS;

Civil Action No.: CIV-22-787-JD

JURY TRIAL DEMANDED

[12] INDEPENDENT SCHOOL DISTRICT NO. )
89 OF OKLAHOMA COUNTY, OKLAHOMA )
a/k/a OKLAHOMA CITY PUBLIC SCHOOLS; )
and )
)
[13] HARDING INDEPENDENCE CHARTER )
DISTRICT, INC., )
)
*Defendants*. )
)

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF

## INTRODUCTION

1.      Plaintiffs Andrew Bridge,[1] Mark Miles, and Sarah Stiles,[2] minors represented in this lawsuit by their respective parents and next friends (collectively, "Plaintiffs"), are Oklahoma public school or public charter school students. They are just like every other middle and high school student, teenagers coming of age as they seek to fit in, navigate life's challenges, obtain support and encouragement, and learn. Just like their peers, Plaintiffs enter their school's doors each morning filled with dreams for their future careers and lives. And just like their peers, each one of them is entitled to an education without being singled out for discriminatory unequal treatment.

2.      After the last Oklahoma legislative session, the 2022–2023 school year brought a cruel and harmful burden targeting Plaintiffs simply because they happen to be

---

[1] Pursuant to Fed. R. Civ. P. 5.2(h), Plaintiff Andrew Bridge, a minor, waives the privacy protections afforded by Fed. R. Civ. P. 5.2(a) as to his name only.

[2] For the reasons set forth in a motion contemporaneously filed with this Complaint for Declaratory, Injunctive, and Other Relief, Plaintiffs Mark Miles and Sarah Stiles proceed under pseudonyms.

transgender—meaning that they consistently, persistently, and insistently identify as a sex that is different than the sex each was assigned at birth. Plaintiffs and other youth who are transgender in Oklahoma schools now face mandated discipline, possibly even suspension, simply for using the restroom and other facilities at school corresponding with who they are.

3.     On May 25, 2022, Oklahoma Governor Kevin Stitt signed into law Oklahoma Senate Bill 615, which has been codified as Okla. Stat. tit. 70, § 1-125 ("SB 615"), and which is now in effect.[3]  Section 1 of SB 615 mandates that each Oklahoma public school and public charter school serving pre-kindergarten through twelfth grade students designate all multiple occupancy restrooms or changing areas exclusively for the use of either the "male sex" or the "female sex."  Under SB 615, "sex" is defined as "the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate."  This is so even when the individual knows themself to be a different sex, and even when others perceive the individual to be a different sex than is identified on their original birth certificate.

4.     Under SB 615, the Oklahoma State Board of Education is required to promulgate and enforce rules to implement the provisions of Section 1 of SB 615.

---

[3] While SB 615 applies to students, school staff, and visitors to the campus of each school, the Complaint focuses specifically on the student population since Plaintiffs are students.

5.      Oklahoma school districts and public charter school governing boards are required by SB 615 to adopt a disciplinary action policy for individuals who refuse to comply with the provisions of Section 1 of SB 615.

6.      If the Oklahoma State Board of Education finds that a school district or public charter school is not complying with SB 615, SB 615 requires that the noncompliant school district or public charter school receive a 5% decrease in state funding for the fiscal year following the year of noncompliance.

7.      Plaintiffs bring this action to challenge the legality of recently-enacted SB 615, to preliminarily and permanently enjoin enforcement of SB 615, to obtain declaratory relief regarding SB 615, and to obtain nominal damages on the basis that SB 615 discriminates on its face against students who are transgender, and as applied to each of the Plaintiffs on the basis of their sex, gender identity, and transgender status, in violation of the Fourteenth Amendment to the United States Constitution and Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.*

## JURISDICTION AND VENUE

8.      This action arises under the United States Constitution, 42 U.S.C. § 1983, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*

9.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 because the matters in controversy arise under the Constitution and laws of the United States, and pursuant to 28 U.S.C. § 1343(a)(3) and (4) because the action is brought to redress deprivations, under color of state authority, of rights, privileges, and immunities secured by the U.S. Constitution, and seeks to secure

nominal damages and equitable relief under 42 U.S.C. § 1983, which provides a cause of action for the protection of civil rights.

10.     This Court has the authority to enter a declaratory judgment and to provide preliminary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201 and 2202.

11.     Venue is proper in the Western District of Oklahoma under 28 U.S.C. § 1391(b)(1) and (2) because Defendants and/or agents of Defendants reside and/or may be found in this District, and a substantial portion of the communications, transactions, events, or omissions underlying Plaintiffs' claims occurred in this District.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff Andrew Bridge ("Andy") is a 16-year-old boy enrolled as a student in 12th grade at Noble High School, a public school operated by Defendant Noble Public Schools.  Andy is a hard-working, high-achieving student, who enjoys reading, painting, and competing as a Varsity member of the Noble High School Academic Team.  Andy is also transgender, and therefore harmed by SB 615 and his school's discipline policy, which prohibits him from using the boys' restrooms at school.  This prohibition applies even though Andy used the boys' restrooms at his school without issue during the 2021–2022 academic year.  Andy is a resident of Oklahoma and, as a minor, brings this action pursuant to Federal Rule of Civil Procedure 17(c) by and through his parents and next friends, Eli Bridge and Aysha Prather.

13. Plaintiff Mark Miles ("Mark") is a boy enrolled as a student at a public school operated by Defendant Moore Public Schools. Mark is also transgender, and therefore harmed by SB 615 and his school's discipline policy, which prohibits him from using the boys' restrooms at school. Mark is a resident of Oklahoma and, as a minor, brings this action pursuant to Federal Rule of Civil Procedure 17(c) by and through his parents and next friends, Max and Mia Miles.

14. Plaintiff Sarah Stiles ("Sarah") is a girl enrolled as a student at a public charter school operated by Defendant Harding Independent School District, Inc. Sarah is also transgender, and therefore harmed by SB 615, and her school's discipline policy, which prohibits her from using the girls' restrooms at school. Sarah is a resident of Oklahoma and, as a minor, brings this action pursuant to Federal Rule of Civil Procedure 17(c) by and through her parents and next friends, Steve and Sue Stiles.

**B.      Defendants**

15. Defendant Oklahoma State Department of Education ("OSDE") is charged with determining the policies and directing the administration and supervision of the public school system of Oklahoma. Okla. Stat. tit.70, § 1-105(A). OSDE is a recipient of Federal financial assistance and, therefore, subject to Title IX.

16. Defendant Joy Hofmeister is the State Superintendent of Public Instruction ("State Superintendent") in Oklahoma. She controls and directs OSDE and also serves as a member and chairperson of the State Board of Education ("SBOE"). Okla. Stat. tit.70 §§ 1-105(C), 3-107.1. In addition to concurrent responsibilities with the other members of the SBOE, the State Superintendent "adopts polices and makes rules for the organization,

operation and administration" of OSDE. Okla. Stat. tit. 70, § 3-107.1(2). The State Superintendent is also "responsible for interpretation of policy and rules set by the [SBOE]." Okla. Stat. tit. 70, § 3-107.1(6). The State Superintendent's "control" extends to any "other operations necessary to carry out the powers, duties and functions of the State Superintendent and the [SBOE]." Okla. Stat. tit. 70, § 3-107.1(3). Defendant Hofmeister is a person within the meaning of 42 U.S.C. § 1983 and is sued in her official capacity for prospective equitable relief. At all relevant times, Defendant Hoffmeister has acted and continues to act under color of state law.

17.     Defendants Carlisha Bradley, Jennifer Monies, Estela Hernandez, Brian Bobek, Trent Smith, and Sarah Lepak (collectively, "Appointed Board Members") are members of the SBOE. The State Superintendent and Appointed Board Members have concurrent responsibility as the SBOE to, *inter alia*, adopt policies and operate the public school system of the state. Okla. Stat. tit. 70, § 3-104. On August 25, 2022, the SBOE adopted emergency rules governing the implementation of SB 615 in public schools and public charter schools. Defendants Appointed Board Members are each a person within the meaning of 42 U.S.C. § 1983 and are sued in their official capacities for prospective equitable relief. At all relevant times, Defendant Appointed Board Members acted and continue to act under color of state law.

18.     Defendant John O'Connor ("OAG" or "Oklahoma Attorney General") is the Attorney General for the State of Oklahoma. Defendant O'Connor has demonstrated a willingness to exercise his duties and powers as Oklahoma Attorney General to exclude students who are transgender from multiple occupancy school restrooms and other sex-

7

separated facilities that align with such students' gender. Upon information and belief, Defendant O'Connor will, directly or indirectly, enforce SB 615, through his duties and powers as Oklahoma Attorney General. Okla. Stat. tit. 74, § 74-18b. *See, e.g.*, Attorney General O'Connor Releases Statement Following the Signing of SB 615 and HB 4327, May 26, 2022 (stating "[t]he Attorney General has been working vigorously on this issue for months now" and has "already begun pushing back… and will continue to do so…."). Defendant O'Connor is a person within the meaning of 42 U.S.C. § 1983 and is sued in his official capacity for prospective equitable relief. At all relevant times, Defendant O'Connor has acted and continues to act under color of state law.

19.     Defendant Independent School District No. 40 of Cleveland County, Oklahoma ("Noble Public Schools" or "NPS") is a body corporate that acts by and through its governing body, the Noble Board of Education ("Noble BOE"). *See* Okla. Stat. tit. 70, §§ 5-105, 5-106. Among other powers and duties, the Noble BOE "make[s] rules, not inconsistent with the law or rules of the State Board of Education, governing the board and the school system of" NPS. Okla. Stat. tit. 70, § 5-117(A)(2). Defendant Noble Public Schools is also a recipient of Federal financial assistance and therefore is subject to Title IX.

20.     Defendant Independent School District No. 2 of Cleveland County, Oklahoma ("Moore Public Schools" or "MPS") is a body corporate that acts by and through its governing body, the Moore Board of Education ("Moore BOE"). *See* Okla. Stat. tit. 70, §§ 5-105, 5-106. Among other powers and duties, the Moore BOE "make[s] rules, not inconsistent with the law or rules of the State Board of Education, governing the board and

the school system of" MPS. Okla. Stat. tit. 70, § 5-117(A)(2). Defendant Moore Public Schools is a recipient of Federal financial assistance and therefore is subject to Title IX.

21.    Defendant Independent School District No. 89 of Oklahoma County, Oklahoma ("Oklahoma City Public Schools" or "OKCPS") is a body corporate that acts by and through its governing body, the Oklahoma City Board of Education ("OKCPS BOE"). *See* Okla. Stat. tit. 70, §§ 5-105, 5-106. Defendant OKCPS is also a recipient of Federal financial assistance and therefore is subject to Title IX. Defendant OKCPS is the authorized public chartering agency that sponsors Defendant HICD pursuant to the Oklahoma Charter Schools Act, Okla. Stat. tit. 70, § 3-130 *et seq*., as amended.

22.    Defendant Harding Independence Charter District, Inc. ("HICD") is a not-for-profit corporation authorized to and currently operating two public schools, including Independence Charter Middle School ("ICMS"), chartered by Defendant OKCPS. HICD was formerly known as Families for Excellence in Education, Inc. Upon information and belief, Defendant HICD is a recipient of Federal financial assistance, whether directly or indirectly, and therefore is subject to Title IX as a recipient or otherwise.

23.    NPS, MPS, and OKCPS are each a local education agency ("LEA") and HICD is considered a LEA under Oklahoma law for purposes of federal funding. Okla. Stat. tit. 70, § 3-142(C). NPS, MPS, OKCPS, and HICD are collectively referred to herein as the "LEA Defendants."

**STATEMENT OF FACTS**

**I.** **Gender Identity and Gender Dysphoria**

24. Every individual's sex is multifaceted and comprised of many distinct biologically-influenced characteristics, including, but not limited to, chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and gender identity. Where there is a divergence between these characteristics, gender identity is the most important and determinative factor. Therefore, someone's sex or gender is properly understood to be the same as their gender identity.

25. All human beings have a gender identity—the sex or gender the individual knows themself to be. A person's gender identity is a fundamental component of their identity that is durable and deeply rooted. Although the detailed mechanisms are unknown, there is a medical consensus that there is a significant biologic component underlying gender identity. It cannot be changed by social or medical intervention.

26. When a child is born, healthcare providers typically make a sex designation at birth based on a visual assessment of the infant's external genitalia. This is the sex that is most commonly listed on a person's original birth certificate. Most people are cisgender, meaning that their gender identity aligns with the sex they were assigned at birth. A girl who is cisgender has a female gender identity and was assigned female at birth. A boy who is cisgender has a male gender identity and was assigned male at birth.

27. Not everyone's gender identity aligns with the sex they were assigned at birth. A person is transgender if they have a gender identity that does not align with their sex assigned at birth. A girl who is transgender has a female gender identity although she

was assigned male at birth. A boy who is transgender has a male gender identity although he was assigned female at birth.

28. Individuals who are transgender have a consistent, persistent, and insistent understanding that their sex is different from the sex they were assigned as at birth. Individuals who are cisgender have a consistent, persistent, and insistent understanding that their sex is the same as the sex they were assigned at birth.

29. Some people who are transgender experience sustained and clinically significant distress caused by the incongruence between their gender and their sex assigned at birth. The American Psychiatric Association's Diagnostic & Statistical Manual of Mental Disorders ("DSM-5") diagnostic term for this sustained and clinically significant distress is "Gender Dysphoria." Not all people who are transgender experience gender dysphoria.

30. In order to be diagnosed with gender dysphoria, the incongruence must have persisted for at least six months and be accompanied by clinically significant distress or impairment in social, occupational, or other important areas of functioning.

31. Being transgender is not itself a medical condition. But gender dysphoria is a serious medical condition that, if left untreated, can result in debilitating anxiety, severe depression, suicidal ideation, self-harm, and suicide.

32. The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published widely accepted standards of care for treating gender dysphoria. The medical treatment for gender dysphoria is to eliminate the clinically significant distress by helping a person who is transgender live in alignment with their

gender identity. This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care." These standards of care are recognized by the American Academy of Pediatrics, which agrees that this care is safe, effective, and medically necessary treatment for the health and well-being of youth suffering from gender dysphoria.

33. The goal of treatment for gender dysphoria is to align the body and life of a person who is transgender with their gender identity. Generally, treatment in accordance with the WPATH Standards of Care may include: (1) social transition; (2) hormone therapy; and/or (3) gender-affirming surgeries. The precise treatment for gender dysphoria depends upon each person's individualized needs, and the medical standards of care and treatment differ across age groups, depending on whether the person suffering from gender dysphoria is a prepubertal child, adolescent, or adult.

34. Treatment of gender dysphoria for prepubertal children with gender dysphoria is limited to social transition. Social transition for this age group entails allowing a child who is transgender to live and be socially recognized in accordance with their gender identity in all aspects of their lives. Typically, social transition includes allowing children to wear clothing, cut or grow their hair, adopt other appearance styles, use names and pronouns, and use restrooms and other sex-separated facilities in accordance with their gender, instead of the sex assigned to them at birth.

35. For example, for a boy who is transgender, social transition can include, among other things, changing his first name to a name typically associated with boys, using male pronouns, changing his identity documents to reflect his male gender, wearing

clothing and modifying his appearance to that stereotypically associated with boys, using restrooms and other facilities for boys, and otherwise living as a boy in all aspects of life. And vice versa for a girl who is transgender.

36.     Social transition as part of treatment for gender dysphoria requires that a boy who is transgender be recognized as a boy and treated the same as all other boys by those in their lives, including family members, friends, educators, peers, and others in the community, as well as by government agencies and officials and private entities with which he interacts, or else he may experience significant harm.  The same is true for social transition as part of treatment for gender dysphoria for a girl who is transgender.  A girl who is transgender must be recognized as a girl and treated the same as all other girls by those in her life, her community, and all government agencies and officials, as well as private entities with which she interacts, or else she may experience significant harm.

37.     Under the WPATH Standards of Care, when a child begins to enter puberty, they have the option, under medical supervision and with the informed consent of their parents or guardians, to receive endogenous puberty-delaying medical treatment.  The puberty-delaying treatment helps prepubertal children who are transgender live in alignment with their gender identity and treats the symptoms of gender dysphoria.  Puberty-delaying treatment is reversible.  It is also the same treatment provided to children who are experiencing precocious puberty—a condition when young children experience puberty years before the typical onset of puberty.  Because puberty-delaying treatment allows youth who are transgender to avoid going through their endogenous puberty, it helps mitigate

gender dysphoria and prevents permanent physical changes that would otherwise accompany their endogenous puberty that are inconsistent with their gender.

38. For adolescents who are transgender and who are ready to begin puberty (after either puberty-delaying treatment or starting endogenous puberty), the WPATH treatment protocols recommend the initiation of gender identity congruent hormone therapy. Hormone therapy, which, upon informed consent by a parent or guardian of the adolescent, is provided under the supervision of a medical professional. Hormone therapy replaces the individual's endogenous hormones with gender identity congruent hormones, at appropriate and standard levels for their age. Boys who are transgender undergo testosterone therapy, and girls who are transgender undergo estrogen therapy. Gender identity congruent hormone therapy allows an adolescent who is transgender, depending on a variety of factors and to various degrees, to experience the same physical changes to secondary sexual characteristics experienced by their cisgender peers.

## II. Youth Who Are Transgender and Their Schools

39. The ability to live consistently with one's gender identity is critical to the health and well-being of people who are transgender, but particularly youth who are transgender.

40. Students who are transgender have been, are, and will continue to attend schools across the country and in Oklahoma. While students who are transgender have long been part of school communities, in recent decades they have had more widespread access to the medical and psychological support that each needs to live as the person they truly are and to thrive.

41.     Because of increased access to care and support from health care providers, their families, and their communities, many students who are transgender attend school without classmates and peers knowing they are transgender.  For example, many students have already socially transitioned to the sex they know themselves to be before beginning school and many others transfer to a new school after transitioning.

42.     With hormone therapy, adolescent students who are transgender develop physical sex characteristics typical of their gender identity—not the sex they were assigned at birth.  For example, hormone therapy affects muscle tone and structure and produces secondary sex characteristics such as a lower voice and an increase in facial and body hair in boys and breasts and wider hips in girls.

43.     According to every major medical and mental health organization, including the American Medical Association, the American Academy of Pediatrics, the American Psychiatric Association, and the American Psychological Association, excluding boys and girls who are transgender from using the same restrooms as other boys and girls is harmful to the health and wellbeing of those transgender students.  When excluded from the multiple occupancy restrooms, students who are transgender often avoid using the restroom entirely.  This may be because using single-occupancy restrooms would reveal that they are transgender to others, is stigmatizing, or is impractical to use given how far the single-occupancy restroom may be from a student's classes or for other reasons.  Those who avoid using restrooms at school may suffer infections and other negative health consequences as a result of avoiding being forced to use a restroom that does not align with their gender.  Treating boys and girls who are transgender differently than their peers and excluding them

from the same restrooms used by peers of the same gender also increases their risk of or worsens, their anxiety, depression, suicidal ideation, and self-harm; could lead to suicide; and interferes with the treatment of, and may cause or increase the intensity of, their gender dysphoria.

44. Educators and school administrators across the country also recognize that excluding boys and girls who are transgender from multiple occupancy restrooms that align with their gender interferes with their ability to learn and thrive at school. It impairs their ability to develop a healthy sense of self, peer relationships, and the cognitive skills necessary to succeed in adult life. In light of these harms, the National Association of School Psychologists, National Association of Secondary School Principals, National Association of Elementary School Principals, and the American School Counselor Association have all called upon schools to allow boys and girls who are transgender to use the same restrooms as their cisgender counterparts.

45. According to the American Academy of Pediatrics and other major medical and mental health organizations, there is no evidence that allowing boys and girls who are transgender to use the same restrooms as their cisgender counterparts causes any harm to cisgender students.

46. Schools can provide accommodations for all students—whether transgender or not—to enhance their own sense of privacy without discriminating against students who are transgender by excluding them from multiple occupancy restrooms used by students of the same gender as the students who are transgender.

47.     Plaintiffs and other students in Oklahoma who are transgender, as well as students across the country who are transgender, already use the same multiple occupancy facilities in public as other boys and girls.

48.     Permitting boys and girls who are transgender to simply exist as who they are, and treating them the same as any other boy or girl, harms no one, and it is the only way that students who are transgender can equally participate in education, employment, and society at large.

**III.    SB 615**

49.     SB 615 was originally introduced by Oklahoma State Senator David Bullard on January 21, 2022, as a bill to amend Oklahoma's law regarding inspection of sex education curriculum to, among other things, define "sexual behavior or attitudes" to include "sexual orientation and gender identity."  On April 28, 2022, following an untimely amendment, the Oklahoma House of Representatives voted to suspend Rule 8.8 of the House Rules[4] to introduce an amendment to SB 615.  This amendment removed the original language and title of the bill, changing it from a bill regarding sex education curricula to one discriminating against students who are transgender by denying them equal access to multiple occupancy restrooms and changing areas.

---

[4] Rule 8.8(c) "An amendment to a main floor amendment must be filed no later than forty-eight (48) hours after a bill or joint resolution is initially published on the Floor Calendar, to be eligible for consideration." House Rules of the Oklahoma House of Representatives for the 58th Oklahoma Legislature (2021-2022).

50.     SB 615 in its current form was passed by the Oklahoma Legislature and thereafter signed by Oklahoma Governor Stitt on May 25, 2022, when it immediately went into full force and effect pursuant to Section 2 of SB 615.

51.     As enacted, SB 615 provides that it was adopted "to ensure privacy and safety" at each public school and public charter school that serves students in pre-kindergarten through twelfth grades in Oklahoma.

52.     The purported "privacy" and "safety" concerns are unfounded pretext to target students who are transgender.  Students who are transgender pose no risks to the privacy or safety of other students, whether in using multiple occupancy facilities or in any other context.

53.     In a press release following the passage of SB 615, Senator Bullard explained the purpose of the bill as "removing all forms of indoctrination," noting "how far we slipped in our society" that "we are willing to fail our kids by coercing them into living in someone else's fantasy," presumably referring to the existence of transgender people as a "fantasy."

54.     On August 25, 2022, Defendant SBOE adopted emergency rules pursuant to Section 1(H) of SB 615 ("SBOE Emergency Rules").  The SBOE Emergency Rules are set forth in Title 210 of the Oklahoma Administrative Code as new Section 35-3-186(h).  They mirror SB 615 by requiring every public school and public charter school that serves students in prekindergarten through twelfth grades in Oklahoma to designate all multiple occupancy restrooms or changing areas for the exclusive use of either the male sex or the female sex, defined as "the physical condition of being male or female based on genetics

and physiology, as identified on the individual's original birth certificate." SB 615 and the SBOE Emergency Rules also require that schools provide a "Reasonable Accommodation" by providing access to a single-occupancy restroom or changing room for individuals who do not wish to utilize the multiple occupancy restroom or changing area designated for their "sex" (as defined in SB 615).

55.     These restroom "accommodations" provided to Plaintiffs by their respective schools are not accommodations at all. Offering students who are transgender a choice between single-occupancy restrooms, restrooms designated for a gender incongruent with who they are, or no restrooms at all is discrimination. These so-called "accommodations" reinforce the differential treatment and trauma associated with living under SB 615, violating Plaintiffs' constitutional and statutory rights under the Equal Protection Clause of the U.S. Constitution and Title IX.

56.     The legislature included a punitive 5% budget cut to school districts found to violate SB 615, delegating enforcement authority to Defendant SBOE. For Oklahoma schools, particularly those that are already underfunded and forced to limit or cut vital programs and services for students year after year, any decrease in state funding is unpalatable.

57.     SB 615 further provides a new "cause of action" for any "parent or legal guardian enrolled in and physically attending a public school district or public charter school" for "noncompliance" with its mandate to bar transgender students from access to multiple occupancy restrooms that align with their gender. The threat of private lawsuits

and accompanying expenses against Oklahoma public schools and public charter schools underscores the coercive nature of SB 615.

58. SB 615, the SBOE Emergency Rules, and LEA Defendants' respective disciplinary policies or practices harm students who are transgender, including Plaintiffs, by excluding them from the same multiple occupancy facilities that are provided to peers of their same gender.

### IV. Plaintiffs' Experiences in Oklahoma Schools as Students Who Are Transgender

59. Plaintiffs attend school under compulsion of State law. Okla. Stat. tit. 70, § 10-105. Like most students, Plaintiffs attend school to learn, develop friendships, and prepare themselves for higher education and success throughout their adult lives.

#### A. Andy Bridge

60. Plaintiff Andy Bridge is a boy. He also is transgender.

61. Andy is 16 years old, and is a registered student at Noble High School, which is part of the Noble Public Schools in Noble, Oklahoma. He began his senior year on August 10, 2022.

62. Andy is an honor student whose academic record is extremely important to him. He competes on the Varsity team in the Academic Bowl. After high school, he plans to attend a four-year university to study Psychology. Ultimately, he would like to be either a clinical psychologist or psychiatrist. In his free time, he loves to paint and read.

63. At birth, Andy was designated as "female" on his birth certificate, even though he is a boy. At the onset of puberty, Andy started to feel uncomfortable with his

body. After many discussions with his therapist, physician, and supportive friends, and after extensive reading and thinking about gender identity, Andy felt ready to come out to his family as transgender, which he did during the summer of 2020.

64. As he came to understand his identity as a boy, Andy began taking steps towards aligning his lived experience with his gender. Andy cut his hair short and began wearing more masculine clothing. He informed his close friends of his name and pronouns. Each gradual step of his transition brought him a sense of relief and happiness, and he felt like he was finally starting to live the way he was meant to live.

65. Andy has since been diagnosed with gender dysphoria, and that diagnosis has been confirmed by multiple health providers.

66. Andy began pursuing medical treatment for gender dysphoria in June 2021 at Oklahoma Children's Adolescent Medicine Clinic ("OU Health"). He has been under the care of health care professionals at OU Health since May 2018 after he was referred there by his primary care physician.

67. During Andy's junior year at Noble High School in August 2021, he lived as his authentic self, meaning as the boy he is. His name was changed on his school records where possible and teachers were informed that he uses male pronouns. At school, he is generally perceived by students and staff alike as a boy. His peers and teachers generally use male pronouns to refer to him, and he is generally treated as the boy he is in every respect.

68. Andy consistently used the boys' restrooms at school for the entire 2021–2022 school year with the knowledge and support of school administration. He knew that

he belonged in the boys' restroom, so he simply used the boys' restrooms along with all the other boys. Andy always used one of the stalls, just as he continues to do in every other setting where he uses male restrooms.

69. Before school started this year, Andy and his mother spoke with the vice principal and principal of his school regarding the school district's restroom policy. The principal and vice principal called a district-level administrator who stated that NPS's policy is that transgender students would have a single-occupancy restroom made available to them. If there was a complaint about a transgender student using the "wrong" restroom (that is, a multiple occupancy restroom used by students of the same gender), they would be counseled to use other restrooms. If Andy persisted in using the boys' restroom after being counseled to use other restrooms, he would be subject to further discipline. At the end of the conversation, both Andy and his mother made it clear that Andy planned to continue using the boys' restroom this school year.

70. Since school has started again, Andy has either used the boys' restroom between classes or returned home during extended breaks in his schedule to use the restroom at home.

71. Being banned from the boys' restroom makes Andy feel singled out and stigmatized. Andy just wants to be treated with the same dignity and respect as all other boys.

**B. Mark Miles**

72. Plaintiff Mark Miles is a boy. He also is transgender.

73.     Mark is a student enrolled at a Moore Public Schools' high school in Oklahoma City, Oklahoma. He began the current school year on August 11, 2022.

74.     Mark's favorite subject in school is AP music theory. He loves music and plays guitar. After he finishes high school, he would like to attend college and study music theory. Ultimately, he would like a career in music production.

75.     At birth, Mark was designated as "female" on his birth certificate, even though he is a boy. From a very young age, Mark knew he was a boy. He would tell people that he was a boy, and if they did not agree he would argue with them. He never wanted to wear feminine clothing, such as dresses and skirts. He also never wanted to play with what are traditionally thought of as "girl" toys and would only play with what are traditionally thought of as "boy" toys.

76.     It was not until Mark was ten that he knew what being "transgender" was. During the summer of 2018, shortly after finding the language to describe himself, he came out to his family as transgender. Mark's family had a positive reaction to him coming out as transgender—everyone was accepting and supportive of him.

77.     After coming out, Mark began taking steps towards aligning his lived experience with his gender identity. Mark cut his hair short, and his family began to use his correct pronouns and name. The day he cut his hair short was one of the happiest days of his life. With each step he took, Mark began to feel more and more like his true self.

78.     Mark has since been diagnosed with gender dysphoria, and that diagnosis has been confirmed by multiple health providers.

79.     Mark began pursuing medical treatment for gender dysphoria in July 2019 at OU Health after he was referred there by his primary care physician.

80.     Mark has consistently used male restrooms in public since 2019 without incident.  Initially during junior high, he would use the faculty restroom because he felt more comfortable doing so.  School ended up being remote during Mark's eighth-grade year due to the COVID-19 pandemic so there was no need to address restroom use at school.

81.     During Mark's freshman year, which began in August 2021, Mark was living as his authentic self, meaning as the boy he is.  He had obtained a legal name change, which was reflected in his school records.  At school, he was generally perceived by students and staff alike as a boy.  His peers and teachers generally used male pronouns, and Mark was generally treated as a boy in every respect.

82.     Mark began using the boys' restroom at the start of the 2021-2022 school year.  He always used one of the stalls, as he continues to do in every other setting where he uses the male restrooms.

83.     In January 2022, a teacher informed the freshman principal that Mark was using the boys' restroom.  The freshman principal contacted both Mark and his parents and informed them that it was Moore Public School's policy that students must use the restroom that that matches the sex they were assigned at birth.  Mark was no longer allowed to use the boys' restroom and was told that he was required to use the single-occupancy faculty restroom.

84.     Mark's parents asked for a written copy of the policy on transgender students and restrooms.  On February 9, 2022, they received an email from an Assistant Superintendent at Moore Public Schools stating that "[t]he district does not have a specific policy with regard to this issue" and instead had a "consistent practice."  The email also stated that transgender students would have access to a private restroom facility.

85.     After receiving this email, Mark's parents requested a copy of the MPS's Title IX grievance policy and shortly thereafter filed a Title IX grievance with the school district.  On June 15, 2022, Mark's family received a final Decision and Opinion in the Appeal of the Title IX Grievance.  It denied all relief they had sought under Title IX because of Oklahoma's enactment of SB 615.

86.     While this process was pending, Mark was required to use a single-occupancy restroom.  This caused Mark's anxiety and depression to worsen.  Due to this distress, Mark was pulled out of in-person classes and allowed to finish the school year online.

87.     Not being allowed to use the boys' restroom at school makes Mark very upset and heightens his gender dysphoria.  Mark also feels that being required to use a separate restroom makes it more likely that his classmates will discover he is transgender.  Worrying about this often distracts Mark from his schoolwork.

88.     On August 8, 2022, the Moore BOE adopted a new discipline policy for Moore Public Schools entitled, "Use/Misuse of School Restrooms and Changing Facilities" to comply with SB 615.  In relevant part, students at MPS, including Mark, are subject to "disciplinary action outlined in the school discipline policy" if they do not use a

single-occupancy restroom or designated multiple occupancy restrooms "based on genetics and physiology; as identified on the individual's original birth certificate."

89.     The MPS school discipline policy includes a non-exclusive list of potential disciplinary actions, including a conference with student/parent, detention, in-school suspension, restriction of privileges, behavior contract, and suspension, among others. *See* MPS Board Policy, Section 7115.

90.     Mark began in-person classes at his high school in August 2022. Despite MPS's policy, Mark has continued to use the boys' restroom at school just as he uses male restrooms in all other public spaces.

### C. Sarah Stiles

91.     Plaintiff Sarah Stiles is a girl. She is also transgender.

92.     Sarah is enrolled as a student at Independence Charter Middle School, which is operated by HICD in Oklahoma City, Oklahoma. She began school on August 11, 2022.

93.     Sarah's favorite subject at school is history. In the future she would like to be a drama or music teacher. For fun, she likes to bowl, play video games, and play the cornet. Sarah is also very active in her church's youth group and a local LGBTQ center's youth group.

94.     At birth, Sarah was designated as "male" on her birth certificate, even though she is a girl. Sarah began questioning her gender in 2020 and, over time, Sarah started to become more certain that she is transgender.

95.     In the summer of 2021, Sarah first let her parents know that she was questioning her gender identity. The idea of going through male puberty brought Sarah

discomfort. As an initial step, Sarah's family began using her correct pronouns and started doing research to better understand and support her. Coming out to her family gave Sarah a huge sense of relief. When she told her family, it felt like a huge weight off of her chest. As her family began using her correct name and pronouns, it made her feel very happy and euphoric.

96. Sarah has since been diagnosed with gender dysphoria, and that diagnosis has been confirmed by healthcare providers. Sarah began pursuing medical treatment for gender dysphoria in April 2022 at OU Health.

97. Sarah attended another middle school during the 2021-2022 school year. Throughout the school year, Sarah was harassed and bullied for being transgender. Most of the bullying and harassment stemmed from the school's restroom policy that required Sarah to use the boys' restroom. In the boys' restroom, Sarah was assaulted on multiple occasions, including being struck on her backside and being shoved in the chest.

98. Because Sarah's parents were unhappy with how Sarah was being treated at her former school, they decided to enroll her at ICMS after Sue Stiles heard that HICD schools were doing all they could to make sure that transgender students were accepted and treated equally.

99. Sue Stiles subsequently met with the principal and a counselor at ICMS, as well as HICD Superintendent Steven Stefanik. They were supportive and assured Sue Stiles that Sarah would be able to use the multiple occupancy girls' restrooms at ICMS. They noted that the ICMS Student Bill of Rights guaranteed Sarah's access to multiple

occupancy girls' restrooms. Sarah was very excited about this because using the girls' restroom feels the most normal for her.

100.     On August 10, 2022, Sarah used the girls' restroom at ICMS without incident during the school day. Given news reports of several Oklahoma school districts enacting discipline policies in response to SB 615, Sue Stiles contacted the Principal at ICMS that day, asking whether Sarah would be permitted to use the multiple occupancy girls' restroom used by other girls at her school and, if not, what consequences she could face if she does.

101.     In response to Sue Stiles' inquiry, Superintendent Stefanik responded that, despite the assurances previously provided to Sarah Stiles' parents, SB 615 was passed and that ICBS and HICD's governance board are obligated to follow the laws passed in Oklahoma. He quoted provisions of SB 615 to Sue Stiles, noted that ICMS has created a single-occupancy restroom that Sarah could use, and explained that "the HICD staff and community will support the non-discrimination policy set forth by the governance board and help your student feel safe and comfortable at school, outside of the provisions provided in SB 615." Superintendent Stefanik thus acknowledged that SB 615 is discriminatory and will cause Sarah and other HICD students who are transgender to feel unsafe and uncomfortable at school.

102.     Defendant HICD, acting through its board, has delegated authority to enforce board policy and rules regarding the discipline of students, including students at ICMS, to the HICD Superintendent.

103.     The single-occupancy restroom that was made available to Sarah is a restroom located in the classroom that is used for in-school suspension ("ISS").  To use the restroom, Sarah must walk through the ISS classroom.  The restroom is also used partially for storage, including an unused wheelchair, empty picture frames, and plants.

104.     Students who attend ISS view that Sarah uses this specific restroom.  This makes Sarah nervous that students will discover that she is transgender because she uses that restroom and will begin to treat her differently.  Sarah has already been approached by a student and asked why she was using that specific restroom.

105.     A trip to the single-occupancy restroom typically takes Sarah 4-6 minutes from her classrooms, and on occasions she has to wait for others to use the restroom, extending the time that she is out of the classroom.  On most trips, Sarah passes three multiple occupancy girls' restrooms.  It takes longer for Sarah to get to the single-occupancy restroom during her four-minute passing periods because there are other students in the hallway; therefore, she can only use the restroom during class time.  This has led to Sarah missing parts of class.

106.      Despite all teachers being notified that Sarah has to use the single-occupancy restroom, a teacher has already complained about the length of time it takes Sarah to use the restroom.  The teacher stated that Sarah's restroom trip took too long and that in the future she has three minutes to use the restroom.  A trip from that specific classroom to the single-occupancy restroom is impossible for Sarah to make in under three minutes.

107.     By excluding Sarah from the girls' restroom, ICMS treats her differently than all of her girl classmates.  This has already had a negative impact on Sarah and Sarah's

parents fear that this will harm her wellbeing. The policy also puts Sarah at risk of the disclosure that she is transgender and significantly disrupts Sarah's education by forcing her to choose between disruptive physical discomfort and missing extended periods of class.

108.    Sarah is upset because her exclusion from the girls' restroom treats her differently than every other girl at school and because it takes away from her opportunity to learn at school for no good reason. All she wants is to use the restroom that makes sense for her to use because of whom she knows herself to be and because of how she appears to others, just like every other student.

## V.    Oklahoma Public Charter Schools and the HICD Charter With Significant Assistance By, and Entwinement With, Defendants OSDE and OKCPS.

109.    As required by the Oklahoma Charter School Act ("OCSA"), Okla. Stat. tit. 70, § 3-130 *et seq.*, HICD and/or Families for Excellence in Education, Inc. filed an application with Defendant OKCPS to operate ICMS as a public charter school. ICMS has been sponsored by OKCPS since its inception in approximately 2000.

110.    OKCPS renewed its charter sponsorship of ICMS in 2021. ICMS is currently operating under the charter contract between OKCPS and HICD with a term of July 1, 2021, through June 30, 2026 (hereinafter, "Charter Contract").

111.    The OCSA authorizes students like Plaintiff Sarah Stiles to attend a public charter school. Okla. Stat. tit. 70, § 3-140. Sarah was admitted to ICMS after being selected for admission pursuant to standards and procedures established by the OCSA. The

OCSA and the Charter Contract are intended to benefit students attending ICMS, like Sarah.

112.     The OCSA prohibits charter schools, including ICMS, from charging tuition or fees.  Okla. Stat. tit. 70, § 3-136(A)(10); *see also id*. at § 3-135(A)(9) (requiring contractual provision that charter schools must "be as equally free and open to all students as traditional public schools").  Therefore, students like Sarah are provided a free education at ICMS without tuition or fees.  Additionally, charter schools must be nonsectarian.  Okla. Stat. tit. 70, § 3-136(A)(2).

113.     The OCSA provides that charter schools are public schools within the public school system of Oklahoma. Okla. Stat. tit. 70, § 1-106; *see also* Charter Contract, Art. IV, 4.2 (stating that ICMS "shall be deemed a public school…").  Like other public schools, ICMS must comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.  *Id*., at 4.4.

114.     The OCSA provides that public funds be allocated to charter schools, including HICD, from funds otherwise allocated to the local school district in accordance with a statutorily-established formula.  Okla. Stat. tit. 70, §§ 3-142.  The allocation is non-discretionary.

115.     The OCSA, with limited exceptions not applicable here, prohibits discriminating against any student in admission on the basis of "ethnicity, national origin, gender, income level, disabling condition, proficiency in the English language, measures of achievement, aptitude, or athletic ability."  Okla. Stat. tit. 70, § 3-140(D).

116.     State law establishes standards regulating student assessment, proficiency, and promotion standards.  *See, e.g.*, Okla. Stat. tit. 70, § 11-103.6. State standards apply to HICD public charter schools, including ICMS.   Charter Contract, Art. V, 5.2 ("The School's educational program shall meet current Oklahoma Academic Standards, as set by state statutes or the Oklahoma State Department of Education.")  If HICD students fail to meet academic performance criteria established by the SBOE, Defendant HICD may lose the charter for ICMS.

117.     The SBOE issues a "School Report Card" for ICMS, as it does for all other Oklahoma public schools.

118.     The OCSA empowers HICD to discipline students, specifically mandating that it shall comply with student suspension requirements in Okla. Stat. tit. 70, § 24-101.3. Policies adopted by HICD governing student conduct must be consistent with the United States and Oklahoma Constitutions.

119.     The Charter Contract requires compliance with "all applicable provisions of local, state and federal law and regulation, specifically including but not limited to health and safety, civil rights… except to the extent such provisions are inapplicable to charter school…."  Charter Contract, Art. IV, 4.2; *see also* Okla. Stat. tit. 70, § 3-136(A)(1).  SB 615 is expressly applicable to charter schools, placing federal law in conflict with Oklahoma state law.

120.     OKCPS may terminate the Charter Contract during the term of the contract "for violations of the law."  Okla. Stat. tit. 70, § 3-137(C); OKCPS Policy I-22(12.1).  In addition, the Charter Contract, after process specified therein, provides for "[p]robation,

termination or nonrenewal" if OKCPS "has reason to believe [ICMS] has failed to meet or violated any provision of state or federal law." Charter Contract, Art. VII, 7.1.

121. OKCPS has entered into one or more lease agreements with Families for Excellence in Education, Inc. and/or HICD for operation of a charter school authorized by OKCPS, including but not limited to the real property used for the operation of ICMS. In 2021, the charter school lease agreement applicable to real property used for the operation of ICMS was "amended to reflect the change in name" replacing Families for Excellence in Education, Inc. with HICD as the tenant.

122. HICD is under the general direction and control of the SBOE and is financially dependent on OSDE support.

123. At all relevant times, HICD's conduct causing the deprivation of Sarah Stiles' federal rights is also fairly attributable to the State. The State's exercise of "coercive power" or "significant encouragement" of SB 615, the SBOE Emergency Rules, the OCSA and other state education laws, the Charter Contract, or any combination thereof, demonstrates a sufficiently close nexus between HICD and the State. In addition, the provision of a free, uniform public education has been the traditional and exclusive function of the State of Oklahoma. Defendant HICD is also pervasively entwined with OKCPS and/or OSDE.

124. For purposes of claims under 42 U.S.C. § 1983, Defendant HICD deprived Plaintiff Sarah Stiles of equal protection, and HICD has acted and continues to act under color of state law.

# CLAIMS FOR RELIEF

## COUNT I

### Denial of Equal Protection
### U.S. Const. Amend. XIV, pursuant to 42 U.S.C. § 1983

**(Against Defendants State Superintendent, Appointed Board Members and OAG, in their Official Capacities, as well as Defendants NPS, MPS, and HICD)**

125.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

126.    Plaintiffs bring this Count against Defendants State Superintendent Joy Hofmeister, the Appointed Board Members (Bradley, Monies, Hernandez, Bobek, Smith, and Lepak), and Attorney General O'Connor in their respective official capacities.

127.    Plaintiff Andy Bridge brings this Count against Defendant Noble Public Schools.  Plaintiff Mark Miles brings this Count against Defendant Moore Public Schools.  Plaintiff Sarah Stiles brings this Count against Defendants Harding Independent Charter District, Inc.

128.    Plaintiffs state this cause of action against all Defendants sued in this Count for purposes of seeking declaratory and injunctive relief and nominal damages (except that Plaintiffs do not seek damages from defendants sued in their official capacities), and challenge Defendants' respective policies under SB 615 of excluding students who are transgender from the multiple occupancy facilities at their schools that align with their gender, both facially and as applied to them.

129.    Each of the Defendants sued in this Count is a person acting under color of state law for purposes of 42 U.S.C. § 1983.

130. The Fourteenth Amendment to the U.S. Constitution, enforceable pursuant to 42 U.S.C. § 1983, provides that no state shall deny to any person within its jurisdiction the equal protection of the laws.

131. Defendants' exclusion of students who are transgender, including Plaintiffs, from the multiple occupancy facilities aligned with their gender treats students who are transgender differently from similarly-situated students who happen to be cisgender. Under Defendants' discriminatory policies, students who are cisgender are able to use multiple occupancy facilities consistent with their gender, but students who are transgender are banned from multiple occupancy facilities consistent with their gender.

132. **Discrimination based on Sex:** Under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, discrimination based on sex is presumptively unconstitutional and subject to heightened scrutiny.

a. Discrimination based on sex includes, but is not limited to, discrimination based on transgender status, gender nonconformity, sex stereotyping, gender expression, and gender transition.

b. Defendants' exclusion of Plaintiffs from multiple occupancy facilities that align with their gender discriminates against them on the basis of sex.

c. Defendants' respective policies discriminate against Plaintiffs based on their transgender status by treating them differently from similarly-situated students who happen to be cisgender.

d. Defendants' policy also discriminates against Plaintiffs based on gender nonconformity and sex stereotyping by treating them differently from other students based

on assumptions derived from Plaintiffs' sex assigned at birth and/or derived from Plaintiffs' genetics and/or physiology.

133. **Discrimination based on Transgender Status:** Under the Equal Protection Clause of the Fourteenth Amendment, discrimination based on transgender status is presumptively unconstitutional and subject to strict, or at least heightened, scrutiny.

a. People who are transgender have suffered a long history of extreme discrimination in Oklahoma and across the country and continue to suffer such discrimination to this day. This year alone, Oklahoma has passed three laws targeting people who are transgender. Across the country, more than 140 bills targeting transgender youth were introduced in 2022 alone and at least 30 laws targeting people who are transgender have been enacted by states in just the last two years. People who are transgender are a discrete and insular group and lack the political power to protect their rights through the legislative process. People who are transgender have largely been unable to secure explicit statutory protections against discrimination.

b. A person's gender identity or transgender status bears no relation to a person's ability to contribute to society.

c. Gender identity is generally fixed at an early age and highly resistant to change through intervention.

134. Defendants' discrimination against Plaintiffs is not narrowly tailored or substantially related to furthering any compelling or important government interest. Indeed, it is not even rationally related to any legitimate government interest. SB 615 and Defendants' respective policies do not promote the safety or privacy of students or any

other valid governmental interest.  They do, however, undermine the health, safety, and privacy of Plaintiffs, who are publicly marked as different and inferior each and every time they are denied access to facilities available to their peers who happen to be cisgender.

135.    SB 615 deprives Plaintiffs and students who are transgender like them of their rights to equal dignity, liberty, and autonomy by branding them as second-class citizens.  Defendants thus have denied and continue to deny Plaintiffs equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment.

136.    As a result, Plaintiffs have been irreparably harmed by Defendants' unlawful conduct, including their enforcement of SB 615 and their respective policies (including discipline policies), practices, and actions and are therefore entitled to declaratory and injunctive relief, as well as nominal damages as specified.

**COUNT II**

**Violation of Title IX**
**20 U.S.C. § 1681, *et seq.***

**(Against Defendants OSDE, NPS, MPS, HICD, and OKCPS)**

137.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 124 as though fully set forth herein.

138.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

139.     Plaintiffs bring this Count against Defendant Oklahoma State Department of Education, which is a recipient of Federal financial assistance and not immune "under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a [Title IX] violation." 42 U.S.C. § 2000d-7(a)(1).

140.     Plaintiff Andy Bridge brings this Count against Defendant Noble Public Schools. Plaintiff Mark Miles brings this Count against Defendant Moore Public Schools. Plaintiff Sarah Stiles brings this Count against Defendants Harding Independent Charter District, Inc. and Oklahoma City Public Schools.

141.     The LEA Defendants are recipients of Federal financial assistance.

142.     Under Title IX, discrimination "on the basis of sex" includes, but is not limited to, discrimination on the basis of sex stereotypes, gender identity, and transgender status. By definition, a person who is transgender is someone who lives and identifies with a sex different than the sex assigned to the person at birth.

143.     SB 615, the SBOE Emergency Rules, and each of the respective LEA Defendants' disciplinary policies, procedures, or practices discriminate against Plaintiffs and other Oklahoma public school and public charter school students who are transgender "on the basis of sex" by singling them out for different treatment from students who are cisgender, and by preventing Plaintiffs and other Oklahoma public school and public charter school students who are transgender from accessing the multiple occupancy facilities that align with their gender, in violation of their rights under Title IX.

144.     In addition, Title IX regulations, at § 106.31(b)(6), state in relevant part that "a recipient shall not … aid or perpetuate discrimination against any person by providing

significant assistance to any agency, organization, or person which discriminates on the basis of sex in providing any aid, benefit or service to students."

145.    Independent from the discriminatory treatment allegations above, Defendant Oklahoma State Department of Education also is aiding and perpetuating discrimination against all Plaintiffs in violation of Title IX, by providing significant assistance to the LEA Defendants, including through, *inter alia*, a substantial relationship between OSDE and each of the LEA Defendants; state aid (or reduction thereof), including aid contingent upon adherence to and enforcement of SB 615; and, education programs or activities by the LEA Defendants that relate so closely to OSDE that they fairly should be considered education programs or activities of OSDE itself.

146.    Defendant Oklahoma City Public Schools is aiding and perpetuating discrimination against Plaintiff Stiles in violation of Title IX, by providing significant assistance to Defendant HICD, including though, *inter alia*, financial support (e.g., state aid and other payments), the provision of tangible resources (e.g., facilities and equipment), intangible benefits (e.g., charter sponsorship and recognition), and a regular and long-term relationship with HICD.

147.    Plaintiffs are, and will continue to be, irreparably harmed by OSDE and the LEA Defendants' unlawful conduct, including their enforcement of SB 615 and their respective policies (including discipline policies), practices, actions, and/or significant assistance, all in violation of Title IX.  Plaintiffs therefore are entitled to declaratory and injunctive relief, as well as nominal damages as specified.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in each of their favor and against Defendants, as follows:

A. Enter a declaratory judgment against the Defendants sued in Count I of this Complaint finding that the provisions of and enforcement by Defendants of Okla. Stat. tit. 70, § 1-125, Okla. Admin. Code 210:35-3-186(h), and LEA Defendants' respective discipline policies as discussed above violate Plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution;

B. Enter a declaratory judgment against the Defendants sued in Count II of this Complaint finding that the provisions of and enforcement by Defendants of Okla. Stat. tit. 70, § 1-125, Okla. Admin. Code 210:35-3-186(h), and LEA Defendants' respective discipline policies as discussed above violate Plaintiffs' rights under Title IX;

C. Issue preliminary and permanent injunctive relief enjoining enforcement by all Defendants of Okla. Stat. tit. 70, § 1-125, Okla. Admin. Code 210:35-3-186(h), and any other law, custom, or policy (including LEA Defendants' respective discipline policies) that prohibit (i) Plaintiffs from using multiple occupancies restrooms and changing facilities located in public school and public charter school buildings that correspond with each Plaintiff's respective gender identity, rather than the gender assigned to them at birth; and (ii) any students, including those who are transgender, from using multiple occupancy facilities that are in accordance with their gender identity;

D. Issue preliminary and permanent injunctive relief requiring Defendants to permit (i) Plaintiffs to use multiple occupancies restrooms and changing facilities located in public

school and public charter school buildings that correspond with each Plaintiff's respective gender identity, notwithstanding the provisions of Okla. Stat. tit. 70, § 1-125, Okla. Admin. Code 210:35-3-186(h), or any other law, custom or policy (including LEA Defendants' respective discipline policies) that provide otherwise; and (ii) any students, including those who are transgender, from using multiple occupancy facilities that are in accordance with their gender identity, notwithstanding the provisions of Okla. Stat. tit. 70, § 1-125, Okla. Admin. Code 210:35-3-186(h), or any other law, custom or policy (including LEA Defendants' respective discipline policies) that provide otherwise;

E. Award each Plaintiff, by and through their next friends, against the Defendants Oklahoma State Department of Education, Noble Public Schools, Moore Public Schools, Harding Independent Charter District, Inc., and Oklahoma City Public Schools nominal damages in the amount of $1.00 for violation of each Plaintiff's rights under the Fourteenth Amendment to the U.S. Constitution and/or Title IX;

F. Award Plaintiffs their costs, expenses, and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws; and

G. Grant such other and further relief as the Court deems just and proper.

H. The declaratory and injunctive relief requested in this action is sought against each Defendant and their successors; against each Defendant's officers, board members, employees, and agents; and against all persons acting in active concert or participation with any Defendant or under any Defendant's supervision, direction, or control.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: September 6, 2022

Respectfully submitted,

*/s/ Megan Lambert*
Megan Lambert

Jon W. Davidson*
(admitted only in California)
Taylor Brown*
American Civil Liberties Union
Foundation
120 Broad Street, 18th Floor
New York, New York 10005-3919
Telephone: (323) 536-9880
Facsimile: (212) 809-0055
jondavidson@aclu.org
tbrown@aclu.org

Megan Lambert
Bar Number 33216
Johanna Roberts
Bar Number 33599
American Civil Liberties Union of
Oklahoma Foundation
PO Box 13327
Oklahoma City, OK 73113
Telephone: (405) 525-3831
Mlambert@acluok.org
Hroberts@acluok.org

Paul D. Castillo*
Nicholas Guillory*
Lambda Legal Defense and Education
Fund, Inc.
3500 Oak Lawn Ave., Ste. 500
Dallas, Texas 75219
Telephone: (214) 219-8585
Facsimile: (214) 481-9140
pcastillo@lambdalegal.org
nguillory@lambdalegal.org

Mitchell A. Kamin*
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
mkamin@cov.com

Isaac D. Chaput*
Covington & Burling LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: (415) 591-6000
ichaput@cov.com

*Attorneys for Plaintiffs*

*Motion for admission *pro hac vice* forthcoming