UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ANDREW BRIDGE, *et al.*,<br><div align="right">*Plaintiffs,*</div><br>v.<br><br>OKLAHOMA STATE DEPARTMENT OF<br>EDUCATION, *et al.*<br><div align="right">*Defendants.*</div> | No.  CIV-22-787-JD |

## STATE DEFENDANTS' MOTION TO DISMISS

Submitted by:

ZACH WEST, OBA #30768
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov

AUDREY WEAVER, OBA #33258
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Audrey.Weaver@oag.ok.gov

**COUNSEL FOR STATE DEFENDANTS**                    **October 26, 2022**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 2

ARGUMENT AND AUTHORITIES ........................................................................ 3

I.  STANDARD OF REVIEW ............................................................................... 3

II. PLAINTIFFS CANNOT STATE A PLAUSIBLE CAUSE OF ACTION FOR
    VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH
    AMENDMENT. ............................................................................................... 4

    A.  *Plaintiffs cannot establish that S.B. 615 intentionally discriminates
        based on transgender status.* ............................................................ 5

    B.  *S.B. 615 is substantially related to an important government
        interest.* ............................................................................................ 9

III. PLAINTIFFS CANNOT STATE A PLAUSIBLE CAUSE OF ACTION FOR
     VIOLATION OF TITLE IX ............................................................................ 17

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Cases:**

*Adams v. Sch. Bd. of St. Johns Cnty.*,
   3 F.4th 1299 (11th Cir. 2021), *reh'g en banc granted*, 9 F.4th 1369 (11th Cir. 2021) .............25

*Ashaheed v. Currington*,
   7 F.4th 1236 (10th Cir. 2021) ...............................................................................11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..............................................................................................3

*Ballard v. United States*,
   329 U.S. 187 (1946)............................................................................................10

*Barney v. Pulsipher*,
   143 F.3d 1299 (10th Cir. 1998)..............................................................................4

*Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*,
   536 U.S. 822 (2002)............................................................................................13

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007).............................................................................................3

*Bostock v. Clayton Cnty., Georgia*,
   140 S. Ct. 1731 (2020)...................................................................................*passim*

*Brannum v. Overton Cty. Sch. Bd.*,
   516 F.3d 489 (6th Cir. 2008)................................................................................23

*Cannon v. Univ. of Chi.*,
   441 U.S. 677 (1979)............................................................................................24

*Cape v. Tennessee Secondary Sch. Athletic Ass'n*,
   563 F.2d 793 (6th Cir. 1977), *abrogated in part on different grounds in Brentwood Acad. v.
   Tennessee Secondary Sch. Athletic Ass'n*, 190 F.3d 705 (6th Cir. 1999) ........................8

*Carcaño v. McCrory*,
   203 F. Supp. 3d 615 (M.D.N.C. 2016) ...................................................................11

*Cardoza-Fonseca v. INS*,
   480 U.S. 421 (1987)............................................................................................19

*Caskey Baking Co. v. Virginia*,
   313 U.S. 117 (1941)..............................................................................................9

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
   473 U.S. 432 (1985)........................................................................................4, 5

*Doe v. Luzerne Cty.,*
   660 F.3d 169 (3d Cir. 2011) .....................................................................23

*Etsitty v. Utah Transit Auth.,*
   502 F.3d 1215 (10th Cir. 2007), *overruled in part on different grounds in*
   *Tudor v. Se. Oklahoma State Univ.,* 13 F.4th 1019 (10th Cir. 2021) ............................ 12, 13, 24

*F.S. Royster Guano Co. v. Virginia,*
   253 U.S. 412 (1920) ...................................................................................9

*Frontiero v. Richardson,*
   411 U.S. 677 (1973)..................................................................................10

*Grimm v. Gloucester Cnty. Sch. Bd.,*
   972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020)................................ 21, 25

*Jackson v. Birmingham Bd. of Educ.,*
   544 U.S. 167 (2005)..................................................................................17

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.,*
   97 F. Supp. 3d 657 (W.D. Pa. 2015) .......................................................... 11, 12, 13

*Lee v. Downs,*
   641 F.2d 1117 (4th Cir. 1981).................................................................. 23, 24

*Meriwether v. Hartop,*
   992 F.3d 492 (6th Cir. 2021)......................................................................24

*Michael M. v. Superior Ct. of Sonoma Cnty.,*
   450 U.S. 464 (1981)..................................................................8, 10, 11, 12

*N. Haven Bd. of Educ. v. Bell,*
   456 U.S. 512 (1982)..................................................................................24

*Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.,*
   522 U.S. 479 (1998)..................................................................................19

*Neitzke v. Williams,*
   490 U.S. 319 (1989)................................................................................3, 4

*Nordlinger v. Hahn,*
   505 U.S. 1 (1992) ....................................................................................4, 7

*Pelcha v. MW Bancorp, Inc.*,
    988 F.3d 318 (6th Cir. 2021) ............................................................................... 24

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ............................................................................................ 12

*Romer v. Evans*,
    517 U.S. 620 (1996) .............................................................................................. 9

*Safford Unified Sch. Dist. No. 1 v. Redding*,
    557 U.S. 364 (2009) ............................................................................................ 14

*Sandifer v. United States Steel Corp.*,
    571 U.S. 220 (2014) ............................................................................................ 20

*SECSYS, LLC v. Vigil*,
    666 F.3d 678 (10th Cir. 2012) ..................................................................... 4, 5, 9

*Sepulveda v. Ramirez*,
    967 F.2d 1413 (9th Cir. 1992) ........................................................................... 23

*Sommers v. Budget Mktg., Inc.*,
    667 F.2d 748 (8th Cir. 1982) ............................................................................. 24

*Taylor v. Roswell Indep. Sch. Dist.*,
    713 F.3d 25 (10th Cir. 2013) ............................................................................... 4

*Teigen v. Renfrow*,
    511 F.3d 1072 (10th Cir. 2007) ........................................................................... 4

*Tonkovich v. Kan. Bd. of Regents*,
    159 F.3d 504 (10th Cir. 1998) ............................................................................. 5

*Tuan Anh Nguyen v. I.N.S.*,
    533 U.S. 53 (2001) ....................................................................................... 10, 11

*Tudor v. Se. Oklahoma State Univ.*,
    13 F.4th 1019 (10th Cir. 2021) ....................................................................... 6, 12

*Ulane v. E. Airlines, Inc.*,
    742 F.2d 1081 (7th Cir. 1984) ........................................................................ 8, 21

*United States v. Virginia*,
    518 U.S. 515 (1996) .................................................................................... *passim*

*Wengler v. Druggists Mut. Ins. Co.*,
    446 U.S. 142 (1980) ............................................................................................ 11

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*,
   858 F.3d 1034 (7th Cir. 2017)...........................................................................24, 25

*Wyoming v. United States*,
   279 F.3d 1214 (10th Cir. 2002)...............................................................................4

**Statutes:**

Okla. Stat. tit. 70, § 1-125...............................................................................1, 2, 3

18 U.S.C. § 249......................................................................................................19

20 U.S.C. § 1092...................................................................................................19

20 U.S.C. § 1681.......................................................................................17, 20, 24

20 U.S.C. § 1686...................................................................................................18

34 U.S.C. § 30503.................................................................................................19

42 U.S.C. § 13925.................................................................................................19

42 U.S.C. § 2000e-2..............................................................................................24

**Rules:**

Fed. R. Civ. P. 12................................................................................................2, 3

**Regulations**:

34 C.F.R. § 106.33.....................................................................................17, 18, 23

34 C.F.R. § 106.37................................................................................................17

34 C.F.R. § 106.41................................................................................................17

**Legislative Materials:**

S.B. 615, 2022 O.S.L. 323.......................................................................................2

39 Fed. Reg. 22,227 (June 20, 1974).....................................................................22

39 Fed. Reg. 22,230 (June 20, 1974).....................................................................22

40 Fed. Reg. 24,127 (June 4, 1975).......................................................................22

40 Fed. Reg. 24,141 (June 4, 1975).......................................................................22

117 Cong. Rec. 30399 (1971) ......................................................................23

117 Cong. Rec. 30406 (1971) ......................................................................23

117 Cong. Rec. 39260 (1971) ......................................................................22

117 Cong. Rec. 39263 (1971) ......................................................................22

118 Cong. Rec. 5803 (1972) ........................................................................23

118 Cong. Rec. 5807 (1972) ........................................................................23

H.R. Conf. Rep. No. 92-1085 ......................................................................22

**Secondary Authorities:**

Callie Marie Rennison, Ph.D., *Rape and Sexual Assault: Reporting to Police and Medical Attention, 1992-2000*, U.S. Dep't of Justice (Aug. 2002) ........................................16

Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019) ................................. 14, 15

Joan Biskupic, *Ginsburg: Court Needs Another Woman*, USA Today (May 5, 2009) ...................14

Laura Wainman & Nicole DiAntoniao, *Teen boy sexually assaulted classmate in a school bathroom, judge says*, WUSA 9 (Oct. 26, 2021) ..............................................16

Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41 (1997) ...................................... 22, 23

Rochelle F. Hanson, et al., *Factors related to the reporting of childhood rape*, 23 Child Abuse and Neglect 559–569 (1999) ..............................................................16

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post (Apr. 7, 1975) ............................................................................................14

Ryan T. Anderson, Ph.D, and Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do,* The Heritage Foundation Backgrounder (Mar. 23, 2017) ...............................................22

*Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013) ..................................................................16

**Dictionaries:**

Merriam-Webster's Collegiate Dictionary 1140 (11th ed. 2011) .......................... 21, 22

The American College Dictionary 1109 (1970) ...........................................................21

The American Heritage Dictionary 1187 (1976) ........................................................21

The American Heritage Dictionary of the English Language 1187 (1980) .............................21

The American Heritage Dictionary 1605 (5th ed. 2011) ......................................... 21, 22

The Oxford English Dictionary 578 (1961) ...............................................................21

The Random House College Dictionary 1206 (rev. ed. 1973) ....................................21

The Random House College Dictionary 1206 (rev. ed. 1980) ....................................21

Webster's New Collegiate Dictionary 1054 (1979) ......................................................21

Webster's New World College Dictionary 1331 (5th ed. 2014) ..................................21

## INTRODUCTION

Biological sex is not a meaningless label. Real physiological differences between men and women exist, and they are enduring and immutable. These differences give rise to privacy interests in places where persons routinely disrobe, either partially or completely, such as restrooms and changing areas. Accordingly, our laws and courts have long permitted, with little fanfare, separating those places of heightened privacy into male and female spaces.

Until very recently, it was also undisputed that the word "sex" (and even "gender") meant *biological* sex. Plaintiffs' legal theories seek to turn this well-established precedent and history upside-down and supplant, entirely, objective sex with subjective gender identity. Plaintiffs apparently regard the real physiological differences between males and females as gender stereotypes, and they claim that laws (like Oklahoma's) that designate intimate spaces based on those real physiological differences between males and females are invidious discrimination in violation of the U.S. Constitution. Although Plaintiffs couch their claims as protecting transgender individuals, they really seek to prohibit Oklahoma from recognizing biological sex altogether. The Constitution in no way requires this radical policy preference.

The Oklahoma law Plaintiffs challenge, Senate Bill 615, simply and permissibly requires students to use the multiple occupancy restroom or changing area corresponding with their sex, as determined by objective physiological factors and as identified on the individual's original birth certificate. *See* OKLA. STAT. tit. 70, § 1-125. The statute also provides an accommodation: Students may opt-out and use a single-occupancy restroom or changing room, which must be provided. While S.B. 615 does *separate* based on biological sex, it does so in a way long recognized as permissible, and it otherwise treats all students the exact same

1

regardless of transgender status or gender identity. All students may either use the restroom or changing area corresponding with their biological sex or may use a single-occupancy restroom accommodation.

Because S.B. 615 treats all similarly situated individuals the same, Plaintiffs cannot establish intentional discrimination in violation of the Equal Protection Clause. And even if they could, the law withstands intermediate scrutiny because its separation of the two sexes substantially relates to well-recognized, important government interests: protecting privacy and safety in intimate spaces. Plaintiffs' Equal Protection claims fail as a matter of law.

Plaintiffs' Title IX claim likewise cannot succeed as a matter of law. Title IX expressly allows schools to separate living spaces, restrooms, and similar facilities on the basis of sex. And Plaintiffs' argument that "sex" refers only to subjective gender identity is squarely foreclosed by Title IX's text, statutory context, legislative history, and original meaning.

Plaintiffs' far-sweeping legal claims and theories have no basis in law or precedent. Accordingly, no set of facts could establish a plausible claim for relief, and dismissal under Fed. R. Civ. P. 12(b)(6) is proper.

## **BACKGROUND**

On May 25, 2022, Senate Bill 615 was signed into law and codified as OKLA. STAT. tit. 70, § 1-125 ("S.B. 615"), after passing in the Oklahoma House and Senate with overwhelming support. *See* S.B. 615, 2022 O.S.L. 323.[1] "To ensure privacy and safety" in areas "where individuals may be in various stages of undress in the presence of other individuals[,]" S.B. 615 requires every public school and charter school serving students in pre-kindergarten

---

[1] Available at http://www.oklegislature.gov/BillInfo.aspx?Bill=SB615&Session=2200.

through twelfth grades to designate "every multiple occupancy restroom or changing area" "[f]or the exclusive use of the male sex; or . . . [f]or the exclusive use of the female sex." OKLA. STAT. tit. 70, § 1-125(B). S.B. 615 defines "sex" as "the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate . . . ." *Id.* at 1-125(A). Schools are also required to "provide a reasonable accommodation to any individual who does not wish to comply with the" law, the accommodation being defined as "access to a single-occupancy restroom or changing room." *Id.* at 1-125(C).

## ARGUMENT AND AUTHORITIES

### I.   STANDARD OF REVIEW

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also* Fed. R. Civ. P. 12(b)(6). While the Court must view a complaint in a light most favorable to the nonmoving party, courts need not accept as true "labels and conclusions," legal characterizations, unwarranted deductions of fact, or "naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678-679 (citation omitted).

When a complaint presents a question of law and "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations," the complaint "must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) (citation omitted). Rule 12(b)(6) "authorizes a court to dismiss a claim on the basis of

a dispositive issue of law . . . ." *Id.* at 326; *see also Wyoming v. United States*, 279 F.3d 1214, 1222 (10th Cir. 2002).

## II.   PLAINTIFFS CANNOT STATE A PLAUSIBLE CAUSE OF ACTION FOR VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT.

The Equal Protection Clause of the Fourteenth Amendment generally directs that "all persons similarly situated should be treated alike[,]" but it "doesn't guarantee equal results for all, or suggest that the law may never draw distinctions between persons in meaningfully dissimilar situations." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *SECSYS, LLC v. Vigil*, 666 F.3d 678, 684 (10th Cir. 2012). "The Equal Protection Clause does not forbid classifications," nor does it create substantive rights. *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 54 (10th Cir. 2013) (citation omitted); *see also Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007). Instead, it "keeps governmental decision makers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992).

To state a plausible claim under the Equal Protection Clause, a plaintiff must first establish "the challenged state action intentionally discriminates between groups of persons." *SECSYS*, 666 F.3d at 685; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) (a plaintiff "must first make a threshold showing that [she was] treated differently from others who were similarly situated to [her]"). Once a plaintiff overcomes this threshold burden, he or she must establish the state's intentional discrimination is not "justified by reference to some upright government purpose." *SECSYS*, 666 F.3d at 686. Here, courts presume the relevant legislation is "valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex.*, 473 U.S. at 440. Only when a plaintiff

4

establishes the intentional discrimination targets a fundamental right or a suspect classification does a heightened standard of review apply. *Id.*; *see also Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532 (10th Cir. 1998).

### A. *Plaintiffs cannot establish that S.B. 615 intentionally discriminates based on transgender status.*

A plaintiff bringing an Equal Protection Clause claim bears the burden of first establishing the challenged law intentionally discriminates between similarly situated groups of individuals. *See SECSYS*, 666 F.3d at 685. "[W]hen the law under review is generally applicable to all persons, no presumption of intentional discrimination arises; proof is required." *Id.* After all, "many laws, perhaps most and often unavoidably, affect some groups of persons differently than others . . . ." *Id.*

Here, S.B. 615 separates multiple occupancy restroom facilities based on biological sex but does not otherwise account for or distinguish students based on gender identity, transgender status, or any other characteristic of any kind. To respect the safety and privacy of all students in areas where they may be partially undressed, S.B. 615 simply requires all students to use the restroom or changing facilities that correspond with their biological sex. Although S.B. 615 does separate restroom facilities by biological sex, it treats every *similarly situated* individual the same. It requires all biological males to use the boy's restroom (or a single-occupancy accommodation restroom). Conversely, all biological boys are excluded from using the girl's restroom, and thus all male classmates are treated the exact same regardless of their gender identity. The law likewise requires all biological females to use the girl's restroom (or a single-occupancy accommodation restroom). All biological girls are excluded from using the men's restroom, and thus all female classmates are treated the exact

5

same regardless of their gender identity. This separation based on biological sex requires no knowledge or awareness of gender identity, and as a result, necessarily does not discriminate based on transgender status or gender identity.

Plaintiffs cannot escape the fact that transgender status or gender identity are not at issue by conflating subjective gender identity with sex—treating the two as entirely interchangeable. Such an argument is foreclosed by U.S. Supreme Court and Tenth Circuit authorities indicating that transgender status cannot exist separate and apart from biological sex. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1743 (2020) ("For an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex."); *see also Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019, 1028 (10th Cir. 2021) ("In the wake of *Bostock*, it is now clear that transgender discrimination, like that complained of by Dr. Tudor, is discrimination 'because of sex' prohibited under Title VII.").

Put differently, *Bostock* taught that these adverse employment actions against transgender individuals in the Title VII context are cognizable because they are based on stereotypes about biological sex, which is sex-based discrimination. This holding is logically *impossible* if biological sex does not exist apart from gender identity. Indeed, the *Bostock* opinion was built on the foundational fact that "sex" at a baseline refers "to biological distinctions between male and female." *Bostock*, 140 S. Ct. at 1739. Only by recognizing that "homosexuality and transgender status **are distinct concepts from sex**[,]" could the Court find that the adverse employment action at issue there was discrimination *because of* sex in the Title VII context. *Id.* at 1746 (emphasis added).

To give an example, discrimination against a transgender female for wearing a dress at work is only sex discrimination because the transgender female is a biological male, and the stereotype at issue is (presumably) that a male cannot wear a dress to work. There is no sex stereotype State Defendants are aware of that says a female cannot wear a dress to work, and the entire theory of stereotypes in *Bostock* relies on the view that biological sex is immutable regardless of gender identity. *See, e.g., id.* at 1749 ("Employer hires based on sexual stereotypes? Simple test. Employer sets pension contributions based on sex? Simple test. Employer fires men who do not behave in a sufficiently masculine way around the office? Simple test."). If biological sex doesn't exist, then nothing is simple in this area.

That is almost certainly why *Bostock* stressed it did "not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753. Not only are there many textual differences between Title VII and laws like Title IX, *see infra* Section III, but adverse employment actions are vastly different from laws permissibly taking into account real physiological differences between the two sexes. Laws separating bathrooms, locker rooms, and similar facilities based on biological sex serve a compelling interest of protecting privacy interests in places where individuals may partially or completely undress. *See infra* Section II(B); *cf. Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."). Such privacy interests were not implicated in *Bostock*.

Plaintiffs simply assume that sex equates to gender identity or transgender status without engaging with this fundamental distinction found in binding case law. Put another way, Plaintiffs' claims hinge on setting aside a key presupposition of *Bostock* by denying the

existence of objective biological sex. That is why their complaint spends so little time discussing the actual distinction being made here (male/female sex) and instead focuses on impacts to Plaintiffs where no classification or discrimination occurs (transgender status). *See, e.g.,* Doc. 1 at ¶¶ 131-133. Their claim fails as a matter of law unless this Court sets aside precedent and conflates objective biological sex with subjective gender identity. *Contra United States v. Virginia*, 518 U.S. 515, 533 (1996); *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981) (recognizing immutable physiological differences between the *two* sexes).

As many authorities have found, conflating sex with subjective gender identity would wreak havoc in the context of laws separating the two sexes based on real and significant physical differences. In the context of sex-based classifications in athletic activities, for example, the Sixth Circuit highlighted:

> it must be apparent that its basis is the distinct differences in physical characteristics and capabilities between the sexes . . . . It takes little imagination to realize that were play and competition not separated by sex, the great bulk of the females would quickly be eliminated from participation and denied any meaningful opportunity for athletic involvement.

*Cape v. Tennessee Secondary Sch. Athletic Ass'n*, 563 F.2d 793, 795 (6th Cir. 1977), *abrogated in part on different grounds in Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 190 F.3d 705, 706 (6th Cir. 1999). Other courts have likewise noted the distinction between discrimination based on sex and gender identity. *See, e.g., Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("[A] prohibition against discrimination based on an individual's sex is not synonymous with a prohibition against discrimination based on an individual's sexual identity disorder or discontent with the sex into which they were born.").

8

To the extent this separation based on biological sex, with equal treatment regardless of gender identity, disproportionately affects certain individuals, that alone is insufficient to establish intentional or purposeful discrimination. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012). *Id.*[2] Consequently, Plaintiffs have not and cannot demonstrate S.B. 615 intentionally discriminates or treats similarly situated individuals differently. On this basis alone, Plaintiffs' Equal Protection claims should be dismissed.

### B.    S.B. 615 is substantially related to an important government interest.

The mere fact S.B. 615 separates multiple occupancy restroom facilities based on biological sex does not establish the law intentionally or invidiously discriminates in violation of the Equal Protection Clause. After all, not all classifications based on sex are constitutionally impermissible. *See, e.g., Caskey Baking Co. v. Virginia*, 313 U.S. 117, 121 (1941) ("Classification is not discrimination."); *United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Sex classifications may be used to compensate women for particular economic disabilities [they have] suffered, to promot[e] equal employment opportunity, to advance full development of the talent and capacities of our Nation's people." (citations omitted)); *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920) ("[T]he 'equal protection of the laws' required by the Fourteenth Amendment does not prevent the states from resorting to classification for the purposes of legislation. Numerous and familiar decisions of this court establish that they have a wide range of discretion in that regard.").

---

[2] Nor can this Court infer improper motive from the fact that S.B. 615 may negatively impact some transgender individuals. *See Romer v. Evans*, 517 U.S. 620, 631 (1996) ("[M]ost legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.").

9

The invidious nature of some statutory classifications based on sex does not render sex classifications altogether disposable. The Equal Protection Clause does not aim to eliminate "dispositive realities" of sex, only assumptions, stereotypes, and over-broad generalizations about the tendencies or preferences of men or women. *Virginia*, 518 U.S. at 549-50; *see also Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 469 (1981) ("Underlying these decisions is the principle that a legislature may not 'make overbroad generalizations based on sex which are entirely unrelated to any differences between men and women or which demean the ability or social status of the affected class.'" (citation omitted)). Indeed, in *Virginia* the U.S. Supreme Court emphasized that "'[i]nherent differences' between men and women, we have come to appreciate, **remain cause for celebration** . . . ." *Virginia*, 518 U.S. at 533 (emphasis added).

The Supreme Court has long recognized that "sex, like race and national origin, is an immutable characteristic." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). "Physical differences between men and women . . . are enduring: '[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" *Virginia*, 518 U.S. at 533 (citing *Ballard v. United States*, 329 U.S. 187, 193 (1946)). As a result, the Supreme Court has explained: "[t]o fail to acknowledge even our most basic biological differences—such as the fact that a mother must be present at birth but the father need not be—risks making the guarantee of equal protection superficial, and so disserving it." *Tuan Anh Nguyen v. I.N.S.*, 533 U.S. 53, 73 (2001). In other words, the distinction between men and women is a real one, and "the principle of equal protection does not forbid Congress to address" problems in a way specific to each sex. *Id.*

Accordingly, the Supreme Court has declined to adopt strict scrutiny to evaluate sex classifications and has not hesitated to uphold sex classifications "used to compensate women 'for particular economic disabilities [they have] suffered,' . . . to 'promot[e] equal employment opportunity,' . . . to advance full development of the talent and capacities of our Nation's people." *Id.* (internal citations omitted); *see also Michael M.*, 450 U.S. at 469 ("[T]his Court has consistently upheld statutes where the gender classification is not invidious, but rather realistically reflects the fact that the sexes are not similarly situated in certain circumstances.").

In other words, sex-based classifications are subject, at most, to intermediate scrutiny. Under this standard, a law or government action must be upheld if it "serve[s] important governmental objectives and . . . the discriminatory means employed must be substantially related to the achievement of those objectives." *Wengler v. Druggists Mut. Ins. Co.*, 446 U.S. 142, 150 (1980); *see also Virginia*, 518 U.S. at 531 ("Parties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action."). Under intermediate scrutiny, unlike strict scrutiny, the state need not prove the law "is narrowly tailored to achieve a compelling state interest . . . ."*Ashaheed v. Currington*, 7 F.4th 1236, 1251 (10th Cir. 2021) (citation omitted).

Here, S.B. 615 withstands intermediate scrutiny, as requiring students to use the restroom and locker room associated with their biological sex is substantially related to a sufficiently important government interest: protecting the privacy of students to disrobe and shower outside of the presence of the opposite sex. This compelling government interest has been repeatedly upheld and recognized by courts. *See, e.g.*, *Carcaño v. McCrory*, 203 F. Supp. 3d 615, 641 (M.D.N.C. 2016) (collecting cases); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher*

11

*Educ.*, 97 F. Supp. 3d 657, 669-670 (W.D. Pa. 2015); *Michael M. v. Superior Ct. of Sonoma Cnty.*, 450 U.S. 464, 478 (1981) (Stewart, J., concurring) ("[W]e have recognized that in certain narrow circumstances men and women are not similarly situated; in these circumstances a gender classification based on clear differences between the sexes is not invidious, and a legislative classification realistically based upon those differences is not unconstitutional.").

Importantly, the Tenth Circuit has held that requiring "employees use restrooms matching their biological sex does not expose biological males to disadvantageous terms and does not discriminate against employees who fail to conform to gender stereotypes . . . ." *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1225 (10th Cir. 2007). To be sure, the Tenth Circuit overruled much of *Etsitty* in *Tudor v. Se. Oklahoma State Univ.*, 13 F.4th 1019 (10th Cir. 2021)*,* but it only did so "to the extent that [*Etsitty*] conflicts with *Bostock*." *Id.* at 1028. And the *Bostock* majority expressly stated that "we do not purport to address bathrooms, locker rooms, or anything else of the kind." *Bostock*, 140 S. Ct. at 1753. Thus, this specific portion of *Etsitty* is still good law, as it does not conflict with *Bostock*. Moreover, as one court succinctly explained in a similar case: "separating students by sex based on biological considerations—which involves the physical differences between men and women—for restroom and locker room use simply does not violate the Equal Protection Clause." *Johnston*, 97 F. Supp. 3d at 670.

These authorities confirm that the physiological differences between the two sexes are real and not rooted in stereotypical assumptions. *Cf. Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (addressing invidious sex stereotyping in the context of Title VII). These biological differences give rise to legitimate privacy interests justifying the exclusion of the opposite sex from certain facilities like restrooms. *See Etsitty*, 502 F.3d at 1224 ("However far *Price Waterhouse*

12

reaches, this court cannot conclude it requires employers to allow biological males to use women's restrooms. Use of a restroom designated for the opposite sex does not constitute a mere failure to conform to sex stereotypes."). A law acknowledging these interests is likewise not rooted in stereotypical assumptions, nor hypothesized or pretextual justifications. *Cf. Virginia*, 518 U.S. at 533 (requiring that a justification be "genuine, not hypothesized or invented *post hoc* in response to litigation").

The fact that transgender individuals may be affected by the exclusion of the opposite sex in facilities like restrooms, or may not prefer that policy choice, is insufficient to render the choice unconstitutional under the Equal Protection Clause. In a similar equal protection challenge in the Western District of Pennsylvania, the court explained:

> [r]egardless of how gender and gender identity are defined, the law recognizes certain distinctions between male and female on the basis of birth sex. Thus, even though Plaintiff is a transgender male, his sex is female, a fact alleged in Plaintiff's complaint and a fact that has legal significance in light of Plaintiff's discrimination claim.

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 671 (W.D. Pa. 2015).

By continuing the long-standing practice of separating multiple occupancy restrooms and similar facilities based on biological sex, S.B. 615 furthers the important state interest of protecting students' safety and privacy rights. As Plaintiffs recognize, school attendance is compelled by law. *See* Doc. 1 at ¶ 59. The State is entrusted to provide *all* students with a safe and healthy learning environment in public schools. *See Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls*, 536 U.S. 822, 830 (2002) (describing "in a public school environment[,] ... the State is responsible for maintaining discipline, health, and safety."). This includes a responsibility to its students to ensure their privacy while engaging in personal

bathroom functions, disrobing, dressing, and showering outside of the presence of members of the opposite sex. This interest involves not just the State, but also the parents and the students who share similar interests. And these interests are particularly compelling in a school environment where children are still developing, physically and emotionally. *See*, e.g., *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009) ("[A]dolescent vulnerability intensifies the patent intrusiveness of the exposure.").

Although these interests extend to both sexes, women are likely the predominant beneficiary and would suffer particular harm under Plaintiffs' Equal Protection theory. As Justice Ginsburg informally observed in an incident involving a school official strip-search of a teenage girl: "Maybe a 13-year-old boy in a locker room doesn't have that same feeling about his body. But a girl who's just the age where she is developing, whether she has developed a lot ... or ... has not developed at all (might be) embarrassed about that." Joan Biskupic, *Ginsburg: Court Needs Another Woman*, USA Today (May 5, 2009).[3] As a result, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, in some situations required, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post at A21 (Apr. 7, 1975).

If biological males can have unrestricted access to female-only restrooms, changing areas, locker-rooms, dormitories, and showers, based solely on how they identify or claim to identify, female students would suffer mental, emotional, and developmental harm. "[L]eaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing

---

[3]   Available   at   https://usatoday30.usatoday.com/news/washington/judicial/2009-05-05-ruthginsburg_N.htm.

they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist."  Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019). And the loss of that private space will fall most heavily on "those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers."  *Id.*

Plaintiffs attempt to downplay this interest by claiming that "[s]tudents who are transgender pose no risks to the privacy or safety of others students . . . ." Doc. 1 at ¶ 52. But Plaintiffs misunderstand that the mere presence of a member of the opposite sex in a restroom or changing area is a violation of privacy, regardless of whether any incident occurs. And Plaintiffs' assurances that *they* pose no safety risk to others does not moot the legitimate safety interest justifying separate facilities. Moreover, Plaintiffs do not explain in any way how a school is supposed to distinguish between a person identifying in good faith as transgender and a person merely claiming a different identity to access otherwise off-limits facilities and potentially prey on the vulnerable. There is no apparent way to discern this objectively; rather, schools are apparently, under this theory, supposed to take people's word for it.  That is entirely insufficient when it comes to the responsibility schools have to protect the privacy and safety of their students.

Laws and policies like S.B. 615 have long provided sex-separated restrooms, locker rooms, and dormitories as a means to protect *all* individuals in their most vulnerable moments and when partially or completely undressed. What makes facilities like restrooms private also makes them susceptible to abuse by bad actors. The examples of abuse and assault, attempted

or actual, occurring in restrooms and similar facilities are not hypothetical. Take, for example, the 2013 assault of an eight-year-old Oklahoma girl who was locked inside a restroom by "a mostly naked man" who "got between her and the door[,] … wrapped a … coat around her neck[,] and began choking her." *Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013).[4] Or last year's nationally recognized story of a "15-year-old [Virginia] boy" who "sexually assault[ed] a female classmate in a school bathroom . . . ." Laura Wainman & Nicole DiAntoniao, *Teen boy sexually assaulted classmate in a school bathroom, judge says*, WUSA 9 (Oct. 26, 2021).[5] Neither the State nor Oklahoma women need wait for further assaults to materialize before adopting laws and policies that substantially relate to this compelling safety interest.[6]

What these incidents have in common is a male perpetrator exploiting a bathroom's privacy to prey on vulnerable female victims. Plainly, these safety interests are not pretextual; and laws that exclude the opposite sex from restrooms and similar facilities are substantially related to this compelling interest. To be clear: the argument is not that transgender individuals are more likely to be bad actors, but that others could exploit the seemingly standardless concept of "gender identity" in order to gain access to vulnerable persons.

---

[4] Available at https://kfor.com/news/police-okc-homeless-man-attacks-8-year-old-girl-in-bathroom/.

[5] Available at https://www.wusa9.com/article/news/legal/teen-found-guilty-loudoun-county-bathroom-sexual-assault/65-e383c241-afd1-4539-8fa3-4ccb01562ea9.

[6] These safety interests are again heightened by the fact S.B. 615 applies in a school environment where children are still developing. Studies show that sexual assault remains one of the most underreported crimes, particularly in child victims with only 12% of child sexual abuse being reported to authorities. *See* Rochelle F. Hanson, et al., *Factors related to the reporting of childhood rape*, 23 Child Abuse and Neglect 559–569 (1999); *see also* Callie Marie Rennison, Ph.D., *Rape and Sexual Assault: Reporting to Police and Medical Attention, 1992-2000*, U.S. Dep't of Justice (Aug. 2002) available at https://bjs.ojp.gov/content/pub/pdf/rsarp00.pdf.

Accordingly, there is not only a rational basis, but a substantially related basis for the State to require students to use the multiple occupancy restroom and changing room associated with their biological sex (or a single-occupancy accommodation).

## III. PLAINTIFFS CANNOT STATE A PLAUSIBLE CAUSE OF ACTION FOR VIOLATION OF TITLE IX.

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Notwithstanding this broad pronouncement, Title IX then clarifies that "nothing contained herein shall be construed to prohibit any educational institution receiving funds under this Act, *from maintaining separate living facilities for the different sexes*." *Id.* § 1686 (emphasis added). As the U.S. Supreme Court summarized: "Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005).

The narrow exceptions continue in regulations promulgated decades ago that, among other things,[7] expressly allow schools to provide "separate toilet, locker room, and shower facilities on the basis of sex," so long as the facilities "provided for students of one sex shall be comparable to such facilities provided for students of the other sex," 34 C.F.R. § 106.33 (May 9, 1980).

---

[7] Title IX regulations also allow covered programs to "operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport," 34 C.F.R. § 106.41(b), and even *requires* universities to consider sex in allocating athletic scholarships, *id.* at § 106.37(c).

In 2021, the federal government attempted to adopt a new interpretation of 34 C.F.R. § 106.33 to include concepts such as gender identity. In a challenge brought by the State of Oklahoma and others, the U.S. District Court for the Eastern District of Tennessee enjoined the federal government from implementing its interpretation. *See Tennessee v. U.S. Dep't of Ed.*, E.D. Tenn. Case No. 3:21-cv-308, Doc. 86 (July 15, 2022). The court explained that the federal government's new interpretation improperly "create[d] rights for students and obligations for regulated entities not to discriminate based on sexual orientation or gender identity that appear nowhere in *Bostock*, Title IX, or its implementing regulations." *Id.* at 41.

By suggesting that this Court can simply read "gender identity" into Title IX and its regulations, Plaintiffs seek to have this Court promulgate by fiat a federal regulatory change, without the federal government present, that another Court has already rejected with both Oklahoma and the federal government as parties.

Because S.B. 615 separates restroom facilities on the basis of biological sex, Plaintiffs' Title IX claims can only succeed if the term "sex" in Title IX eschews biological sex and instead means only subjective gender identity. *Cf.* Doc. 1 at ¶ 24 ("Therefore, someone's sex or gender is properly understood to be the same as their gender identity."). Such an interpretation is foreclosed by the plain text and original understanding of Title IX.

Out of the gate, Plaintiffs' Title IX claim face a significant textual hurdle: the congressional decision to use the term "sex" and not "gender identity[,]" as Plaintiffs apparently prefer. To avoid this hurdle, Plaintiffs attempt to rewrite the plain and ordinary understanding of "sex" as one and the same as "gender identity," suggesting that "someone's

sex or gender is properly understood to be the same as their gender identity." Doc. 1 at ¶ 24. Plaintiffs' interpretation of "sex" as "gender identity" finds no textual support in Title IX.

When Congress wants to protect against gender-identity discrimination, it does so explicitly. *See* 18 U.S.C. § 249(a)(2) (defining hate crimes as causing willful bodily injury to another on the basis of "actual or perceived . . . gender, sexual orientation, [or] gender identity . . . ."); 20 U.S.C. § 1092(f)(1)(F)(ii) (requiring the collection of data related to hate crimes "because of the actual or perceived . . gender, . . . sexual orientation, [or] gender identity . . . ."); 34 U.S.C. § 30503(a)(1)(C) (providing financial assistance in the investigation or prosecution of any crime motivated by "actual or perceived . . . gender, sexual orientation, [or] gender identity . . . ."). The Violence Against Women Act ("VAWA"), for example, prohibits funded programs or activities from discriminating based on either "sex" or "gender identity." 42 U.S.C. § 13925(b)(13)(A). "Sex" and "gender identity" must have meant distinct things to the Congress that enacted VAWA, for equating sex with gender identity would create an obvious surplusage. *See, e.g., Nat'l Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998) (rejecting agency interpretation for making statutory language surplusage). The subsequent use of the term "gender identity" in some contexts shows that Congress means something different when it fails to use that term — as it did in Title IX. *See, e.g., Cardoza-Fonseca v. INS*, 480 U.S. 421, 432 (1987) ("The contrast between the language used in the two standards, and the fact that Congress used a new standard to define the term 'refugee,' certainly indicate that Congress intended the two standards to differ.")

Statutory context confirms "sex" as used in Title IX refers to traditional biological sex—not subjective gender identity. Surrounding provisions reveal the biological dichotomy

19

that informs the two, distinct sexes. *See* 20 U.S.C. § 1681(a)(2) (describing how an institution may change "from . . . . admit[ting] only students of one sex to . . . admit[ting] students of *both sexes*") (emphasis added)); *id.* § 1681(a)(6)(B) (referring to "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girl[s]," "the membership of which has *traditionally* been limited to persons of *one sex*") (emphases added)); *see also id.* § 1681(a)(5), (a)(7), (a)(8), (a)(9), (b).

In stark contrast, Plaintiffs define sex as "multifaceted and comprised of many distinct biologically-influenced characteristics," but ultimately understood as "the sex or gender the individual knows themselves to be." Doc. 1 at ¶¶ 24-25. Plaintiffs' subjective understanding of "sex" would render Title IX's clear distinctions between *two* sexes, men and women, and boys and girls, entirely superfluous. For example, what purpose would Title IX's *permissive* sex-based distinctions between "Men's" and "Women's" associations serve if such identities are fluid and shift with an individual's self-perception over time? If sex was as subjective as Plaintiffs propose, akin to a feeling and not a biological reality, Congress will have spilled a great deal of ink for no discernable purpose.

The legislative history and ordinary public meaning of the term "sex" at the time Title IX was enacted likewise confirms "sex" cannot be interpreted as subjective gender identity. *See Bostock v. Clayton Cnty., Georgia*, 140 S. Ct. 1731, 1738 (2020) ("This Court normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment."); *see also Sandifer v. United States Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a "fundamental canon of statutory construction" that, "unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." (citation omitted)).

At the time Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). During that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females." *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020), *as amended* (Aug. 28, 2020) (Niemeyer, J. dissenting) (collecting dictionary definitions); *see also The Oxford English Dictionary* 578 (1961) ("[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."); *The American College Dictionary* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished . . ."); *The Random House College Dictionary* 1206 (rev. ed. 1973) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions."); *The American Heritage Dictionary* 1187 (1976) ("[t]he property or quality by which organisms are classified according to their reproductive functions"); *Webster's New Collegiate Dictionary* 1054 (1979) ("the sum of the structural, functional, and behavioral characteristics of living beings that subserve reproduction by two interacting parents and that distinguish males and females"); *The Random House College Dictionary* 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *The American Heritage Dictionary of the English Language* 1187 (1980) ( "two divisions" of organisms, "designated male and female," classified "according to their re-productive functions.").[8]

---

[8] That definition of "sex" continues even to today. *See, e.g.*, *Webster's New World College Dictionary* 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *The American Heritage*

Additionally, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson, Ph.D, and Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do,* The Heritage Foundation Backgrounder (Mar. 23, 2017).[9] In fact, "the word 'gender'" itself "had been coined only recently in contradistinction to sex." *Id.*

The earliest Title IX rulemaking codified sex-separated "toilet, locker room, and shower facilities" without any discussion of gender identity. *See* 39 Fed. Reg. 22,227, 22,230 (June 20, 1974) (proposing the rule that is now C.F.R. § 106.33 without explanation); 40 Fed. Reg. at 24,127, 24,141 (June 4, 1975) (finalizing the same rule without justification or response to commentary). Similarly, proponents of Title IX included an amendment expressly permitting schools to maintain separate living facilities on the basis of sex without any discussion or dissent regarding gender identity. *See* 117 Cong. Rec. 39260, 39263 (1971); H.R. Conf. Rep. No. 92-1085 at 222.

The undisputable purpose of Title IX also confirms the ordinary understand of "sex" as biological. Title IX was initially introduced as the Women's Equality Act of 1971. *See* Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41, 54 (1997). The senator who introduced the legislation described its aim to "eradicate the pervasive, divisive, and unwarranted discrimination against

---

*Dictionary* 1605 (5th ed. 2011) ("Either of the two divisions, designated female and male, by which most organisms are classified on the basis of their reproductive organs and functions"); *Merriam-Webster's Collegiate Dictionary* 1140 (11th ed. 2011) ("either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures").

[9] Available at https://www.heritage.org/education/report/gender-identity-policies-schools-what-congress-the-courts-and-the-trump.

a majority of our citizens, *the women of this country*." *Id.* (quotation omitted) (emphasis added). The senator went on: "[w]hat we are trying to do is provide equal access for *women and men* students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved." *Id.* at 59 (citing 117 Cong. Rec. 30399, 30406 (1971)); *see also id.* at 61 (describing Senator Bayh's remarks on the goal to end "corrosive and unjustified discrimination against women" that was "overt and socially acceptable within the academic community").

The statute's proponents focused on prohibiting "sex discrimination," *see* 118 Cong. Rec. 5803 (1972), but at the same time sought to preserve schools' ability to separate males and females to preserve "personal privacy," *see* 118 Cong. Rec. 5807 (1972); *see also Doe v. Luzerne Cty.,* 660 F.3d 169, 176–77 (3d Cir. 2011) (recognizing that an individual has "a constitutionally protected privacy interest in his or her partially clothed body" and that this "reasonable expectation of privacy" exists "particularly while in the presence of members of the opposite sex"); *Brannum v. Overton Cty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) (explaining that "the constitutional right to privacy . . . includes the right to shield one's body from exposure to viewing by the opposite sex") (citing 118 Cong. Rec. 5803 (1972)); *Sepulveda v. Ramirez,* 967 F.2d 1413, 1416 (9th Cir. 1992) (explaining that "[t]he right to bodily privacy is fundamental" and that "common sense, decency, and [state] regulations" require recognizing it in a parolee's right not to be observed by an officer of the opposite sex while producing a urine sample); *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981) (recognizing that, even though inmates in prison "surrender many rights of privacy," their "special sense of privacy in their genitals" should not be violated through exposure unless "reasonably necessary" and

explaining that the "involuntary exposure of [genitals] in the presence of people of the other sex may be especially demeaning and humiliating").

Nothing in *Bostock* dictates otherwise. *See supra* Section II(A).  The facts of *Bostock* are distinguishable: here, S.B. 615 involves no invidious discrimination nor adverse employment action. The law at issue is also distinguishable: here, the text of Title IX is different from Title VII. *See Bostock*, 140 S. Ct. at 1753 (noting its holding concerned only Title VII, that "other federal or state laws that prohibit sex discrimination"—like Title IX—were not "before" the Court, and refusing to "prejudge any such question" about what those statutes require); *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021) ("Title VII differs from Title IX in important respects."); *cf. Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) ("[T]he Court in *Bostock* was clear on the narrow reach of its decision and how it was limited only to Title VII itself."). Title IX prohibits discrimination "on *the basis* of sex," 20 U.S.C. § 1681(a) (emphasis added), rather than "because of . . . sex," 42 U.S.C. § 2000e-2(a)(1). Additionally, Title IX—unlike Title VII—*expressly authorizes* separation based on sex in certain circumstances, including in restroom facilities.

In the four decades after the enactment of Title IX, there was no question that sex meant sex as it has always been understood. *See, e.g., N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 523 n.13 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979) (describing that Title IX grew from a concern about discrimination against *women*). That was the implicit, if not explicit, holding of nearly every court to consider the issue until very recently. *See, e.g., supra* Section II(B); *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221–22 (10th Cir. 2007) (Title VII); *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) (Title VII); *but see Whitaker By Whitaker*

24

*v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020), *as amended* (Aug. 28, 2020). Although some recent cases have emerged adopting Plaintiffs' erroneous and atextual gender identity discrimination theories:  "[n]ot long ago, a suit challenging the lawfulness of separating bathrooms on the basis of sex would have been unthinkable." *Adams v. Sch. Bd. of St. Johns Cnty.*, 3 F.4th 1299, 1321 (11th Cir. 2021), *reh'g en banc granted*, 9 F.4th 1369 (11th Cir. 2021) (Pryor, C.J., dissenting). The overwhelming authorities cited herein, as well as basic logic, establish that should still be the case.

Since there can be no legitimate dispute that "sex" in Title IX does not encompass "gender identity" or an individual's subject feeling of gender, Plaintiffs' Title IX claims must fail. The State does not violate Title IX by requiring schools to separate multiple occupancy restrooms and changing areas consistent with students' biological sex. To the contrary, Title IX and its regulations expressly permit such a law.

## **CONCLUSION**

For the many reasons stated herein, Plaintiffs claims fail as a matter of law. State Defendants respectfully this Court dismiss the Complaint in its entirety and grant all other and further relief as the Court deems appropriate.

Respectfully submitted,

*s/ Audrey A. Weaver*

ZACH WEST, OBA #30768
 *Solicitor General*
AUDREY A. WEAVER, OBA #33258
 *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
 STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:  (405) 521-3921
Zach.west@oag.ok.gov
Audrey.weaver@oag.ok.gov
*Counsel for State Defendants*