UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

ANDREW BRIDGE, *et al.*,

*Plaintiffs,*

v.

OKLAHOMA STATE DEPARTMENT OF
EDUCATION, *et al.*

*Defendants.*

No.  CIV-22-787-JD

## STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

Submitted by:

ZACH WEST, OBA #30768
  *Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Zach.West@oag.ok.gov

KYLE PEPPLER, OBA #31681
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Kyle.Peppler@oag.ok.gov

AUDREY WEAVER, OBA #33258
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Audrey.Weaver@oag.ok.gov

WILLIAM FLANAGAN, OBA #35110
  *Assistant Solicitor General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
William.Flanagan@oag.ok.gov

**COUNSEL FOR STATE DEFENDANTS**          **November 16, 2022**

# TABLE OF CONTENTS

INTRODUCTION .................................................................................................. 1

BACKGROUND ................................................................................................... 2

ARGUMENT AND AUTHORITIES ................................................................... 6

I.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE
MERITS. .............................................................................................................. 7

    A.   **Plaintiffs are not likely to succeed on their Equal Protection Clause claim.** .. 7

    *1. Plaintiffs cannot establish that SB 615 intentionally discriminates against transgender
    students.* ................................................................................................................. 8

    *2. Plaintiffs cannot establish that biological sex and gender identity are interchangeable.* ............... 10

    *3. Case law exists on both sides of this issue, and the analysis in favor of Defendants is far
    more persuasive.* ................................................................................................... 13

    *4. SB 615 easily withstands intermediate scrutiny because it advances legitimate privacy and
    safety interests.* ..................................................................................................... 15

    B.   **Plaintiffs are unlikely to succeed on their Title IX claims.** ............................ 19

II.   PLAINTIFFS HAVE NOT SHOWN THEY WILL SUFFER IRREPARABLE HARM. ......... 20

III.  THE BALANCE OF HARMS AND PUBLIC INTERESTS FAVOR THE STATE. ............ 24

CONCLUSION ................................................................................................... 25

### TABLE OF AUTHORITIES

**Cases**

*Adams v. Sch. Bd. of St. Johns Cnty., Flo.,*
  3 F.4th 1299 (11th Cir. 2021) .................................................................... 14, 15, 16

*Adams v. Sch. Bd. of St. Johns Cnty., Flo.,*
  9 F.4th 1369 (11th Cir. 2021)(*en banc*) ................................................................ 14

*Ashaheed v. Currington,*
  7 F.4th 1236 (10th Cir. 2021) ................................................................................ 8

*Barnes v. Glen Theatre, Inc.,*
  501 U.S. 560 (1991) ............................................................................................ 16

*Barney v. Pulsipher,*
  143 F.3d 1299 (10th Cir. 1998) .............................................................................. 8

*Barnhart v. Sigmon Coal,*
  534 U.S. 438 (2002) ............................................................................................ 10

*Bostock v. Clayton Cnty., Ga.*
  140 S. Ct. 1731 (2021) ........................................................................................ 13

*Chaney v. Plainfield Healthcare Ctr.,*
  612 F.3d 908 (7th Cir. 2010) ................................................................................ 12

*Cumbey v. Meachum,*
  684 F.2d 712 (10th Cir. 1982) .............................................................................. 12

*D.H. by A.H. v. Williamson Cnty. Bd. of Educ.,*
  No. 3:22-CV-00570, 2022 WL 16639994 (M.D. Tenn. Nov. 2, 2022) ................................ 14

*DeClue v. Cent. Illinois Light Co.,*
  223 F.3d 434 (7th Cir. 2000) .................................................................................. 4

*Fish v. Kobach,*
  840 F.3d 710 (10th Cir. 2016) .............................................................................. 20

*Fortner v. Thomas,*
  983 F.2d 1024 (11th Cir. 1993) ............................................................................ 17

*G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.,*
  822 F.3d 709 (4th Cir. 2016) .................................................................................. 2

*Gloucester Cnty. Sch. Bd. v. G. G. ex rel. Grimm,*
  137 S. Ct. 1239 (2017) .......................................................................................... 2

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ........................................................................................ 6, 11

*Grimm v. Gloucester Cnty. Sch. Bd.,*
  976 F.3d 399 (4th Cir. 2020) ............................................................................ 12, 14

*Hayes v. Marriott,*
   70 F.3d 1144 (10th Cir. 1995) ................................................................17

*Heideman v. S. Salt Lake City,*
   348 F.3d 1182 (10th Cir. 2003) ..............................................................20

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.,*
   97 F. Supp. 3d 657 (W.D. Pa. 2015)......................................................14

*Maryland v. King,*
   567 U.S. 1301 (2012) ..............................................................................25

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ..................................................................................8

*Michael M. v. Super. Ct. of Sonoma Cnty.,*
   450 U.S. 464 (1981) ................................................................................16

*Munaf v. Geren,*
   553 U.S. 674 (2008) ..................................................................................6

*New Motor Vehicle Bd. v. Orrin W. Fox Co.,*
   434 U.S. 1345 (1977) ..............................................................................25

*Nguyen v. Immigr. & Naturalization Serv.,*
   533 U.S. 53 (2001)..................................................................................16

*Nordlinger v. Hahn,*
   505 U.S. 1 (1992)......................................................................................8

*O'Centro Espirita Beneficiente Unio Do Vegital v. Ashcroft,*
   389 F.3d 973 (10th Cir. 2004) ................................................................24

*Planned Parenthood v. Abbott,*
   734 F.3d 406 (5th Cir. 2013)...................................................................25

*Plyler v. Doe,*
   457 U.S. 202 (1982) ............................................................................ 9, 11

*RoDa Drilling Co. v. Siegal,*
   552 F.3d 1203 (10th Cir. 2009) ......................................................... 20, 24

*Rosenstiel v. Rodriguez,*
   101 F.3d 1544 (8th Cir. 1996) ................................................................10

*Rostker v. Goldberg,*
   453 U.S. 57 (1981)............................................................................... 1, 12

*Salt Lake Tribune Pub. Co. v. AT&T Corp.,*
   320 F.3d 1081 (10th Cir. 2003) ................................................................7

*Sampson v. Murray,*
   415 U.S. 61 (1974)..................................................................................21

*Schrier v. Univ. Of Colo.*,
    427 F.3d 1253 (10th Cir. 2005) .................................................................7

*State v. EPA*,
    989 F.3d 874 (10th Cir. 2021) ...................................................................7

*Tuan Anh Nguyen v. INS*,
    533 U.S. 53 (2001).............................................................................12, 16

*United States v. Virginia*,
    518 U.S. 515 (1996) ..........................................................................11, 12

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ...................................................................................8

*Williamson Cnty. Bd. Of Educ.*,
    2022 WL 16639994....................................................................................10

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)....................................................................................6-7

### Statutes

20 U.S.C. § 1686 ......................................................................................19, 20

34 C.F.R. § 106.33 .........................................................................................20

OKLA. STAT. tit. 70, § 1-125.........................................................................5, 8, 9

### Other Authorities

Ray Carter, *Mothers Urge Change to Stillwater Bathroom Policy*,
    OCPA (April 13, 2022) .................................................................................6

Ruth Bader Ginsburg, *Sexual Equality under the Fourteenth and Equal Rights Amendments*,
    1979 Wash. U.L.Q. 161 (1979).......................................................................4

Stuart & Stuart, *Behind Closed Doors: Public Restrooms and the Fight for Women's Equality*,
    24 TEX. REV. L. & POL. 1 (2019)..................................................................3

W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*,
    37 Yale L. & Pol'y Rev. 227 (2018) .........................................................2, 5

## **INTRODUCTION**

Schools, societies, and governments have long separated communal locations where intimate activities take place into male and female spaces. A special sense of bodily privacy arises in places where people may be in various stages of undress, and biological males are not similarly situated to biological females when it comes to private functions such as using the restroom, changing, showering, or bathing. The physical differences between males and females are real and immutable, not mere stereotypes. And the different anatomical biology of males and females *particularly* matters when it comes to restrooms, which are designed to accommodate anatomical differences between males and females.

Neither the U.S. Constitution nor Title IX prohibit the State from relying on these biological realities when adopting laws and policies governing the use of multiple occupancy restrooms and changing facilities in public schools. The State certainly does not violate the Constitution or any federal law by refusing to open public school bathrooms and locker rooms based on a person's subjective self-identification, as opposed to objective biology. Rather, as the State's various lay and expert witnesses testify here, there are important privacy and safety reasons for maintaining separate intimate spaces for male and female schoolchildren, and Oklahoma's approach does not conflict with scientific principles and studies.

In the end, "[t]he Constitution requires that Congress treat similarly situated persons similarly, not that it engage in gestures of superficial equality." *Rostker v. Goldberg*, 453 U.S. 57, 79 (1981). Thus, for the same reasons articulated in the State Defendants' Motion to Dismiss, Doc. 47, and for the additional reasons articulated herein, Plaintiffs' Motion for Preliminary Injunction, Doc. 24, should be denied.

## BACKGROUND

"Across societies and throughout history, it has been commonplace and universally accepted to separate public restrooms, locker rooms, and shower facilities on the basis of biological sex in order to address privacy and safety concerns arising from the biological differences between males and females." *G.G. ex rel. Grimm v. Gloucester Cnty. Sch. Bd.*, 822 F.3d 709, 734 (4th Cir. 2016) (Niemeyer, J., concurring in part and dissenting in part), *vacated and remanded by Gloucester Cnty. Sch. Bd. v. G. G. ex rel. Grimm*, 137 S. Ct. 1239 (2017). Such practices have been recorded in the Ancient Roman public baths, the Ancient Greek public baths, and even German, Japanese, and Egyptian bathhouses all pre-dating the 18th Century. *See* W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 259-60 (2018). The historic practice of separating these communal spaces by sex "was rooted primarily in safety and privacy concerns . . . ." *Id.* at 228.[1]

Early United States history also provides many examples of sex-separated communal spaces for performing intimate activities like bathing. *Id.* at 268-272, 277-278. Notably, by 1886, "[s]chools educating both sexes followed sex-separation in multi-entry intimate spaces." *Id.* at 277 n.212. And when states began enacting laws reflecting the long-established practice of separating bathrooms by sex, these "were among the earliest state-wide attempts to protect women from workplace sexual harassment." *Id.* at 279; *see also id.* at 279-283. One historical

---

[1] The relationship between privacy concerns and bathroom use is evident from the association of such spaces with the word "private" in advertisements and labels. For example, a "privy" was an early form of a toilet, and the term "privy" developed from the French and Latin words meaning "private." *Id.* at 245, 255-56. Various advertisements from early American public baths also boasted of things like "[t]hree of the baths are for ladies who can bathe in the most private manner they please . . . ." *Id.* at 271-72.

examination revealed "four leading reasons behind women's demands for separate restrooms: (1) men's toilets were filthy; (2) women needed a physically safe public space; (3) women desired a temporary reprieve from the oppressive male gaze; and (4) women's restrooms and other public facilities provided a space for women to discuss their particular concerns and to organize protests and movements that promoted their interests." Stuart & Stuart, *Behind Closed Doors: Public Restrooms and the Fight for Women's Equality*, 24 TEX. REV. L. & POL. 1, 28–29 (2019).

In Oklahoma, separate restrooms for each sex can be traced to the early years of statehood. For example, the school sanitation recommendations for water closets, dry closets, and privies from the State Health Department in 1909-1910 provided for "good fly-tight, well ventilated out-houses **for the sexes**, **separated** by closely built fences," and indicated that "males shall have urinals." *First Biennial Rep. of the Okla. State Pub. Health Dep't 1909 & 1910* at 165 (emphasis added).[2] In addition, an inspection form for the State Department of Labor in 1908-1909 asked: "Are separate wash rooms provided for male and female employees?" and "Are separate water closets provided for male and female employees?" *Second Ann. Rep. of the Dep't of Labor for the State of Okla. 1908-09* at 258;[3] *see also Eighth Biennial Rep. of the State Sup. of Pub. Inst. 1920* at 123 (describing a college gym furnished with "a large locker room for young women and one for young men . . . . In the room reserved for young women individual private dressing rooms open into private shower compartments.").[4]

In more recent history, accessible single-sex restrooms have been important for the advancement of women's rights in employment.  As one Seventh Circuit judge explained:

---

[2] Available at https://digitalprairie.ok.gov/digital/collection/okresources/id/10135/rec/4
[3] Available at https://digitalprairie.ok.gov/digital/collection/okresources/id/20641/rec/1
[4] Available at https://digitalprairie.ok.gov/digital/collection/okresources/id/62750/rec/83

"some employers not only maintain, but deliberately play up, the lack of restroom facilities and similarly inhospitable work conditions as a way to keep women out of the workplace." *DeClue v. Cent. Illinois Light Co.*, 223 F.3d 434, 438-39 (7th Cir. 2000) (Rovner, J., dissenting in part). Inadequate or unavailable restroom facilities for women, "which strikes many men to be of secondary, if not trivial, importance, can affect [women's] ability to do their jobs in concrete and material ways." *Id.* at 437.

Separating restrooms based on sex was such a pervasive and accepted practice in the United States by the 1970s, that future Justice Ginsburg wrote about the "the potty problem" surrounding the proposed Equal Rights Amendment (ERA). *See* Ruth Bader Ginsburg, *Sexual Equality under the Fourteenth and Equal Rights Amendments*, 1979 Wash. U.L.Q. 161, 175 (1979). The ERA should not render same-sex restrooms unconstitutional, Justice Ginsburg indicated, because "human rights guarantees are seldom absolute," the ERA "is not a 'unisex' amendment," and it "does not stamp man and woman as one." *Id.* Indeed, she observed, the Senate Judiciary Committee majority report on the ERA assured its critics of "the congressional expectation that the ERA would coexist peacefully with separate public restrooms, separate sleeping and bathroom facilities for male and female military personnel and prisoners." *Id.* Alluding to the frivolity of opposing the ERA based on concerns over sex-separated restrooms, Justice Ginsburg even quipped that "[p]erhaps Congress found it hard to conceive of a plaintiff litigating the issue, or of a judge who would find man or woman harmed by that limited separation." *Id.* What was inconceivable to Justice Ginsburg and Congress under the ERA is now claimed to be *required* under the Constitution.

In sum, "[t]he bathroom has long been treated as unique public space, not as space just like any other. The key reason for the separation was safety and privacy." Carter, 37 Yale L. & Pol'y Rev. 227 at 288. And "[i]n the context of women's long battle for equality over so many centuries," *id.* at 289, this history should not be ignored or contorted.

\* \* \*

The Oklahoma Legislature took these long-standing concerns into account in enacting Senate Bill 615 ("SB 615"). In the wake of revelations that certain public schools in Oklahoma were opening school restrooms to biological males and females, SB 615 mandated that public schools "require every multiple occupancy restroom or changing area" to be designated either for "the exclusive use" of the male or female sex. OKLA. STAT. tit. 70, § 1-125(B). So, "[t]o ensure privacy and safety" of schoolchildren, the Legislature provided a simple restroom rule, congruent with centuries of historical practice and reasoning. *Id.* At the same time, it required schools to allow those who do not wish to comply with the rule to have access to a single-occupancy restroom or changing room—an eminently reasonable accommodation. *Id.* at § 1-125(C). SB 615 took effect on May 25, 2022. The present lawsuit, seeking to upend the status quo, was filed nearly four months later, on September 6, 2022. *See* Doc. 1.

In addition to the historical evidence listed above, Defendants 1-9 ("State Defendants") provide six declarations further exploring and supporting the State's legitimate privacy and safety rationales. Three of the declarations are submitted by parents of children in Oklahoma public schools who were deeply concerned with, or negatively affected by, the school district policies that led to SB 615 being enacted. *See* Ex. 1, Decl. of Delicia Timmons; Ex. 2, Decl. of

R.A.; Ex. 3, Decl. of Julia Ray.[5] Another is from a seasoned and award-winning former Oklahoma City Police Department sex crimes detective, who states that school bathrooms are particularly vulnerable places that should be separated based on sex and not self-identification for the protection and privacy of students. *See* Ex. 4, Expert Decl. of Kim Davis. And the final two are reports from experts on the science of sex and gender identity, who explain that biological sex and gender identity are different concepts, that gender dysphoria in children is not immutable, consistent, and persistent, but will normally resolve for most children, and that the scientific evidence does not require total affirmation of gender dysphoric children or opposite-sex restroom usage—especially when a reasonable accommodation is present. *See* Ex. 5, Expert Rep. of Debra Soh, PhD; Ex. 6, Expert Rep. of James Cantor, PhD.

The U.S. Supreme Court gives state legislatures "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales v. Carhart*, 550 U.S. 124, 163, (2007). For the following reasons, the State's exercise of its discretion should not be disturbed.

## ARGUMENT AND AUTHORITIES

"A preliminary injunction is an 'extraordinary and drastic remedy . . . it is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-690 (2008) (citations omitted). To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res.*

---

[5] Of course, these aren't the only parents with such concerns. *See, e.g.*, Ray Carter, *Mothers Urge Change to Stillwater Bathroom Policy*, OCPA (April 13, 2022) https://www.ocpathink.org/post/mothers-urge-change-to-stillwater-bathroom-policy.

*Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). "[T]he right to relief must be clear and unequivocal." *Schrier v. Univ. Of Co.*, 427 F.3d 1253 (10th Cir. 2005).

Three of the types of disfavored injunctions require a plaintiff to satisfy a heightened standard: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *State v. EPA*, 989 F.3d 874, 883-84 (10th Cir. 2021). Plaintiffs' request implicates all three. That is, Plaintiffs want this Court to force Defendants to alter the status quo, mandate that Defendants affirmatively change the State's "policy, practice, or custom" regarding public school restrooms, and grant Plaintiffs the same relief they would recover after a full trial. *Compare* Doc. 24 at 25, *with* Doc. 1 at 40-41. Plaintiffs must therefore "'make a strong showing' both on the likelihood of success on the merits and on the balance of the harms." *State v. EPA*, 989 F.3d at 884. Because Plaintiffs cannot overcome their heightened burden, Plaintiffs' motion should be denied.

## I.    PLAINTIFFS CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS.

Plaintiffs' claims that SB 615 violates the Equal Protection Clause and Title IX are not substantially likely to succeed on the merits, for the reasons outlined in State Defendants' Motion to Dismiss, Doc. 47, and more.

### A.    *Plaintiffs are not likely to succeed on their Equal Protection claim.*

The "Equal Protection Clause does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Here, Plaintiffs cannot establish SB 615 discriminates against persons who are in all relevant respects alike, intentionally or otherwise.

Plaintiffs claim they have a "right to be treated just like any other student, regardless of their transgender status," Doc. 24 at 1, and that is exactly what is happening.

1. *Plaintiffs cannot establish that SB 615 intentionally discriminates against transgender students.*

Proof of a "discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977). Here, rather than establishing intentional discrimination based on gender identity or transgender status, Plaintiffs simply declare that intentional discrimination is happening so they can move straight to "heightened scrutiny." *See* Doc. 24 at 12-13. But Plaintiffs cannot snub their "burden of proving 'the existence of purposeful discrimination.'" *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987) (citation omitted). And purposeful discrimination must be shown by either "a distinction between groups of persons appear[ing] on the face of a state law[,]" or proof "that the plaintiff was treated differently from similarly situated persons who are 'alike in all relevant respects.'" *Ashaheed v. Currington*, 7 F.4th 1236, 1250 (10th Cir. 2021) (citation omitted); *see also Barney v. Pulsipher*, 143 F.3d 1299, 1312 (10th Cir. 1998) ("[P]laintiffs must first make a threshold showing that they were treated differently ….").

Here, under either theory Plaintiffs cannot establish SB 615 purposefully discriminates based on transgender status or gender identity. First, SB 615 contains no classification or differential treatment based on gender identity or transgender status on its face. *See* OKLA. STAT. tit. 70, § 1-125. It does not establish a separate procedure for transgender students, classify based on gender identity, or single out transgender individuals. At most, it creates two

groups of students based on *biological* sex.[6] Anyone with any "gender identity" must use the multiple occupancy bathroom corresponding with their biological sex, or a single-occupancy accommodation that schools are required to make available. In short, SB 615 does not facially discriminate based on transgender status or gender identity.

Second, SB 615 treats all similarly situated individuals, including transgender individuals, the same in every *relevant* respect. As the U.S. Supreme Court explains: "[t]he initial discretion to determine what is 'different' and what is 'the same' resides in the legislatures of the States." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). In other words, the State does not purposefully discriminate when it distinguishes persons as being dissimilar under some rational basis. Here, using its "substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill[,]" *id.*, Oklahoma chose to require separate restroom and changing facilities in schools on the basis of objective, biological sex. This is fatal to the Equal Protection Clause claim.

Plaintiffs make half-hearted attempts to show that legislators or Defendants acted with some sort of animus, but they cite precious little for these accusations. For instance, they claim that Defendant O'Connor "expressed his intent to exercise his powers to exclude students who are transgender," Doc. 24 at 5-6, but the quotation they provide does not support their conclusion. In any event, a statement by a stray official or legislator cannot override the text itself. As the U.S. Supreme Court has held, "[w]e see no reason to give greater weight to the

---

[6] SB 615 defines "sex" as "the physical condition of being male or female based on genetics and physiology, as identified on the individual's original birth certificate." *Id.* § 1-125 (A)(1).

views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text." *Barnhart v. Sigmon Coal*, 534 U.S. 438, 457 (2002); *see also Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1552 (8th Cir. 1996).[7]

    2. *Plaintiffs cannot establish that biological sex and gender identity are interchangeable.*

SB 615 treats all students, transgender or not, the same as all other similarly situated students. The law simply separates multiple-occupancy school restrooms based on biological sex differences—as has been done for centuries. This does not treat differently "persons who are in all relevant respects alike," since biological sex is real, it is distinct from gender identity, and the differences between biological males and females in this context are meaningful. *See, e.g.*, Ex. 5, Soh at 2, 5; Ex. 6, Cantor ¶¶ 10-12; *see also D.H. by A.H. v. Williamson Cnty. Bd. Of Educ.*, No. 3:22-cv-00570, 2022 WL 16639994 at *9 ("[S]eparate bathrooms for the biological sexes have been accepted as a valid differentiation …."). The law does not account for how an individual identifies, dresses, or behaves, and thus it doesn't treat any individual differently because of those factors, much less intentionally so. Moreover, there are no stereotypes involved. *See* Doc. 47 at 10-12.

No matter how much Plaintiffs try to make this case about transgender status and gender identity, those facts simply do not matter unless they can establish that a biological male who identifies as a female is "alike in all relevant respects" to a biological female, or vice versa, when it comes to public school restrooms, showers, and locker rooms.

---

[7] It is similarly irrelevant to a constitutional analysis that SB 615 was enacted in a certain manner, procedurally, and that it did not include findings of fact. *See* Doc. 24 at 17.

Plaintiffs' perfunctory claim that sex and gender identity are the same thing is wrong. *See, e.g.*, Doc. 24-7 at ¶ 24 (Budge: "[S]omeone's sex or gender is properly understood to be the same as their gender identity."); Doc. 24 at 5 ("SB 615 … conflict[s] with the scientific understanding of sex."). Neither Plaintiffs nor their expert cite anything for this baffling proposition, and it is contravened by common sense and by State Defendants' experts. *See* Ex. 5, Soh at 2, 5, Ex. 6, Cantor ¶¶ 10-12.[8] It also contravenes U.S. Supreme Court precedent recognizing that "[p]hysical differences between men and women . . . are enduring: '[T]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both.'" *United States v. Virginia*, 518 U.S. 515, 533 (1996) (citation omitted); *see also* Doc. 47 at 10-12. And if the Constitution allows states to act upon those differences in certain instances, the most obvious instance is here. Where else would the physical differences between sexes matter if not in communal spaces where developing children are undressed and vulnerable? Plaintiffs, quite tellingly, never identify a single instance where a governmental distinction based on physical differences between male and female would be lawful. To the contrary, by equating separating bathrooms based on biological sex with racial segregation, *see* Doc. 24 at 18 n.10, Plaintiffs make it clear that all sex-unique spaces are invidious.

But physical differences sometimes matter. A biological male, or someone "assigned male at birth[,]" Doc. 1 at ¶ 26, as Plaintiffs inaccurately phrase it, has different external genitalia and reproductive organs than a biological female, or someone "assigned female at

---

[8] To the extent there is a legitimate dispute among experts on this point, again, the U.S. Supreme Court gives state legislatures "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163; *see also Plyler*, 457 U.S. at 216.

birth." *Id.*; *see also* Ex. 6, Cantor ¶ 10 (criticizing the use of "assigned … at birth" as lacking scientific merit). As should by now be obvious: "such anatomical differences are at the root of why restrooms are generally separated on the basis of sex." *Grimm v. Gloucester Cnty. Sch. Bd.*, 976 F.3d 399, 401 (4th Cir. 2020) (Niemeyer, J., concurring).

The U.S. Supreme Court has recognized that these anatomical differences *are not meaningless* and give rise to the compelling privacy and safety considerations, as discussed in State Defendants' Motion to Dismiss. *See* Doc. 47 at 9-17. For example, the Supreme Court recognizes that "[f]athers and mothers are not similarly situated with regard to the proof of biological parenthood" and "[t]he difference between men and women in relation to the birth process is a real one." *Tuan Anh Nguyen v. INS*, 533 U.S. 53, 63, 73 (2001). The Supreme Court likewise recognizes alterations may be "necessary to afford members of each sex privacy from the other sex in living arrangements." *Virginia*, 518 U.S. at 550 n.19. In the prison context, the Tenth Circuit recognizes "that if guards regularly watch inmates of the opposite sex who are engaged in personal activities, such as undressing, using toilet facilities, or showering, the inmates' constitutional rights to privacy are being violated." *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982); *see also Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) (recognizing that a patient's privacy interest can be offended "when one undresses in front of a doctor or nurse of the opposite sex . . . .").[9]

If anatomical differences between the two sexes are mere sex-stereotypes, as Plaintiffs seem to suggest, why would court after court recognize a *constitutional right to privacy* is violated

---

[9] *See also Rostker v. Goldberg*, 453 U.S. 57, 78 (1981) ("Men and women, because of the combat restrictions on women, are simply not similarly situated for purposes of a draft ….").

when individuals are forced to undress in front of members of the opposite sex? Plaintiffs'

argument that State laws violate *the Constitution* when separating individuals based on biological

sex in those intimate communal spaces finds no basis whatsoever in Supreme Court or Tenth

Circuit precedent, and in fact directly conflicts with binding precedent.

Nor does the fact that a law distinguishes based on sex establish that the law

discriminates or classifies based on transgender status or gender identity. To support this

position, Plaintiffs improperly invert the conclusion reached in *Bostock v. Clayton Cnty., Ga.*, 140

S. Ct. 1731 (2021). *See* Doc. 24 at p. 13. Although Plaintiffs correctly quote *Bostock*'s conclusion

that discrimination based on transgender status necessarily entailed discrimination based on

sex, they attempt to use this to establish the reverse: that classification on the basis of sex

necessarily entails discrimination based on transgender status. The Supreme Court has never

reached this inverse conclusion, nor would it make sense. To adopt this theory would turn

equal protection precedent (not to mention *Bostock*) completely on its head. The important

factual distinction between the adverse employment action *based on transgender status* in *Bostock*

and the state law separating multiple occupancy restrooms *based on sex* here underscores exactly

why *Bostock* expressly denied its ruling reached restrooms. *See id.* at 1753.[10]

3. *Case law exists on both sides of this issue, and the analysis in favor of Defendants is far more persuasive.*

Although Plaintiffs tout favorable district and circuit court rulings, these non-binding

authorities are no substitute for this Court's independent legal analysis. Moreover, Plaintiffs'

statement that every court of appeals and virtually every district court to consider these

---

[10] *Bostock* was limited to Title VII and did "not purport to address bathrooms, locker rooms, or anything else of the kind." *See* Doc. 47 at 6-7, 24 (quoting *Bostock*, 140 S. Ct. at 1753).

questions has ruled in their favor is simply not true. *See, e.g.*, Doc. 24 at 12-13 & n.6. Although the Eleventh Circuit indeed sided with Plaintiffs' position in *Adams v. Sch. Bd. of St. Johns Cnty., Flo.*, 3 F.4th 1299 (11th Cir. 2021), it subsequently vacated this opinion and granted rehearing *en banc* in *Adams v. Sch. Bd. of St. Johns Cnty., Flo.*, 9 F.4th 1369 (11th Cir. 2021).

In addition to cases such as *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657 (W.D. Pa. 2015), just two weeks ago a federal district court in Tennessee denied an injunction to a plaintiff bringing nearly identical school restroom claims under the Equal Protection Clause and Title IX because that plaintiff had "not shown a likelihood of success on the merits of either claim." *Williamson Cnty. Bd. of Educ.*, 2022 WL 16639994, at *12. And even the favorable decisions cited by Plaintiffs are not without opposition. The dissenting opinions in *Grimm*, 976 F.3d at 627, by Circuit Judge Niemeyer, and *Adams*, 3 F.4th at 1321, by Chief Judge Pryor, are particularly instructive and persuasive.

Chief Judge Pryor's spirited dissent in *Adams*, for example, decried the majority for "reach[ing] the remarkable conclusion that schoolchildren have no sex-specific privacy interest when using the bathroom[,]" and observed that "[t]he logic of this decision . . . would require all schoolchildren to use sex-neutral bathrooms and locker rooms." *Id.* He argued that the majority incorrectly followed the plaintiff "in using the word 'sex' as a synonym for 'gender identity[,]'" although the defendants "use 'sex' in its ordinary, traditional sense, and they use 'biological sex' as a synonym." *Id.* at 1322. By conflating "sex" with "gender identity[,]" he argued, the majority misunderstood that "[t]he object of the schools' practice with respect to the enrollment documents is to determine students' sex, not their gender identity." *Id.* at 1323. In light of that objective, the schools' policy *for determining sex*, not gender identity, was

14

reasonable and produced accurate results. *Id.* at 1322-1323. The majority, he wrote, closed "its eyes to the record, not to mention biological reality[,]" and transformed "the schools' sensible way of ascertaining sex and unassailable way of separating restrooms into a single, irrational policy . . . ." *Id.* at 1325.

Moreover, although the majority relied on the fact that only 16 of the 40,000 students in question were transgender to characterize its ruling as limited, *id.* at 1329, Judge Pryor emphasized that "all students … are potentially affected by a ruling that forces them to share bathrooms with individuals of the opposite sex." *Id.* at 1324. After all, "anyone can take advantage of the [] demolition of sex-specific bathroom privacy." *Id.* at 1327. Pryor warned that "the majority's view would have consequences far beyond the confines of this appeal[,]" because "if the privacy interest at stake is untethered from using the bathroom away from the opposite sex or from biological differences between the sexes, then no justification exists for separating bathrooms—or any related facility—by sex." *Id.* State Defendants respectfully urge the Court to adopt the same reasoning here.

4. *SB 615 easily withstands intermediate scrutiny because it advances legitimate privacy and safety interests.*

To the extent Plaintiffs' Complaint could seriously be construed as contesting the constitutionality of separating restrooms and changing facilities based on sex as invidious sex-based discrimination, SB 615 easily survives intermediate scrutiny. Here, Plaintiffs' repeated use of the ambiguous phrase "heightened scrutiny" (used twelve times) over the more accurate phrase "intermediate scrutiny" (used one time) suggests an attempt to exaggerate the rigor of the standard applicable to laws reasonably classifying on the basis of sex. *See* Doc. 24 at 12-15, 18. But intermediate scrutiny does not demand "that the statute under consideration must be

capable of achieving its ultimate objective in every instance." *Tuan Anh Nguyen v. INS*, 533

U.S. 53, 70 (2001); *see also Michael M. v. Super. Ct. of Sonoma Cnty.*, 450 U.S. 464, 473 (1981)

(plurality opinion) ("The relevant inquiry ... is not whether the statute is drawn as precisely as

it might have been ...."). The relevant inquiry is instead whether the law substantially relates to

the governments' important objectives. *See id.*; Doc. 24 at 16.

In *Adams*, Judge Pryor explained why laws like SB 615 withstand intermediate scrutiny:

> [T]he schools' sex-separated bathrooms policy … serves the important
> objectives of protecting the interests of children in using the bathroom
> away from the opposite sex and in shielding their bodies from exposure
> to the opposite sex. The policy also fits tightly with both interests in
> privacy. By requiring students to use the bathroom away from the
> opposite sex, the policy directly protects the first interest and eliminates
> one of the most likely opportunities for a violation of the second interest.
> In short, it easily satisfies intermediate scrutiny, and even if questions
> remained, the Supreme Court has long required that we defer to the
> judgment of public-school officials in this context.

*Adams*, 3 F.4th at 1328 (Pryor, J., dissenting). In support, Pryor highlighted the history of

separating bathrooms based on sex and the well-established legal precedent recognizing "the

law tolerates same-sex restrooms ... to accommodate privacy needs." *Id.* at 1328-29 (citation

omitted). Pryor noted "the policy is a mirror image of its objective—it protects students from

using the bathroom with the opposite sex by separating bathrooms on the basis of sex[,]" and

therefore "[t]he policy 'is not a means to some greater end, but an end in itself.'" *Id.* at 1329

(quoting *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) (plurality opinion)).

The objectives of privacy and safety are important and applicable here, Plaintiffs'

feigned incredulity aside. This Court should give no weight to Plaintiffs' conclusory assertions

that these interests are "speculative," "false," "empty[,]" "unsupported[,]" and "not genuine."

Doc. 24 at 16-17. Especially when Plaintiffs acknowledge these interests when it suits them.

Indeed, Plaintiffs make several rather startling concessions, arguing at one point that allowing a *Plaintiff* to use a single-occupancy restroom is an "invasion of his privacy." *Id.* at 7. (Why this principle only applies to Plaintiffs in single-sex situations but not to other schoolchildren in multiple-occupancy restrooms, we aren't told.) Elsewhere, incredibly, Plaintiffs contend that if "an adolescent transgender boy is forced to use a girls' restroom, other students in that restroom could actually feel *less safe*, due to the presence of an individual they correctly perceive as of a different sex in an otherwise sex-segregated space." *Id.* at 19. In other words, while Plaintiffs readily acknowledge safety concerns arising from the mere *perception of the presence of the opposite sex* in the restroom, they ignore the safety concerns arising from the *actual presence of the opposite sex* in the restroom.

The State has a legitimate interest in protecting the privacy and safety interests of school children in places of heightened vulnerability, such as communal restrooms and changing rooms, where students may be in various stages of undress. As numerous circuit courts have held in the prison context: "people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (collecting cases); *see also Hayes v. Marriott*, 70 F.3d 1144, 1146 (10th Cir. 1995). It would be the height of irony if the Constitution **required** the state to recognize a prison inmate's privacy interest against bodily exposure to the opposite sex but **prohibited** the state from recognizing school children's privacy interest against bodily exposure to the opposite sex.

There can also be no serious dispute that by separating multiple occupancy restroom and changing facilities on the basis of sex, SB 615 eliminates the opportunity for involuntary

bodily exposure to the opposite sex in the most common areas where such bodily exposure may take place. SB 615 directly advances, and is substantially related to the achievement of, the important government interests at stake. It protects students' privacy interests, including the right to be free from involuntary bodily exposure to individuals of the opposite sex. Because SB 615 directly achieves the government objective, it more than satisfies intermediate scrutiny. *See Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 572 (1991) ("The statutory prohibition is not a means to some greater end, but an end in itself.").

The justifications are also well-supported in the record here. Before the law, a Stillwater Public School District practice allowed schoolchildren to use multiple-occupancy bathrooms based on gender identity. Because of this practice, R.A.'s daughter "stopped drinking water in an attempt to not use the school bathroom" based on concerns for her privacy and safety. Ex. 2, R.A. ¶ 3. Delicia Timmons's daughter was concerned "a male would peek under the stall or through the crack in the stall door, while she used the restroom." Ex. 1, Timmons ¶ 4. She also feared "a male would learn that she was on her period and make fun of her or tell others she was on her period . . . ." *Id.* These were not trifling privacy concerns for Ms. Timmons because she worried her daughter, who "chose not to use the girls' bathroom all day," could suffer from "toxic shock syndrome" by not changing "a pad or tampon . . . at least every four hours" and face "an increased risk of urinary tract infections from not urinating regularly." *Id.* ¶ 5. These privacy concerns are mirrored by Julia Ray, who recalled that as a young woman in school, she "took great lengths to hide when [she] was menstruating to avoid being made fun of by boys. The restroom and locker room were an escape from harassment—places where [she] knew a boy would not know what [she] was doing . . . ." Ex. 3, Ray ¶ 6.

On the safety side, the need for privacy in school bathrooms creates as a byproduct significant "vulnerabilities." Ex. 4, Davis ¶ 11. Surveillance cameras cannot and should not be placed in school bathrooms for obvious reasons. However, this creates a blind spot for school officials and law enforcement officers alike. *Id.* It comes as no surprise that "[p]redators know this, and routinely" use the seclusion and privacy naturally found in bathrooms to their advantage. *Id.* In fact, in Davis' 15 years of experience as a sex crimes detective, most bathroom-related cases she investigated involved underaged child victims. *Id.* ¶12. As such, a daughter's fear of "being sexually assaulted in the restroom, or [seeing] male body parts" is not unfounded. Ex. 1, Timmons ¶ 4; *see also* Ex. 5, Soh at 7 ("Allowing individuals who were born male to access [restrooms, locker rooms, and shower rooms] creates opportunities for those with antisocial or coercive sexual proclivities to seek out and sexually abuse victims with less difficulty."). Surely schoolchildren should not be in constant worry, while using school bathrooms, "since a bathroom is supposed to be a private, safe place." Ex. 4, Davis ¶ 10.[11]

**B.**      ***Plaintiffs are not likely to succeed on their Title IX claims.***

For the same reasons as explained above, Plaintiffs are not substantially likely to succeed on their Title IX claims. Nonetheless, Plaintiffs' Title IX claim is even less availing than their Equal Protection claim because **Title IX specifically authorizes** laws and policies like SB 615 that separate multiple occupancy restrooms and changing areas by sex. *See* Doc. 47 at 17 (citing 20 U.S.C. § 1686 and 34 C.F.R. § 106.33). Plaintiffs' failure to even mention these dispositive legal authorities, let alone contend with them, speaks volumes. *See* Doc. 24

---

[11] The "problem isn't transgender individuals, but predators who may pretend to identify as a different sex to gain access to vulnerable persons they otherwise would not have access to." Ex. 4, Davis ¶ 15.

at 19-20. A plain reading of the text of 20 U.S.C. § 1686 and 34 C.F.R. § 106.33 alone demonstrates Plaintiffs are not likely to succeed on their claims that SB 615 violates Title IX. For further discussion on the merits of Plaintiffs' Title IX claims, *see* Doc. 47 at 17-25.

## II.    PLAINTIFFS HAVE NOT SHOWN THEY WILL SUFFER IRREPARABLE HARM.

"Irreparable harm is not harm that is 'merely serious or substantial.'" *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted). Instead, "an injury must be certain, great, actual 'and not theoretical[,]'" and of "such *imminence* that there is a clear and present need for equitable relief to prevent the irreparable harm." *Id.* (citations omitted). "Purely speculative harm will not suffice." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009). Here, Plaintiffs have not established they will suffer certain, great, actual, and clearly imminent injury in the absence of their claim for relief.

To start, Plaintiffs' suggestion that alleging a constitutional violation "presumptively" establishes irreparable harm is circular and fails for the same reasons Plaintiffs' constitutional claims are unlikely to succeed on the merits. *Compare* Doc. 24 at 21 *with Supra* Section I. Moreover, it drastically overstates *Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016). Far from establishing a presumption of irreparable harm every time a plaintiff invokes the Constitution, in *Fish* the Tenth Circuit held that courts could not depart from the "traditional equitable inquiry as to the presence of irreparable harm in such a context," even though constitutional violations should "weigh heavily in that analysis." *Id.* at 752.

Next, Plaintiffs' allegations that "shame, stigma, and invalidation" or "discrimination" "may" "result from being forced to use restrooms inconsistent with their gender identity" are speculative and irrelevant because Plaintiffs provide no evidence that they have been forced

to use multiple occupancy restrooms. Doc. 24 at 21. Instead, Plaintiffs acknowledge each school provides a single occupancy accommodation restroom. *See* Doc. 24-1 at ¶¶ 20, 22; Doc. 24-3 at ¶ 17; Doc. 24-5 at ¶¶ 18, 20. And Defendants' witnesses testify repeatedly in support of this as a reasonable accommodation. *See* Ex. 1, Timmons ¶ 7; Ex. 2, R.A. ¶ 7; Ex. 3, Ray ¶ 9; Ex. 4, Davis ¶ 20; Ex. 5, Soh at 7; Ex. 6, Cantor at ¶ 26.

Any remaining complaints of experiencing feelings of shame, stigma, marginalization, emotional distress, and the like from using the single-occupancy accommodation restroom are speculative and insufficient to establish irreparable harm. *See* Doc. 24 at 22-23. Plaintiffs fail to cite a single binding authority to support their argument that "feelings of stigma and marginalization constitute irreparable injury." *Id.* at 22. And the U.S. Supreme Court has explained in the employment context that "humiliation and damage to [a plaintiff's] reputation" "falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction . . . ." *Sampson v. Murray*, 415 U.S. 61, 91-92 (1974).

Nevertheless, even if "psychological harm" and "emotional distress" could theoretically constitute irreparable injury, Plaintiffs fall well short of establishing any concrete, actual evidence of experiencing such harms. Instead, Plaintiffs' complaints amount to being "very upset" or "disappointed" with S.B. 615,[12] feeling "insult[ed][,]" "uncomfortable[,]" or "singled out and stigmatized" by S.B. 615,[13] and finding "very disheartening" the Oklahoma Legislature's policy choices, which Plaintiffs believe "make the lives of transgender people . . . more difficult" or make them "feel unwanted . . . ." Doc. 24-1 at ¶¶ 24-25; Doc. 24-3 at ¶ 21.

---

[12] Doc. 24-1 at ¶ 21, Doc. 24-3 at ¶ 19, Doc. 24-5 at ¶ 16.
[13] Doc. 24-3 at ¶ 18; Doc. 24-1 at ¶ 24.

Plaintiffs even suggest, sans citation, that SB 615 somehow "tell[s] the Students that who they are is wrong and . . . encourag[es] further discrimination against and harassment of the Students." Doc. 24 at 2. SB 615, of course, says nothing of the sort. In addition, State Defendants' experts rebut the notion that any increased risk of depression, self-harm, or suicidal ideations can be attributed to laws such as SB 615 rather than a number of other intervening variables. *See, e.g.*, Ex. 5, Soh at 4; Ex. 6, Cantor at ¶¶ 30-33.

To be sure, one Plaintiff describes being harassed and assaulted during middle school, Doc. 24 at 10, which are serious claims that could potentially change the calculus on an irreparable harm analysis. But even those allegations don't specify whether the assaults were based on the child's transgender status, they arose before the enactment of SB 615, and they relate to a "former middle school" and not the named Defendant that "was more accepting of who I am." Doc. 24-5 at ¶¶ 12-14. Moreover, such accusations at least partially cut in favor of SB 615 and its requirement that a single-occupancy space be provided for all students. If it is truly dangerous for transgender students in a given multiple-occupancy restroom because of the hostility of classmates, *see, e.g.*, Doc. 24 at 11, it is difficult to understand why utilizing the multiple-occupancy restroom one door over would somehow alleviate this problem, especially if students—including the hostile ones—were allowed to access any restroom based on self-identification rather than an objective standard. *See* Ex. 4, Davis ¶ 17.

Plaintiffs' claims of psychological harm and emotional distress are also diminished by the fact they acknowledge their peers and teachers generally treat them with respect and even accommodate their gender identity preferences. *See, e.g.,* Doc. 24-1 at ¶ 18; Doc. 24-3 at ¶ 15. Plaintiffs also claim that certain single-sex restrooms are "out-of-the-way" or inconvenient.

Doc. 24 at 8, 10. But surely ground-breaking constitutional claims, let alone extraordinary injunctive relief, do not rise and fall on the alleged inflexibility of a single teacher, or on the difference between three and six minutes. *See* Doc. 24 at 10. Furthermore, even if true, this would at *most* counsel toward a ruling under state law that a school needed to make the accommodation more reasonable or convenient—not a revolutionary ruling under federal law that, after centuries of practice, single-sex facilities are no longer allowed, period.

Plaintiffs claim that SB 615 interferes with their medical treatment. Doc. 24 at 2. But as the State's experts attest, the State has good reasons to be skeptical of experimental treatments on minors in this area, since gender dysphoria in minors is not "persistent" but rather typically goes away in minors *unless* medical and social transitions are started. Ex. 5, Soh at 2; Ex. 6, Cantor ¶ 20.[14] And Plaintiffs cite no authority indicating that a public school *must* participate in any and every treatment a student is undergoing, no matter how scientifically unmoored or invasive of others' privacy. What Plaintiffs are essentially demanding is that every single student in Oklahoma public schools, as well as every single administrator and official, must be co-opted to participate in their treatment. The State has no right or power to force its entire school system to participate in experimental medical procedures.

Importantly, for every risk of harm that may be experienced by the exclusion of the opposite sex in multiple occupancy bathrooms, there would be an opposite risk of those same harms being experienced by other students by the inclusion of the opposite sex in multiple occupancy bathrooms. For example, Plaintiffs' Motion generally references "health

---

[14] Plaintiffs even acknowledge at one point that "social transition" is *not* the sole treatment for gender dysphoria in children. *See* Doc. 24 at 4 ("aside from psychological therapy").

consequences, physical discomfort, psychological distress, and attendant impairment of focus and concentration caused by attempts to hold urine or restrict fluid or food intake." Doc. 24 at 23.[15] But State Defendants' witnesses testify that, when a gender-identity based policy was in place, their children had similar issues. *See* Ex. 1, Timmons ¶ 5; Ex. 2, R.A. ¶ 3. In other words, Plaintiffs' claims of alleged irreparable harms without the injunction will be matched and mirrored by other harms to school children caused by the injunction.

Finally, Plaintiffs' unnecessary delay in seeking relief must be taken into account. SB 615 took effect on May 25, 2022, yet Plaintiffs waited until September 6, 2022 to file their lawsuit. Doc. 1, and waited until September 29, 2022 to file this motion—well into the new school year, Doc. 24. Plaintiffs' delay shows there is no urgency underlying the alleged harms claimed that would support the issuance of an injunction. *See, e.g., O'Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1017, (10th Cir. 2004) (McConnell, J., concurring) ("a court may naturally ask why, if the injury is so pressing as to warrant preliminary relief, the plaintiff waited so long before bringing a claim"); *RoDa Drilling Co.*, 552 F.3d at 1211 (delay in seeking preliminary injunction is a factor in irreparable harm analysis).

## III. THE BALANCE OF HARMS AND PUBLIC INTERESTS FAVOR THE STATE.

Oklahoma, Oklahoma schools, Oklahoma parents, and Oklahoma schoolchildren will experience irreparable harm if this Court forces Defendants to allow members of the opposite sex to use multiple occupancy restrooms and changing areas in schools. The State has a

---

[15] Somewhat contrariwise, one Plaintiff appears to continue to use the preferred restroom in violation of school policy, Doc. 24-1 at ¶ 23, another Plaintiff is attending online school, Doc. 24-3 at ¶ 20, and one Plaintiff appears to be using the accommodation with minor inconvenience but no complaints of adverse health concerns, Doc. 24-5 at 18-22.

sovereign right to see that its laws are enforced. Accordingly, "'[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (quoting *New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977)); *see also Planned Parenthood v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

In addition, the State has a strong public interest in ensuring that the privacy and safety interests of schoolchildren in its care are sufficiently protected. *See* Doc. 47 at 9-16; *see supra* Section I(A)(4) In sum, the public interest and the interests of the State at large and its citizens, would be severely and irreparably harmed if this Court granted injunctive relief.

Plaintiffs' remaining proposition is that forcing schools to permit students "to use multiple occupancy facilities consistent with their gender fosters positive outcomes compared to segregating facilities on the basis of birth certificates." Doc. 24 at 25. Plaintiffs' speculation that injunctive relief will "foster[] positive outcomes" is outweighed by the concrete and actual harms injunctive relief would cause to the public interest. Moreover, it is contradicted by the State's expert witnesses. Ex. 5, Soh at 5, Ex. 6, Cantor ¶¶ 24-26. On the balance of the equities, the harm that an injunction would cause exceeds any speculative harm claimed by Plaintiffs.

## <u>CONCLUSION</u>

Defendants respectfully request that this Court deny Plaintiffs' Motion.

Respectfully submitted,

*s/ Audrey Weaver*
ZACH WEST, OBA #30768
*Solicitor General*

25

Kyle Peppler, OBA #31681
Audrey A. Weaver, OBA #33258
William Flanagan, OBA #35110
  *Assistant Solicitors General*
Office of Attorney General
  State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:   (405) 521-3921
Zach.West@oag.ok.gov
Kyle.Peppler@oag.ok.gov
Audrey.Weaver@oag.ok.gov
William.Flanagan@oag.ok.gov
*Counsel for State Defendants*