# ATTACHMENT 2

## SUPPLEMENTAL EXPERT DECLARATION OF STEPHANIE L. BUDGE, PH.D.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

Andrew Bridge, et al.,

    *Plaintiffs*,

        v.

Oklahoma State Department of
Education, et al.,

    *Defendants*.

Case No.: CIV-22-787-JD

## SUPPLEMENTAL DECLARATION OF STEPHANIE L. BUDGE, PH.D., IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Stephanie L. Budge, Ph.D., hereby declare as follows:

1.      I submit this expert declaration based on my personal knowledge.

2.      I have been retained by counsel for the Plaintiffs as an expert in the above-captioned lawsuit (the "lawsuit") to provide my expert opinions on certain issues relating to the lawsuit. This supplemental declaration addresses the following issues: 1) the qualifications of state defendants' experts Dr. James Cantor and Dr. Debra Soh; 2) the state defendants' experts' reliance on outdated terminology and misrepresented science regarding how gender identity develops for children and adolescents; 3) why the WPATH Standards of Care Version 8 are not necessary to understanding why transgender youth should use the restroom that aligns with their gender identity; 4) how sex is comprised of multiple components and why gender identity is the most important of those components in determining someone's sex; 5) the fact that "sex assigned at birth" is commonly used

language in the scientific community, 6) why psychotherapy should not be the only intervention to reduce gender dysphoria; and 7) the data supporting the importance of transgender students being able to use restrooms that align with their gender identity.

3.      My opinions contained in this supplemental declaration are based on: 1) my clinical experience as a licensed psychologist working with approximately 200 transgender patients since 2007 through the provision of individual therapy, group therapy, psychological evaluations, and supervision of others' clinical work; 2) my knowledge of the peer-reviewed research, including my own, regarding, among other things, the impact of discrimination on transgender people; and 3) my work training mental health providers to use evidence-based practice and up-to-date standards of care, specifically in working with transgender patients.

4.      I reviewed the declarations of Dr. James Cantor and Dr. Debra Soh submitted in this lawsuit. In this supplemental declaration, I respond to several of the central points in those declarations. I may not address all studies or citations directly, but instead focus on the conclusions from their reports. I may further supplement these opinions in response to additional information from state defendants' experts.

**A.      Dr. James Cantor and Dr. Debra Soh do not have the level of expertise required to provide expert opinions regarding the issues raised in my initial declaration.**

5.      There are several reasons why Dr. Cantor does not have the level of expertise to provide expert opinions regarding the issues discussed in my September 5, 2022 declaration. First, there is no mention in Dr. Cantor's declaration that he has ever treated a minor with gender dysphoria. As well, when mentioning his professional

2

expertise, he does not provide any information that he has ever diagnosed a child or adolescent with gender dysphoria nor does it seem that he has ever monitored or supervised any minor patient receiving gender affirming treatment. In addition to a lack of clinical expertise, Dr. Cantor primarily relies on outdated studies that have since been disproven (for example, Blanchard, 1985; 1990; 1991) or misrepresents scientific studies that have been more recently published. As part of his introduction, Dr. Cantor mentions his prior association with academic journals and as a member of the American Psychological Association. Dr. Cantor has never been on a review board or an editor of a journal that specializes in transgender health, but instead journals that focus on sexuality, sexual behavior, and sexual abuse; it is also notable that he is no longer in these positions.[1] As well, Dr. Cantor mentions his experience being the chair for the Committee for Science Issues for the American Psychological Association but fails to mention that this was 20 years ago (2002-2003) when the field of transgender science was barely emerging.[2] I have been a member of the LGBT Division of APA since 2006 and I have never heard anyone in the division or in greater APA indicating Dr. Cantor's expertise related to transgender issues. As a scholar in the field, I regularly attend transgender-focused academic conferences and also the larger conferences relating to mental health

---

[1] In contrast, I am an associate editor for the *Psychology of Sexual Orientation and Gender Diversity* and on the editorial board of two transgender-centered academic journals (*International Journal of Transgender Health* and *LGBTQ+ Family: An Interdisciplinary Journal*).

[2] In contrast, I was the co-chair of the same committee from 2011-2021 and am a current member of the committee.

issues (such as the American Psychological Association convention). I have never seen Dr. Cantor present at those conferences on any issues relating to transgender health nor have I seen his name listed regarding transgender health on any of the scientific programming at any conference I have attended. In fact, his conference presentations and journal publications primarily focus on pedophilia, sex offenders, and hypersexuality, with only three presentations mentioning transgender people and two publications mentioning transgender people (one of which was not research).

6.      Dr. Soh also does not have any clinical expertise in working with transgender children and adolescents, given that her training was not in any clinically-oriented field. Thus, she has never worked with any transgender youth as patients, nor been trained in any of the clinical aspects of working with transgender children and adolescents. Since Drs. Cantor and Soh collaborate professionally, much of my commentary about Dr. Cantor also applies to Dr. Soh. For example, her area of expertise primarily focuses on pedophilia and fetal alcohol spectrum disorder. She has only published 5 journal articles and has 11 conference presentations, none of which focus on transgender people. She has published one non-peer reviewed book that discusses sex and identity. Similar to Dr. Cantor, I have never come across Dr. Soh's work in my years of experience editing scientific journal articles or at large professional conferences or at transgender-focused conferences. In sum, both Drs. Cantor and Soh are providing commentary in areas outside of their research and clinical expertise. As well, the opinions provided in their declarations are outliers in the field, with most of the commentary misrepresenting data or being outdated. It should also be noted that neither Dr. Cantor nor

Dr. Soh has been recognized by any professional association for their expertise in transgender-specific research or care.[3]

**B.    Dr. Cantor and Dr. Soh rely on outdated terminology and misrepresented science regarding how gender identity develops for children and youth.**

7.    Both Drs. Cantor and Soh use language that focuses on the "desistence" of gender identity in children and adolescents. However, the studies that are cited to promote this argument: a) are often misunderstood, and b) have significant flaws in their design. In these studies, both children who did not have gender dysphoria and children who did not identify as transgender were included in the analyses because they exhibited behaviors that did not conform to gender norms. Therefore, the concept of gender dysphoria being "outgrown" does not make sense for the vast majority of these children since they did not have gender dysphoria to begin with. All of these studies used criteria for diagnosing gender identity disorder that focused mainly on behaviors (and not identity) and had less specific criteria for distinguishing those with the disorder from other children. The current DSM-5 (American Psychiatric Association, 2013) gender dysphoria criteria require that children/adolescents identify with a gender that is different from their assigned gender for at least six months, which was not the case for any of the studies that are cited to indicate whether or not a youth will experience gender dysphoria in the future (see Temple Newhook et al., 2018 for a comprehensive review of the data).

---

[3] In contrast, I have received numerous awards for my advancement in the science and clinical work with transgender people.

8.      Steensma & Cohen-Kettinis (2018) agree that their data have been cited incorrectly to support the purportedly low persistence rates and have stated that their "studies cannot be used to support" (p. 226) the persistence estimation, in that they never calculated or reported rates of persistence/desistence. They also note that the negative social climate for transgender children and adolescents should be taken into account when reading the data (p. 226). They further state that their data did not actually reflect gender dysphoria in children and "expect that future follow up studies using the new diagnostic criteria may find higher persistence rates" (p. 226). Finally, they indicate that the terms "desistence" and "persistence" have been misused; they state that when they were researching youth, there were many youth who may have been "hesitating, searching, fluctuating, or exploring" and that those youth have been misclassified as desisting (p. 227).

9.      In addition, Dr. Cantor mentions the concept of "rapid onset gender dysphoria" ("ROGD"), which has been debunked in the scientific community and is not a valid diagnostic term. In 2018, Lisa Littman conducted a study which has been heavily critiqued for its methodological flaws (see Ashley, 2020 and Restar, 2020 for examples). While there are many flaws in the study Littman conducted, the major ones are: 1) the consent form noted that Littman felt that trans identity in youth was influenced by social contagion, which would likely lead to a self-selection bias of the respondents who would choose to participate in the study, 2) Littman included only *parents* of gender nonconforming or transgender youth and not youth themselves, 3) Littman used unvalidated measures of diagnostic criteria and asked parents to provide diagnostic

6

impressions of their children and also did not provide any psychometric information regarding any measures used, 4) Littman asked parents to comment on their own perceptions of whether or not their child's gender identity had a "rapid onset" (with rapid onset not being defined), 5) 77% of the parents believed their child's transgender identification "was not correct," and 6) recruitment relied significantly on three websites known to have parents who were vocal about promoting the concept of ROGD. Beyond the flaws in the article, scientific evidence also demonstrates that ROGD does not have validity. For example, Bauer et al. (2022) evaluated clinical data from 10 gender clinics across Canada to analyze data focused on youth's report of "recent gender knowledge," which was coded by subtracting age in years from the age adolescents self-reported they "realized your gender was different from what other people called you." The authors analyzed several research questions using their large clinic-based dataset to better understand the claims made by Littman. They indicate: "We did not find support within a clinical population for a new etiologic phenomenon of rapid onset gender dysphoria during adolescence. Among adolescents under age 16 years seen in specialized gender clinics, associations between more recent gender knowledge and factors hypothesized to be involved in rapid onset gender dysphoria were either not statistically significant or were in the opposite direction to what would be hypothesized" (p. 225).

**C.    WPATH Standards of Care Version 8 do not change any of my opinions in my prior declaration and are not necessary to understanding why transgender youth should be allowed to use restrooms that aligns with their gender identity.**

10.     Both Drs. Cantor and Soh critique my use of the WPATH Standards of Care Version 7 ("SOC v.7") in my previous report. When I prepared my previous September 5, 2022 declaration for this lawsuit, the new WPATH Standards of Care Version 8 ("SOC v.8") had not yet been publicly released and at the time, I was citing the most up-to-date version. However, the new SOC v.8 were released on September 15, 2022, and I can report that none of my opinions in my declaration are changed based on any of the updates from version 7 to 8.

11.     It should be noted that medical treatments (hormones and surgery) for children and adolescents are highly regulated and very carefully considered. The clinics I have worked with have strict guidelines surrounding the medical treatment protocols for children and adolescents with gender dysphoria. In my work as a psychologist working with adolescents to determine their readiness for hormones and surgery, there is an extensive protocol in place to evaluate the appropriateness of the interventions for the youth. For example, in my position as a health psychologist at the American Family Children's Hospital in the Pediatric and Adolescent Transgender Health Clinic in Madison, Wisconsin, I worked on an interdisciplinary team with two medical doctors, a nurse, and a social worker. We consulted with the adolescent's mental health provider(s) to assess long-term mental health care. We also gathered information from guardians and others important in the youth's life. Children who had not yet entered puberty are not eligible for any medical interventions pertaining to their gender dysphoria. If considered medically necessary, youth entering puberty (in what is referred to as "Tanner Stage 2") may be given medication to suppress puberty—the same medication given to treat

precocious puberty, where very young children begin puberty prematurely, which has proven safe and is reversible if the medication is discontinued. If clinicians deem it appropriate, adolescents may be evaluated for hormone therapy. Adolescents are rarely even evaluated for surgery prior to reaching the age of majority. It is highly unlikely that a youth who goes through an extensive psychological evaluation and is assessed by multiple health care providers over a long period of time would be "misdiagnosed" with gender dysphoria or inappropriately prescribed irreversible treatment.

12.     Beyond the fact that medical transition processes for transgender youth are highly regulated, none of the commentary that either Drs. Cantor or Soh provide about the SOC v.8 is relevant regarding the use of restrooms by transgender youth. The SOC v.8 simply provide short commentary about ages when youth can access hormones and surgery, and while there is additional context in the WPATH SOC v.8 for this, it also does not matter in the context of discussing the importance of transgender children and adolescents being allowed to use restrooms that are aligned with their gender identity. The data are clear regarding the importance of social transitioning for transgender people, and specifically transgender youth (as the numerous citations in my previous declaration indicate). Thus, medical transition recommendations from SOC v. 8 need not be taken into account when considering the importance of access to restrooms aligned with gender identity for transgender youth.

13.     When I mentioned the SOC v.7 in my previous declaration, I was attempting to provide information to the Court about WPATH and the Standards of Care to which that declaration refers. This is very different than what Dr. Cantor does, which is

to quote the 2012 version of the Standards of Care to promote outdated commentary regarding persistence and desistence of gender identity. The new Standards of Care v.8 provide an updated version of the science, for example: "findings from studies of gender incongruent pubertal/adolescent cohorts, in which participants who have undergone comprehensive gender evaluation over time, have shown persistent gender incongruence and gender-related need and have received referrals for medical gender care, suggest low levels of regret regarding gender-related medical care decisions" (p. 561). As well, Dr. Cantor cites Dahlen et al. (2021), who were critiquing the 2012 Standards of Care which were in the process of being updated in 2021 due to consensus about the standards being outdated. Dr. Cantor also mentions that internationally, public healthcare systems are ending transition-related care for minors around the world but does not provide evidence for this claim.

**D.      Sex is comprised of multiple components.**

14.      Both Drs. Cantor and Soh use outdated, inaccurate, and narrow definitions of sex. Dr. Cantor mentions that sex can only be determined either by "visual inspection" or "chromosomes." There are several significant flaws to this outdated argument, the first being that major medical and psychological associations agree that sex is multifaceted, comprising of chromosomes, hormones, internal and external genitalia, secondary sex characteristics, and gender identity (e.g., American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018). To be more specific, American Medical Association Board member Dr. William Kobler has

10

explained: "Sex and gender are more complex than previously assumed. It is essential to acknowledge that an individual's gender identity may not align with the sex assigned to them at birth. A narrow limit on the definition of sex would have public health consequences for the transgender population and individuals born with differences in sexual differentiation, also known as intersex traits" (AMA, 2018). The second is that visual inspection is inherently flawed regarding determination—for example, if a cisgender man sustains injuries to his genitals to make them unrecognizable, that would mean that his sex is undeterminable. Similarly, in the past, babies with intersex conditions that influence their genitals typically had medical providers decide the sex of the baby, usually deciding female since those genitals were easier to reconstruct (Carpenter, 2016). As noted in my previous declaration, chromosomes are not limited to XX and XY and thus cannot also be deemed as the only major way to determine one's sex. Given that there are biological changes that occur with hormone therapy and gender affirming surgeries (see Coleman et al., 2022), relying solely on one aspect of sex determined in utero is outdated.

15.    Dr. Cantor claims that neuroimaging is capable of distinguishing sex and sexual orientation, but not gender identity. Given the multifaced nature of sex as described above, neuroimaging can capture a multitude of components that reflect the complexity of sex (referred to as the brain mosaic by neuroscience researchers, see Rouse & Hamilton, 2021). Neither Drs. Cantor or Soh provide commentary on the most recent articles I cite, especially the Spizzirri et al. (2018) article that demonstrates that hormone therapy impacts transgender women's brains and their hypotheses about how gender

11

dysphoria may impact the brain. Neuroscience research conducted with transgender people reflects the complexity of sex and has become more specific over the years. There is not one particular component in the brain that is indicative of sex and the studies over the years reflect how researchers are measuring components of sex. For example, transgender women's hypothalamus responded similarly to cisgender women's hypothalamus when encountering pheromones (Berglund et al., 2008) and transgender women demonstrated similar cognitive responses in their parietal lobe to cisgender women when manipulating certain 2D and 3D images (Carillo et al., 2010). In addition, research indicates adolescent trans boys demonstrated alignment with cisgender boys in their sensorimotor network; similar findings were noted for adolescent trans girls when compared to cisgender girls (Nota et al., 2017). A meta-analysis conducted by (Nguyen et al., 2018) notes the longitudinal neurobiological transformations that occur during the use of hormone therapy for both transgender men and transgender women.

16.   As well, there is irrefutable evidence that a person's gender identity cannot be changed (either from transgender to cisgender or from cisgender to transgender). The evidence also indicates that not only can you not change transgender youth's or adults' gender identity, but that it is incredibly harmful to attempt to change their identity. There are numerous sources indicating the harmful and unethical nature of these types of treatments (usually called reparative therapies or conversion therapies). For example, the American Psychological Association's statement on gender diversity and transgender identity in adolescents indicates: "attempts to force gender diverse and transgender youth to change their behavior to fit into social norms may traumatize the youth and stifle their

12

development into healthy adults" (p. 2, Mizock et al., 2015). Data analyzed for over 27,000 transgender participants indicates that gender identity conversion efforts were associated with increased odds of psychological distress and lifetime suicide attempts when compared with transgender participants who had not been exposed to gender identity conversion efforts (Heiden-Roots et al., 2022; Turban et al., 2020). Data from the Turban study indicate that participants who reported engaging in conversion therapies prior to age 10 indicated an increase in the lifetime odds of suicide attempts. These U.S. data are supported by analyses of international data indicating similar outcomes (see Lee et al., 2021; Veale et al., 2021).

17.     Given the complexity of sex, the most important determination of sex should be gender identity. As noted above, the data are clear regarding that one's gender identity cannot be changed and it is a "deeply felt, inherent sense" (APA, 2015). As an example of this, when a cisgender man or woman experiences injuries or illness that impact their internal and external genitalia or secondary sex characteristics, their gender identity is considered central to considerations for reconstructive surgeries or treatments. The data are comprehensive and overwhelmingly indicate the importance of supporting transgender youth's gender identity (e.g., Austin et al., 2022; Durwood et al., 2021; Johns et al., 2018). When transgender youth are not believed, not supported, or required to delay social transition, dire consequences follow—including, but not limited to attempted and completed suicide, depression, anxiety, trauma, and non-suicidal self-injury (see my prior declaration for the full scope of supporting data).

13

**E.     "Sex assigned at birth" is commonly used terminology in the scientific community.**

18.     Both Drs. Cantor and Soh contend that the terminology "sex assigned at birth" should not be used. Their arguments are grounded in a false and narrow definition of what sex is. As well, "sex assigned at birth" is the terminology that is used by the major medical and psychological organizations when referring to infants being labeled as male or female at birth (see American Academy of Pediatrics, 2018; American Psychological Association, 2014; American Psychological Association, 2021; American Psychiatric Association, 2017; American Medical Association, 2018). In addition to this terminology being the primary terminology that is used by these organizations, this is also reflected in the field in academic publications and presentations. For example, in September 2022, in the journal Pediatrics, Turban and colleagues published an article titled "Sex assigned at birth ratio among transgender and gender diverse adolescents in the United States." A Google Scholar search of the term "sex assigned at birth" elicited 2,930 results for articles published in 2022 alone.

**F.     Psychotherapy should not be the only intervention to reduce gender dysphoria.**

19.     It is also my clinical experience that psychotherapy is not effective as the sole treatment for individuals who need to socially transition and who need medical changes to their bodies to reduce gender dysphoria. I have often worked with individuals diagnosed with gender dysphoria who have financial barriers that do not allow them to receive medical treatments. I have also provided psychotherapy to transgender adolescents who experienced interpersonal barriers to social and medical transition.

14

While psychotherapy can assist these patients with coping on a day-to-day basis, many of these patients experience significant distress from delays in social and medical transition and psychotherapy alone does not alleviate their dysphoria. Clinically, I see extremely high rates of suicidal ideation and suicidal intent with patients who have barriers to social and medical transitioning. I have assisted several of these patients with obtaining inpatient care to ensure that they do not die by suicide (which is costly and usually only provides a short-term solution to their immediate distress). As noted in my previous declaration, delaying the transition process can be detrimental for transgender youth, with early recommendations noting the importance of not delaying a gender dysphoria diagnosis and treatments (including social transition) that are most appropriate for the youth (Edwards-Leeper & Spack, 2012) and more recent articles noting the immense harms from delaying treatment (de Vries et al., 2021).

20.    In contrast with the state defendants' expert witnesses, I have been the principal investigator for two psychotherapy clinical trials with transgender patients. In addition to my own clinical experiences with transgender patients, I have first-hand knowledge of thousands of hours of psychotherapy sessions that were collected for the purposes of research. The data from these studies indicate that the psychotherapy is effective as a source of support, but there was not one patient who enrolled with a goal to engage in psychotherapy to replace social or medical transitioning. And, the psychotherapy sessions where medical and social transition came up support my own clinical experience in demonstrating the harm from delayed social and medical transition

15

and the psychological benefit of supporting patients through their social and medical

transition processes.

**G.**     **The data support the importance of transgender students being allowed to use restrooms that align with their gender identity rather than being forced to use only single-user restrooms.**

21.     In my previous declaration, I provided robust evidence that indicate the

harm caused to transgender youth when they are denied access to restrooms aligned with

their gender identity. For example, Price-Feeney et al.'s (2021) study indicating that

transgender youth who were denied access to restrooms that corresponded to their gender

identity reported high instances of depression and suicidality. Dr. Cantor provided

commentary about it being difficult to connect the discrimination to the harm, but

additional studies also address this. For example, in Seelman's (2016) study, the author

statistically controlled for other variables that could account for mental health concerns,

such as interpersonal discrimination outside of the denial of using restrooms aligned with

a transgender person's gender identity, and even when controlling for these issues, the

data indicate that being denied access to restrooms corresponding to one's gender identity

was significantly associated with lifetime suicide attempts for young adults. As well,

McGuire et al.'s (2022) qualitative study directly addresses the issue of attributing harm

to the discrimination—because this study is qualitative, the data directly provide quotes

from research participants who connect the harms to the denial of restroom use.

Participants described being bullied and victimized in the restrooms of their assigned sex

at birth, since their gender presentation usually does not match what would be expected

for those using those restrooms. Participants also described the direct emotional harm

16

caused by their experiences with discrimination linked to restrooms and others'
expectations of which one they should be using.

22.     Beyond the data, I can also speak to my clinical experience and
conversations I have had with patients who described the impact of the harm caused by
not being able to use the restrooms that aligned with their gender identity. I have the
experience of processing the trauma of clients who have been beaten up in restrooms
aligned with their sex assigned at birth. I have also provided coping skills to youth who
have panic attacks when they consider having to use the restrooms aligned with their sex
assigned at birth. I have also problem-solved with youth who hold their urine all day so
they do not have to use the restrooms at school or who are dehydrated because they
refuse to drink liquids for fear of having to use the restroom at school aligned with their
sex assigned at birth. These are just a few examples of experiences of harm that I have
heard firsthand.

23.     Finally, there is additional stigma and harm that can come from transgender
students being required to use a teacher/staff restroom or single-user restrooms at school.
Although this is often labeled an accommodation, it is frequently considered stigmatizing
and segregating by transgender students. For example, in Weihnardt et al.'s (2017) mixed
method study, they note: "One difficulty they encountered was being restricted from
multiple-user bathrooms altogether. Another difficulty was that single-user bathrooms
were locked or located in faculty/staff-only areas, potentially exposing students to
unwanted attention from peers and adults and being seen as different from their peers"
(p. 147). In addition to the social exclusion and being made to feel othered

and different, the process of requiring transgender students to use a faculty/staff restrooms or other single-user restrooms instead of the restroom with their peers also has the potential to out them to others as transgender. Unintentional outing of transgender youth to their peers can subject them to bullying and harassment from others and also increase fears of safety on behalf of the transgender youth (Brumbaugh-Johnson & Hull, 2019). In my personal experience discussing the experience of transgender youth being required to use restrooms other than those aligned with their gender identity, the youth have described intense feelings of shame, difference, embarrassment, being less than others, and dysphoria. Several youth have reported to me that they simply avoid using the restroom altogether if they are required to use restrooms other than those aligned with their gender identity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of American that the foregoing is true and correct.

Stephanie L. Budge, Ph.D.

Executed on _____December 1, 2022_____.

18

# Appendix A

# Supplemental Bibliography of Stephanie L. Budge, Ph.D.

American Academy of Pediatrics (2018) cited via Rafferty, J., Yogman, M., Baum, R., Gambon, T. B., Lavin, A., Mattson, G., ... & Committee on Psychosocial Aspects of Child and Family Health. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics*, *142*(4).

American Medical Association (2018). AMA *Adopts New Policies at 2018 Meeting*. Retrieved from https://www.ama-assn.org/press-center/press-releases/ama-adopts-new-policies-2018-interim-meeting on November 29, 2022.

American Psychiatric Association. (2013). *Diagnostic and statistical manual of mental disorders* (5th ed.). Arlington, VA: American Psychiatric Publishing.

American Psychiatric Association (2017). *Definitions of Gender, Sex, Sexual Orientation, and Pronoun Useage.* https://www.psychiatry.org/psychiatrists/diversity/education/transgender-and-gender-nonconforming-patients/definitions-and-pronoun-usage

American Psychological Association. (2014). *Answers to your questions about transgender people, gender identity, and gender expression*. Retrieved from http://www.apa.org/topics/lgbt/transgender.aspx on November 29, 2022.

American Psychological Association (2021). *APA Resolution on Gender Identity Change Efforts*. Retrieved from https://www.apa.org/about/policy/resolution-gender-identity-change-efforts.pdf on November 29, 2022.

Ashley, F. (2020). A critical commentary on 'rapid-onset gender dysphoria'. *The Sociological Review*, *68*(4), 779-799.

Austin, A., Craig, S. L., D'Souza, S., & McInroy, L. B. (2022). Suicidality among transgender youth: elucidating the role of interpersonal risk factors. *Journal of Interpersonal Violence*, 37(5-6), NP2696-NP2718.

Bauer, G. R., Lawson, M. L., Metzger, D. L., & Trans Youth CAN! Research Team. (2022). Do Clinical Data from Transgender Adolescents Support the Phenomenon of "Rapid Onset Gender Dysphoria"?. *The Journal of pediatrics*, *243*, 224-227.

Berglund, H., Lindström, P., Dhejne-Helmy, C., and Savic, I. (2008). Male-to-female transsexuals show sex-atypical hypothalamus activation when smelling odorous steroids. *Cereb. Cortex* 18, 1900–1908.

Brumbaugh-Johnson, S. M., & Hull, K. E. (2019). Coming out as transgender: Navigating the social implications of a transgender identity. *Journal of Homosexuality*, 66(8), 1148-1177.

Carpenter, M. (2016). The human rights of intersex people: Addressing harmful practices and rhetoric of change. *Reproductive Health Matters*, *24*(47), 74-84.

Carrillo, B., Gómez-Gil, E., Rametti, G., Junque, C., Gomez, A., Karadi, K., Segovia, S., and Guillamon, A. (2010). Cortical activation during mental rotation in male-to-female and female-to-male transsexuals under hormonal treatment. *Psychoneuroendocrinology* 35, 1213–1222.

Coleman, E., Radix, A. E., Bouman, W. P., et al. (2022) Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health*, 23:sup1, S1-S259.

Dahlen, S., Connolly, D., Arif, I., Junejo, M. H., Bewley, S., & Meads, C. (2021). International clinical practice guidelines for gender minority/trans people: Systematic review and quality assessment. *BMJ open*, *11*(4), e048943.

Durwood, L., Eisner, L., Fladeboe, K., Ji, C. G., Barney, S., McLaughlin, K. A., & Olson, K. R. (2021). Social support and internalizing psychopathology in transgender youth. Journal of youth and adolescence, 50(5), 841-854.

de Vries, A. L. C., Richards, C., Tishelman, A. C., Motmans, J., Hannema, S. E., Green, J., & Rosenthal, S. M. (2021). Bell v Tavistock and Portman NHS Foundation Trust [2020] EWHC 3274: Weighing current knowledge and uncertainties in decisions about gender-related treatment for transgender adolescents. *International Journal of Transgender Health*, 22, 217-224.

Edwards-Leeper, L., & Spack, N. P. (2012). Psychological evaluation and medical treatment of transgender youth in an interdisciplinary "Gender Management Service"(GeMS) in a major pediatric center. *Journal of Homosexuality*, *59*(3), 321-336.

Heiden-Rootes, K., McGeorge, C. R., Salas, J., & Levine, S. (2022). The effects of gender identity change efforts on Black, Latinx, and White transgender and gender nonbinary adults: Implications for ethical clinical practice. *Journal of Marital and Family Therapy*, *48*(3), 927-944.

Lee, H., Operario, D., Restar, A. J., Choo, S., Kim, R., Eom, Y. J., ... & Kim, S. S. (2022). Gender Identity Change Efforts Are Associated with Depression, Panic Disorder, and Suicide Attempts in South Korean Transgender Adults. *Transgender Health*.

Littman, L. (2018). Rapid-onset gender dysphoria in adolescents and young adults: A study of parental reports. *PloS one*, *13*(8).

McGuire, J. K., Okrey Anderson, S., & Michaels, C. (2022). "I don't think you belong in here:" The impact of gender segregated bathrooms on the safety, health, and equality of transgender people. *Journal of Gay & Lesbian Social Services*, 34(1), 40-62.

Mizock, L., Mougianis, E., Meier, C., & Moundas, S. (2015). Gender Diversity and  Transgender Identity in Youth. *Journal of Sexual Medicine*, *5*, 1892-1897.

Nota, N. M., Kreukels, B. P., Den Heijer, M., Veltman, D. J., Cohen-Kettenis, P. T., Burke, S. M., & Bakker, J. (2017). Brain functional connectivity patterns in children and adolescents with gender dysphoria: Sex-atypical or not?. *Psychoneuroendocrinology*, 86, 187-195.

Nguyen, H. B., Chavez, A. M., Lipner, E., Hantsoo, L., Kornfield, S. L., Davies, R. D., & Epperson, C. N. (2018). Gender-affirming hormone use in transgender individuals: impact on behavioral health and cognition. *Current Psychiatry Reports*, *20*(12), 1-9.

Price-Feeney, M., Green, A. E., & Dorison, S. H. (2021). Impact of bathroom discrimination on mental health among transgender and nonbinary youth. *Journal of Adolescent Health*, *68*(6), 1142-1147.

Restar, A. J. (2020). Methodological critique of Littman's (2018) parental-respondents accounts of "rapid-onset gender dysphoria". *Archives of Sexual Behavior*, *49*(1), 61-66.

Rouse Jr, M., & Hamilton, E. (2021). Rethinking Sex and the Brain: How to Create an Inclusive Discourse in Neuroscience. *Mind, Brain, and Education*, *15*(2), 163-167.

Seelman, K. L. (2016). Transgender adults' access to college bathrooms and housing and the relationship to suicidality. *Journal of Homosexuality*, *63*(10), 1378-1399.

Spizzirri, G., Duran, F. L. S., Chaim-Avancini, T. M., Serpa, M. H., Cavallet, M., Pereira, C. M. A., ... & Abdo, C. H. N. (2018). Grey and white matter volumes either in treatment-naïve or hormone-treated transgender women: a voxel-based morphometry study. *Scientific Reports*, 8(1), 736.

Steensma, T. D., & Cohen-Kettenis, P. T. (2018). A critical commentary on follow-up studies and "desistence" theories about transgender and gender non-conforming children. *International Journal of Transgenderism*, *19*, 225-230.

Temple Newhook, J., Pyne, J., Winters, K., Feder, S., Holmes, C., Tosh, J., ... & Pickett, S. (2018). A critical commentary on follow-up studies and "desistance" theories about transgender and gender-nonconforming children. *International Journal of Transgenderism*, 19, 212-224.

Turban, J. L., Beckwith, N., Reisner, S. L., & Keuroghlian, A. S. (2020). Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults. *Jama Psychiatry*, *77*(1), 68-76.

Turban, J. L., Dolotina, B., King, D., & Keuroghlian, A. S. (2022). Sex Assigned at Birth Ratio Among Transgender and Gender Diverse Adolescents in the United States. *Pediatrics*, *150*(3).

Veale, J. F., Tan, K. K., & Byrne, J. L. (2021). Gender identity change efforts faced by trans and nonbinary people in New Zealand: Associations with demographics, family rejection, internalized transphobia, and mental health. *Psychology of Sexual Orientation and Gender Diversity*.

Weinhardt, L. S., Stevens, P., Xie, H., Wesp, L. M., John, S. A., Apchemengich, I., ... & Lambrou, N. H. (2017). Transgender and gender nonconforming youths' public facilities use and psychological well-being: a mixed-method study. *Transgender Health*, 2(1), 140-150.