# EXHIBIT 2

2023 WL 4010694
Only the Westlaw citation is currently available.
United States District Court, N.D. Oklahoma.

Rowan FOWLER, et al., Plaintiffs,

v.

Kevin STITT, in his official capacity As Governor
of the State of Oklahoma, et al., Defendants.

Case No. 22-cv-115-JWB-SH
|
Signed June 8, 2023

**Attorneys and Law Firms**

Christina S. Paek, Peter C. Renn, Lambda Legal Defense &
Education Fund, Inc., Los Angeles, CA, Karen Keith Wilkins,
Tulsa, OK, Nicholas Arthur Guillory, Dallas, TX, Shelly Lynn
Skeen, Lambda Legal, Dallas, TX, for Plaintiffs.

Audrey A. Weaver, Zachary Paul West, Oklahoma Office of
the Attorney General, Oklahoma City, OK, Bryan Cleveland,
Oklahoma State Department of Education, Oklahoma City,
OK, Garry Michael Gaskins, II, Drummond Law Firm, Tulsa,
OK, for Defendants.

**MEMORANDUM AND ORDER**

JOHN W. BROOMES, UNITED STATES DISTRICT
JUDGE

**\*1** Plaintiffs are two transgender men and one transgender
woman born in Oklahoma who seek to alter their respective
Oklahoma birth certificates to reflect their sex to be consistent
with their current gender identity. Plaintiffs allege that
the State of Oklahoma's refusal to issue revised birth
certificates violates their federal constitutional rights under
the Free Speech Clause of the First Amendment, the Equal
Protection Clause of the Fourteenth Amendment, and the
Due Process Clause of the Fourteenth Amendment. (Doc.
41.) [1] Defendants move to dismiss for failure to state a claim
pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc.
24.) The motion is fully briefed and ready for review. (Docs.
33, 38.) For the reasons explained below, Defendants' motion
is GRANTED.

**I. BACKGROUND**

Under Oklahoma law, a certificate of birth must be filed with
the Oklahoma State Registrar shortly after birth. *See* 63
O.S. § 1-311(A). The individual preparing the certificate,
typically the attending physician, "shall certify to the facts
of birth and provide the medical information required by
the certificate ..." *See* *id.* § 1-311(B). This includes
information such as the date and time of birth, the child's
name, the names of the parents, and the child's sex (the
"sex designation"). [2] By signing the certificate worksheet, the
parent "attest[s] to the accuracy of the personal data entered
thereon ..." *See* *id.* § 1-311(E).

**\*2** Prior to April 2022, 63 O.S. § 1-321 authorized
the Oklahoma State Department of Health ("OSDH")
Commissioner to amend a birth certificate in the following
situations: (1) to reflect a person's new legal name change; (2)
to show paternity, if paternity was not shown on the original
birth certificate; (3) to change the surname of a child born out
of wedlock; and (4) "in accordance with [the] regulations ...
adopted by the State Commissioner of Health." 63 O.S. §
1-321(A), (C), (D), (E). The applicable regulations authorized
the following amendments: (1) "Name added to certificate if
item blank"; (2) "erroneous entries"; and (3) to "correct[ ]
an error or misstatement of fact as to any non medical
information." *See* Okla. Admin. Code § 310:105-3-3(a)-(d).
Under § 1-321(A), all other amendments were prohibited:
"A certificate or record registered under this article may be
amended *only* in accordance with this article *and regulations
thereunder adopted* by the State Commissioner of Health ...."
63 O.S. § 1-321(A) (emphasis added).

From at least 2007 until late-2021, Oklahoma state district
courts and OSDH allowed transgender people to amend the
sex designation on their birth certificates to match their gender
identity. (Doc. 41 at 2, 12.) Between 2018 and 2021, OSDH
amended the sex designations on the birth certificates of more
than one hundred transgender people to match their gender
identity. (*Id.* at 12.)

In early 2021, each of the Plaintiffs filed Petitions for
Change of Name and Gender Marker and eventually obtained
"court orders directing that the [Plaintiff's] birth certificate
be amended to match their gender identity." (*See id.* at 14,
17-18, 22-23, 25-26.) On August 18, 2021, the District Court
of Tulsa County granted Plaintiff Rowan Fowler's Petition.
(*Id.* at 17.) "In addition to changing her name, the August
18, 2021 court order ... also ordered, adjudged, and decreed
that Ms. Fowler is female; that any designation by Oklahoma

agencies of Ms. Fowler being anything other than female is incorrect; and that she shall be designated as female on official documents generated, issued, or maintained in the State of Oklahoma." (*Id.*) Plaintiff Allister Hall obtained a similar order on August 24, 2021. (*Id.* at 22.) And Plaintiff Carter Ray obtained a similar order on June 24, 2021. [3] (*Id.* at 25.) After obtaining their orders, Plaintiffs promptly sought to amend their birth certificates by providing OSDH with a copy of the court order and paying the requisite fee. (*Id.* at 18, 22, 25.)

Up until that point, the parties agree that it was OSDH's practice to grant such applications and make the necessary amendments. (*See id.* at 12; Doc. 24 at 11 ("[OSDH] complied with those court orders, believing Oklahoma law required said compliance notwithstanding the need to protect the integrity and accuracy of vital statistics records.")) However, this practice apparently ended in October 2021 as the result of litigation commenced by a plaintiff who sought an amended birth certificate with a gender-neutral designation. Commissioner of Health Lance Frye and other OSDH officials eventually entered into a settlement which enabled the plaintiff to obtain an amended birth certificate with a non-binary, gender-neutral designation. (Doc. 41 at 12-13.)

In response to this settlement, Governor Stitt issued a statement on October 21, 2021, in which he stated that: "I believe that people are created by God to be male or female. Period." (*Id.* at 13.) He further stated that: "There is no such thing as non-binary sex, and I wholeheartedly condemn the OSDH court settlement that was entered into by rogue activists who acted without receiving proper approval or oversight. I will be taking whatever action necessary to protect Oklahoma values." (*Id.*) The following day, on October 22, Commissioner Frye announced his resignation, which was effective immediately. (*Id.*)

**\*3**  On November 8, 2021, Governor Stitt issued Executive Order 2021-24 ("Executive Order"), which ordered the OSDH to "[c]ease amending birth certificates that is in any way inconsistent with 63 O.S. § 1-321." The Executive Order provides, in full:

> It has come to my attention that the Oklahoma State Department of Health (OSDH) has entered into a settlement agreement which was not reviewed or approved by my Administration. This settlement requires OSDH to amend birth certificates in a manner not permitted under

Oklahoma Law. This Order ensures that this unauthorized action will be corrected.

63 O.S. § 1-321 establishes how and when a birth certificate may be amended under Oklahoma Law. Neither this statute nor Oklahoma law otherwise provide OSDH or others any legal ability to in any way alter a person's sex or gender on a birth certificate. Moreover, neither this statute, nor OSDH's administrative rules, give the agency authority to enter agreements that circumvent the laws of this state.

Therefore, I, J. Kevin Stitt, Governor of the State of Oklahoma, pursuant to the power vested in me by Article VI of the Oklahoma Constitution, hereby order that OSDH immediately:

1. Cease amending birth certificates that is in any way inconsistent with 63 O.S. § 1-321.

2. Remove from its website any reference to amending birth certificates that is inconsistent with its authority under 63 O.S. § 1-321.

3. Inform the Governor's office of any pending litigation that is related to amending birth certificates in Oklahoma.

4. Provide the Governor's office with any other information that OSDH feels is responsive to this Executive Order.

I also encourage our lawmakers, upon reconvening for the 2nd Regular Session of the 58th Legislature this coming February to:

1. Immediately pass legislation that will clarify, to the extent necessary, that changes in sex or gender on a birth certificate or a designation of non-binary is contrary to Oklahoma Law.

2. Include in the legislation a provision that requires the Commissioner of Health to promulgate any administrative rules necessary to effectuate the purposes of this statute.

Okla. Admin. Code § 1:2021-24 (Nov. 8, 2021).

Plaintiffs' applications were all denied between January and March 2022 when they received an email from Defendant Baker "which invoked the Governor's Executive Order in the denial." (Doc. 41 at 18, 23, 26.) Plaintiffs allege that Governor Stitt and his office have enforced the Executive

Order by specifically instructing OSDH officials that they cannot correct the birth certificates of transgender people to reflect their male or female gender identity. (*Id.* at 14.)

On April 26, 2022, Governor Stitt signed into law Senate Bill 1100 ("SB1100"), which amends 63 O.S. § 1-321 by adding the following provision: "Beginning on the effective date of this act, the biological sex designation on a certificate of birth amended under this section shall be either male or female and shall not be nonbinary or any symbol representing a nonbinary designation including but not limited to the letter 'X' ". 63 O.S. § 1-321(H) (2022); *see also* 2022 Okla. Sess. Laws, c. 87, § 4, emerg. eff. April 26, 2022.

Since then, Oklahoma officials have denied the requests of other transgender people to amend the sex designation on their birth certificate to match their gender identity. (Doc. 41 at 13-14.) They have denied such requests even where they were accompanied by court orders directing that the transgender person's birth certificate be amended to match their gender identity. (*Id.* at 14.) OSDH officials have stated that they believe they cannot grant such requests because of the Executive Order. (*Id.*) Oklahoma continues to permit other changes to birth certificates (such as for adoption and legal name).

**\*4** On March 14, 2022, Plaintiffs filed this lawsuit against Governor Stitt, OSDH Commissioner of Health Keith Reed, and State Registrar of Vital Records Kelly Baker. (Doc. 1.) According to Plaintiffs:

Possessing accurate identity documents that are consistent with a person's gender identity—which represents a person's core internal sense of their own gender—is essential to a person's basic social, economic, physical, and mental well-being. A birth certificate is a critical and ubiquitous identity document used in many settings to verify a person's identity. Access to employment, education, housing, health care, voting, banking, credit, travel, and many government services all hinge on having appropriate and accurate personal documentation that reflects a person's true identity. Birth certificates are also often used to obtain other essential identity documents, such as driver's licenses and passports.

While others born in Oklahoma have access to an accurate birth certificate matching their gender identity, transgender people are barred from obtaining an accurate birth certificate matching their gender identity. Oklahoma's refusal to issue such birth certificates erects a barrier to the full recognition, participation, and inclusion of transgender people in society. Indeed, few things are as essential to personhood and regular interaction in the world as being able to accurately present a person's identity to those with whom they come into contact.

(*Id.* at 1-2.)

In this lawsuit, Plaintiffs challenge Defendants' "*policy and practice of refusing* to provide transgender people with birth certificates that match their gender identity" (the "Policy"). [4] (*Id.* at 11 (emphasis added.)) Plaintiffs allege that Defendants' Policy infringes upon fundamental rights protected by the United States Constitution and discriminates against transgender people which bears indicia of a suspect classification requiring heightened scrutiny by the courts. Plaintiffs bring three claims under 42 U.S.C. §§ 1983 & 1988 alleging violations of the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment. Plaintiffs allege that Oklahoma's Policy "lacks any narrowly-tailored, substantial, or even rational relationship to a valid government interest, and it is not the least restrictive means of achieving a valid government interest." (Doc. 41 at 16.) Plaintiffs contend that the Policy is "not supported by any compelling, substantial, or even legitimate government interest," and is instead "maintained and motivated by animus toward transgender people." (*Id.* at 15-16.)

**\*5** Plaintiffs filed the first amended complaint on July 29, 2022. (Doc. 21.) On August 26, 2022, Defendants filed the present motion to dismiss pursuant to Rule 12(b)(6). (Doc. 24.) The motion was fully briefed as of October 14, 2022 when Defendants filed their reply. (Doc. 38.) In the interim, then-assigned District Court Judge Gregory Frizzell denied Plaintiff Ray's motion to proceed pseudonymously. (Doc. 4; Doc. 37.) As a result, Defendants consented to Plaintiffs filing a second amended complaint to comply with the court's order, and the parties filed a joint stipulation to apply the pending motion to dismiss to Plaintiffs' second amended complaint. (Doc. 39.) The parties agreed that the second amended complaint would only contain non-substantive changes such as the full disclosure of Plaintiff Ray's name and updates to the Plaintiffs' ages due to the time that had passed since the case had been filed. (*Id.* at 1.) Judge Frizzell granted the parties' request on November 7, 2022. (Doc. 40.) Plaintiffs filed the second amended complaint on November 7, 2022.

On January 11, 2023, Defendants filed a Rule 26(c) motion to stay discovery pending resolution of the motion to dismiss. (Doc. 42.) Finding good cause shown, Judge Frizzell granted the motion on January 25. (Doc. 49.) The case was transferred to the undersigned on February 15, 2023. (Doc. 50.)

## II. LEGAL STANDARD

Upon a motion to dismiss, the court must determine whether a complaint states a legally cognizable claim by making allegations that, if true, would show that the plaintiff is entitled to relief. The pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

## III. ANALYSIS [5]

Defendants contend that Plaintiffs fail to state a cognizable claim under the Free Speech Clause of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, or the Due Process Clause of the Fourteenth Amendment. The court addresses each claim in turn.

### A. Free Speech

The court begins by addressing Plaintiffs' First Amendment claim. Plaintiffs claim that Defendants' refusal to amend their birth certificates violates their First Amendment right to freedom of speech in two ways: (1) it restricts their ability to define and express their gender identity; and (2) it compels them "to endorse the government's position as to their own gender," and "disclose their transgender status" when they show their birth certificates to third parties. (Doc. 41 at 32.) Defendants move to dismiss, arguing that the contents of a birth certificate are government speech which does not implicate the First Amendment.

The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. amend. I. The First Amendment protects against prohibitions of speech, and also against laws or regulations that compel speech. "Since all speech inherently involves choices of what to say and what to leave unsaid, one important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say." *Hurley v. Irish-Am. Gay, Lesbian, and Bisexual Grp. of Boston*, 515 U.S. 557, 573 (1995) (citations and quotations omitted); *see also Wooley v. Maynard*, 430 U.S. 705, 714 (1977).

### 1. Prohibition on Speech

**\*6** First, Plaintiffs contend that Defendants' Policy impermissibly "prohibits Plaintiffs from conveying their own constitutionally-protected message about their identity and gender." (Doc. 33 at 32.) But this "argument rests on a faulty conception of expressive conduct." *Interest of C.G.*, 976 N.W.2d 318, 341 (Wis. 2022). The Free Speech Clause's protection "extend[s] ... only to conduct that is inherently expressive." *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.*, 547 U.S. 47, 66 (2006); *see also Cressman v. Thompson*, 798 F.3d 938, 952-53 (10th Cir. 2015) (stating that the "animating principle" behind pure-speech protection is "safeguarding self-expression"). For example, when Plaintiffs present themselves to society in conformance with their gender identities, their conduct is expressive. The expressive component of their transgender identity is not created by the sex designation listed on their birth certificates, but by the various actions they take to present themselves as a man or woman, e.g., dressing in gender-specific clothing, or changing their legal name. *See Interest of C.G.*, 976 N.W.2d at 341. In no way does Defendants' Policy restrict Plaintiffs' ability to express themselves in this manner or otherwise prevent them from bringing their bodies and their gender expression into alignment with their subjective gender identities. (*See* Doc. 41 at 17.)

Defendants' Policy is only implicated when Plaintiffs present their birth certificates to a third-party. However, "[t]he act of presenting identification," or "handing government documents ... to someone else, has never been considered a form of expressive conduct in either legal precedent or in the historical record." *Interest of C.G.*, 976 N.W.2d at 341, 345 ("[I]dentifying one's self is an act, not a mode of expression."); *see also United States v. Cline*, 286 F. App'x 817, 820 (4th Cir. 2008) (holding that production of identification documents does not implicate any right protected by the First Amendment); *United States v. Jaensch*,

678 F. Supp. 2d 421, 431 (E.D. Va. 2010) (same); *Petition of Variable for Change of Name v. Nash*, 190 P.3d 354, 355 (N.M. Ct. App. 2008). A person observing a Plaintiff present himself in conformance with his gender identity would not understand that Plaintiff to be expressing himself as a gender that he does not identify with simply based on the sex designation on his birth certificate. Perhaps the birth certificate might cause a person to realize that a Plaintiff is transgender, but this insight does not stop Plaintiffs from expressing themselves in whatever manner they choose. And while this may inhibit the success of their intended goal to be perceived as a man or woman, "[t]hat impediment does not render the production of identification expressive conduct." *See Interest of C.G.*, 976 N.W.2d at 341.

Accordingly, the court finds that Oklahoma's prohibition on changing a person's sex designation on their birth certificate does not restrict Plaintiffs' rights to freedom of speech or expression.

### 2. Compelled Speech

Next, Plaintiffs contend that Defendants' Policy compels transgender people to use birth certificates that convey Defendants' viewpoint about their gender. [6] (Doc. 33 at 32.) According to Plaintiffs, Defendants' Policy "represents a particular ideology: that a person's gender should be based exclusively on the sex associated with their external genitalia at birth." (*Id.*) Plaintiffs contend that they "cannot be made to endorse the State's message by being forced to communicate it to others." (*Id.*) But Defendants contend that the contents of a birth certificate are government speech which does not implicate the First Amendment.

Government-compelled speech is antithetical to the First Amendment. Forcing an individual "to be an instrument for fostering public adherence to an ideological point of view he finds unacceptable ... 'invades the sphere of intellect and spirit which it is the purpose of the First Amendment to our Constitution to reserve from all official control.' " *Wooley v. Maynard*, 430 U.S. 705, 715 (1977) (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). For example, the government cannot coerce affirmations of belief, compel unwanted expression, or force one speaker to host the message of another as a public accommodation.

*See Hurley*, 515 U.S. at 573; *Wooley*, 430 U.S. at 714; *Barnette*, 319 U.S. at 633-34.

**\*7** However, the "First Amendment's Free Speech Clause does not prevent the government from declining to express a view." *Shurtleff v. City of Boston, Mass.*, 142 S. Ct. 1583, 1589 (2022). The government-speech doctrine provides that: "[w]hen government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). As explained by the Supreme Court:

> That freedom in part reflects the fact that it is the democratic electoral process that first and foremost provides a check on government speech. Thus, government statements (and government actions and programs that take the form of speech) do not normally trigger the First Amendment rules designed to protect the marketplace of ideas. Instead, the Free Speech Clause helps produce informed opinions among members of the public, who are then able to influence the choices of a government that, through words and deeds, will reflect its electoral mandate.

*Id.*

"The doctrine is usually invoked when the question is whether the control that the government exercises over a particular forum (in *Walker*, license plates) constitutes government regulation of private speech (which cannot discriminate on the basis of content) or is no more than the government determining what content it wishes to convey itself." *VDARE Found. v. City of Colo. Springs*, 11 F.4th 1151, 1176 (10th Cir. 2021) (Hartz, J., dissenting) (citing *Walker*, 576 U.S. at 206-07). Thus, "[t]here is no violation of the First Amendment protections of free speech when the government favors particular content, or even a particular viewpoint, so long as it is the government that is speaking." *Id.*

In *Shurtleff*, the Supreme Court explained that the "boundary between government speech and private expression can blur when ... a government invites the people to participate in a program." 142 S. Ct. at 1589 ("In those situations, when does government-public engagement transmit the government's own message? And when does it instead create a forum for the expression of private speakers' views?"). Thus, the court looks to several types of evidence to guide the analysis, including: "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589-90.

Here, the court finds that the content of a birth certificate constitutes government speech which does not implicate the First Amendment. Specifically, birth certificates constitute a purposeful communication of data chosen by the State of Oklahoma, on behalf of the government. The public would reasonably view a birth certificate as spoken by the government—who is certifying the information therein to be accurate—as opposed to the birth certificate holder.

Indeed, government bodies have long used vital records to speak to the public. *See, e.g.*, Am. Bar Ass'n, *Birth Certificates* (Nov. 20, 2018), *available at* https://www.americanbar.org/groups/public_education/publications/teaching-legal-docs/birth-certificates/ (noting that the United States began collecting birth data at the national level in 1902, via the U.S. Census, but certain individual states (which were actually colonies at the relevant time) had already been collecting birth data as far back as the 1630s). Because these are inherently government documents, the State of Oklahoma—not the birth certificate holder—controls every aspect of the issuance and appearance of a birth certificate. The State determines what information is required on a birth certificate, and what information can—and cannot—be subsequently amended. *See Walker*, 576 U.S. at 212 ("[L]icense plates are, essentially, government IDs. And issuers of ID typically do not permit the placement on their IDs of message[s] with which they do not wish to be associated.") (quotations omitted). If state law permitted individuals to communicate their own messages in birth certificates without restriction, birth certificates would cease to function as reliable government-issued identification. *See id.*; *Doe v. Kerry*, 2016 WL 5339804, at *18 (N.D. Cal. 2016). Accordingly, the reasonable interpretation would be that a birth certificate is conveying a message on the

government's behalf—not the birth certificate holder's. *See also Shurtleff*, 142 S. Ct. at 1595 (Alito, J., concurring) ("[The government-speech doctrine] presents no serious problems when the government speaks in its own voice—for example, when ... a governmental body issues a report.").

**\*8** And while the government may be communicating information that a birth certificate holder does not agree with, it is not impermissibly compelling unwanted expression. The cases cited by Plaintiffs are not persuasive because they involved government speech containing an "ideological message" or a political position. *See Janus v. Am. Fed'n of State, Cty., and Mun. Emps.*, 138 S. Ct. 2448, 2464 (2018) (addressing Illinois law which forced employees to subsidize a union, even if they choose not to join and strongly object to the positions the union takes in collective bargaining and related activities); *NIFLA v. Beccera*, 138 S. Ct. 2361, 2375 (2018) (addressing California law which forced pro-life pregnancy centers to notify women that California provides free or low-cost services, including abortions, and give them a phone number to call). These cases implicated the First Amendment because the government's ideological message would be attributed to—or deemed to be endorsed by—the private citizen. But here, the sex designation on a birth certificate simply conveys one of "the facts of birth" that the legislature directed to be recorded at the time of birth. *See* 63 O.S. § 1-311(B). This does not communicate any ideological or political message and is thus distinguishable from the compelled, ideological speech at issue in *Janus* and *NIFLA*.

The court thus finds that Defendants' Policy does not violate the First Amendment's prohibition on government-compelled speech. *See United States v. Arnold*, 740 F.3d 1032, 1034–35 (5th Cir. 2014) (explaining that "compelled disclosure of information on an IRS form" is not unlawful compelled speech"); *see Interest of C.G.*, 976 N.W.2d at 345 (rejecting compelled speech challenge to statute that prohibits sex offenders from changing their legal name, noting that "[t]he State has not branded Ella with her legal name, and when Ella presents a government-issued identification card, she is free to say nothing at all or to say, 'I go by Ella' "). The Policy imposes no restraint on Plaintiffs' freedom to communicate any message to any audience; it does not compel Plaintiffs to engage in any actual or symbolic speech; and it does not compel Plaintiffs to endorse or communicate any political or ideological views. Plaintiffs may not agree

with the information contained in their birth certificates. But for government to work, private parties cannot invoke the protections of the First Amendment to force their elected officials to espouse other views or, more particularly in this case, to collect and record the data Plaintiffs want rather than the data that the government wants to collect; instead, it is through the ballot box that such parties may provide a check on the government's own speech or otherwise compel the government to collect and record data more to their liking. *See* Shurtleff, 142 S. Ct. at 1589; *see also* Johnson v. Wis. Elections Comm'n, 967 N.W.2d 469, 487 (Wis. 2021) (explaining that the freedoms protected by the First Amendment do not entitle the speaker to a favorable outcome in her endeavor).

Accordingly, the court finds Plaintiffs' have failed to state a claim under the First Amendment.

### B. Defendants' Policy does not infringe upon a fundamental right protected by the Fourteenth Amendment's Due Process Clause.

Next, Plaintiffs bring a Fourteenth Amendment substantive due process claim under two theories. First, Plaintiffs allege that the fundamental right to privacy includes the freedom from involuntary disclosure of transgender status. And second, Plaintiffs allege that Defendants' Policy "burdens transgender people's liberty interests, including the right to define and express a person's gender identity and the right not to be treated in a manner contrary to a person's gender by the government." (Doc. 41 at 30-31.) Defendants move to dismiss Plaintiffs' due process claims because Plaintiffs have not identified a fundamental right that is protected by the Fourteenth Amendment. (Doc. 24 at 24.)

"Constitutional analysis must begin with 'the language of the instrument,' which offers a 'fixed standard' for ascertaining what our founding document means." Dobbs v. Jackson Women's Health Org., 142 S. Ct. 2228, 2244-45 (2022) (quoting Gibbons v. Ogden, 9 Wheat. 1, 186-189, 6 L. Ed. 23 (1824)). The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Constitution makes no express reference to a right to privacy concerning one's gender, nor does it reference a right to be treated consistent with one's gender identity. Thus, Plaintiffs must show that the right is somehow implicit in the constitutional text, i.e., that the Due

Process Clause provides substantive protection for Plaintiffs' "liberty" interest. Dobbs, 142 S. Ct. at 2245.

**\*9** Under the Supreme Court's jurisprudence, the Due Process Clause protects two categories of substantive rights. "The first consists of rights guaranteed by the first eight Amendments." *Id.*; *see also* McDonald v. City of Chicago, Ill., 561 U.S. 742, 763-67 (2010). The second category, which Plaintiffs rely upon here, "comprises a select list of fundamental rights that are not mentioned anywhere in the Constitution." Dobbs, 142 S. Ct. at 2246.

The latter category is one of the most controversial issues in constitutional law. *See* Moore v. East Cleveland, 431 U.S. 494, 503 (1977) (plurality opinion) ("Substantive due process has at times been a treacherous field for this Court."). In essence, substantive due process is a judicial doctrine that allows courts to conclude that the "liberties" specially protected by the Due Process Clause include additional rights beyond those specifically protected by the Bill of Rights. The Supreme Court has used this doctrine to recognize the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion. *See* Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (citing cases).

The fundamental quandary with this doctrine, however, is that it lacks any well-defined limiting principle.[7] *See* Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992) (cautioning that the "guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended"). Indeed, the natural human tendency to confuse what the Fourteenth Amendment protects with a jurist's ardent views about the liberty that Americans should enjoy, "has sometimes led the Court to usurp authority that the Constitution entrusts to the people's elected representatives." *Dobbs*, 142 S. Ct. at 2447. Judicial caution is thus imperative and courts should "exercise the utmost care whenever we are asked to break new ground in this field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences" of the judicial branch. Glucksberg, 521 U.S. at 720. And when determining whether this breaking of new ground amounts to recognizing rights long understood but not stated, or instead amounts to constitutionalizing the judge's own notions of

right and wrong, courts should consider whether the relief sought amounts to a proper exercise of the judicial power, or whether it requires the exercise of powers reposed elsewhere under our constitutional system.

The Constitution divides the powers of the federal government into three distinct categories: the legislative power, the executive power, and the judicial power. Those powers spring from the "People of the United States." U.S. Const. preamble. Under Article II of the Constitution, the entirety of the executive power is vested in the President of the United States. *Id.* Art. II, § 1, cl. 1; *see also Seila Law LLC v. Consumer Fin. Prot. Bur.*, 140 S. Ct. 2183, 2197 (2020) (noting that the entire executive power is vested in the President and "belongs to the President alone"). Similarly, Article III vests the entirety of the judicial power in the Supreme Court "and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. Art. III; *see also Marbury v. Madison*, 5 U.S. 137, 173 (1803) ("The constitution vests the whole judicial power of the United States in one supreme court, and such inferior courts as congress shall, from time to time, ordain and establish. This power is expressly extended to all cases arising under the laws of the United States ..."). By contrast, Article I vests Congress with only a portion of the legislative power. *See* U.S. Const. Art I (limiting the scope of Congress's powers to those "legislative Powers herein granted").

**\*10** Each of these distinct powers is fundamentally different in its nature than the other powers. *See, e.g., Gundy v. United States*, 139 S. Ct. 2116, 2133 (2019) (Gorsuch, J., dissenting) ("To the framers, each of these vested powers had a distinct content."); *see also Wayman v. Southard*, 23 U.S. 1, 46 (1825) ("The difference between the departments undoubtedly is, that the legislature makes, the executive executes, and the judiciary construes the law"). Reduced to its essence, the legislative power is the power to make law. *See* The Federalist No. 78 (A. Hamilton) (defining legislative authority as the power to "prescrib[e] the rules by which the duties and rights of every citizen are to be regulated"). It includes the ability to not only enact laws, but also to abolish laws and to change laws. *See Az. State Leg. v. Az. Indep. Redistricting Comm'n*, 576 U.S. 787, 828 (2015) (Roberts, J., dissenting) (noting that the legislative power consists of the "power to make and repeal laws"). The executive power contemplates the authority to execute or carry out the laws, and to enforce them, but not to make laws in the first instance.

*See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952) ("In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."). And the judicial power is the power to construe and apply the law. *See Marbury*, 5 U.S. at 177 ("It is emphatically the province and duty of the judicial department to say what the law is."). Indeed, it is limited by the Constitution to be exercised in the context of cases and controversies, which has long been understood to prohibit federal courts from rendering advisory opinions regarding the interpretation or constitutionality of a law outside of a live case or controversy. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, (1936) ("The Court has frequently called attention to the 'great gravity and delicacy' of its function in passing upon the validity of an act of Congress; and has restricted exercise of this function by rigid insistence that the jurisdiction of federal courts is limited to actual cases and controversies; and that they have no power to give advisory opinions. And even within the context of an existing case, the judicial power comprehends only that a court should say what the law is, not what it ought to be.").

To alter or add to the Constitution requires an exercise of legislative power. This can be understood intuitively, or at least inductively, from the nature of the three powers of government. The act of establishing a constitution in the first instance is clearly an exercise of legislative power —the power to make law. No one could suggest that a president or a court could undertake to enact a new constitution through their respective executive or judicial powers. Similarly, it requires an exercise of legislative power to abolish a constitution, as was the case when the Articles of Confederation were abolished and replaced with the Constitution. Yet when it comes to altering the Constitution, such as by augmenting it with new rights not articulated therein or understood as being contemplated by the relevant constitutional provision at the time it was enacted, some view this as falling within the scope of the judicial power.

*See, e.g., Missouri v. Holland*, 252 U.S. 416, 433 (1920) (articulating the legal theory of a "living constitution," which suggests that the Constitution's meaning changes over time);;

*see also American Bush v. City of South Salt Lake*, 140 P.3d 1235, 1256 (Utah 2006) (Durrant, J., concurring) ("Adherents to this approach consider the constitution a living, evolving document that is malleable, sensitive to, and capable of reflecting changing social conditions, attitudes, perceptions, and trends."). However, if it requires legislative power to

enact a constitution, and legislative power to abolish a constitution, then simple logic dictates that legislative power, not judicial power, is required to alter a constitution. Were it not for the need to avoid the obvious problem of triggering the process contemplated under Article V of the Constitution, we would likely refer to an alteration of the meaning of that instrument as an "amendment."

Just as intuition and consideration of the basic nature of the powers of government shows that legislative power is wielded when changing constitutional meaning, the same conclusion can be reached deductively by analyzing relevant provisions of the Constitution. Article V of the Constitution describes the amendment process. That provision authorizes Congress to propose amendments, but it does not empower Congress to approve them. Instead, ratification is left to the People, acting through their respective state legislatures, or through state conventions, depending on the mode of ratification proposed by Congress. In either case, the question arises as to what power the People exercise when they ratify changes to the Constitution. It cannot be the judicial power, because in Article III they gave the entirety of the judicial power to the courts. Likewise, it cannot be an exercise of the executive power, because the totality of that power was given to the president under Article II. The only remaining alternative is the legislative power because, as plainly stated in Article I, the People invested Congress with only a portion of that power. U.S. Const. Art. I ("All legislative Powers *herein granted* shall be vested in a Congress of the United States ...." (Emphasis added)). Thus, it is beyond cavil that in approving changes to the Constitution under Article V, the People are exercising a portion of their retained legislative power because that is the only power they have left.

**\*11** Based on the foregoing, one might wonder how a court, invested only with the judicial power, could undertake to engraft new rights onto the Constitution when that appears to be a prerogative that the People reserved to themselves. More specifically, when a court undertakes to alter the Constitution in that manner, from whom does it acquire the legislative power necessary to do so? Certainly not from Congress, for not even Congress is authorized to alter the Constitution, though the text of Article V makes clear that Congress has an indispensable role in that process. What becomes readily apparent from an analysis of the nature of each of the three powers of government, and the manner in which the People separated and granted those powers in Articles I, II, III, and V of the Constitution, is that the only way a court could undertake to alter the Constitution is to appropriate to itself

the legislative power that the People reserved to themselves to perform that very task.

Some have suggested that the framers of the Constitution could never have intended the meaning of that document to remain static over the more than two centuries since it was originally ratified, and that the difficulties inherent in the amendment process envisioned in Article V necessitate a means for keeping it up to date with the needs of an ever-changing society. *See* 🏳 Holland, 252 U.S. at 433 ("The case before us must be considered in the light of [our] whole experience and not merely in that of what was said a hundred years ago."); R. Randall Kelso, *Contra Scalia, Thomas, and Gorsuch: Originalists Should Adopt a Living Constitution*, 72 U. Miami L. Rev. 112, 117-18 (2017) (opining that when jurists adopt "a static or fixed approach to constitutional interpretation that seeks to determine how the framers and ratifiers would have decided the case in 1789 (or 1791 for the Bill of Rights, or 1868 for the Fourteenth Amendment's Due Process or Equal Protection Clauses), they are not following either the historically valid original intent or original meaning of the Constitution"). Moreover, since the courts regard themselves as the final arbiters of the Constitution, many feel that the more or less incremental changes that flow from decisions of the Supreme Court provide a proper means to accomplish that important task. *See, e.g.*, Franita Tolson, *Benign Partisanship*, 88 Notre Dame L. Rev. 395, 429 (2012) (arguing that the Supreme Court "can resolve at least some of the [constitutional] issues created by gerrymandering by incrementally changing the norms that govern the process of redistricting"). But early authorities on the meaning of the Constitution did not see it that way.

During the debates on ratification of the Constitution in the winter of 1788, one of the leading Anti-Federalist voices opposing ratification of the proposed constitution was an author writing under the pseudonym "Brutus." In an essay published in the *New York Journal* in January of 1788, Brutus lamented that, under the proposed constitution, the federal courts would be empowered "to explain the constitution according to the reasoning spirit of it, without being confined to the words or letter." Brutus No. XI (Jan. 31, 1788), reprinted in *The Debate on the Constitution: Federalist and Anti-Federalist Speeches, Articles and Letters During the Struggle Over Ratification, Part Two: January to August 1788*, at 131 (Bernard Bailyn ed., 1993). Continuing, he noted that "in their decisions [the federal courts] will not confine themselves to any fixed or established rules, but will determine, according to what appears to them, the reason

and spirit of the constitution." *Id.* at 132; *see also* Brutus No. XII (Feb. 7 & 14, 1788), *reprinted in* The Debate on the Constitution, *supra*, at 171 (explaining that the Supreme Court's ability to interpret the Constitution according to the spirit of the law will serve to expand federal power at the expense of the states).

**\*12** Alexander Hamilton responded directly to Brutus' concerns on this point in Federalist 81. Hamilton began by summarizing Brutus' contentions:

> The arguments or rather suggestions, upon which this charge is founded, are to this effect: "The authority of the proposed supreme court of the United States, which is to be a separate and independent body, will be superior to that of the legislature. The power of construing the laws, according to the *spirit* of the constitution, will enable that court to mould them into whatever shape it may think proper; especially as its decisions will not be in any manner subject to the revision or correction of the legislative body. This is as unprecedented as it is dangerous. In Britain, the judicial power in the last resort, resides in the house of lords, which is a branch of the legislature; and this part of the British government has been imitated in the state constitutions in general. The parliament of Great-Britain, and the legislatures of the several states, can at any time rectify by law, the exceptionable decisions of their respective courts. But the errors and usurpations of the supreme court of the United States will be uncontrollable and remediless." This, upon examination, will be found to be altogether made up of false reasoning upon misconceived fact.

The Federalist No. 81 (A. Hamilton). Hamilton promptly countered Brutus' argument by observing "there is not a syllable in the plan under consideration, which *directly* empowers the national courts to construe the laws according to the spirit of the constitution ...." *Id.* (emphasis in original). Moreover, to the extent that the courts might usurp legislative power in construing the constitution in this manner, Hamilton observes:

> Particular misconstructions and contraventions of the will of the legislature may now and then happen; but they can never be so extensive as to amount to an inconvenience, or in any sensible degree to affect the order of the political system. This

> may be inferred with certainty from the general nature of the judicial power; from the objects to which it relates; from the manner in which it is exercised; from its comparative weakness, and from its total incapacity to support its usurpations by force. And the inference is greatly fortified by the consideration of the important constitutional check, which the power of instituting impeachments, in one part of the legislative body, and of determining upon them in the other, would give to that body upon the members of the judicial department. This is alone a complete security. There can never be a danger that the judges, by a series of deliberate usurpations on the authority of the legislature, would hazard the united resentment of the body entrusted with it, while this body was possessed of the means of punishing their presumption by degrading them from their stations.

*Id.*

Thus, prior to ratification, leading voices among both the Federalists and the Anti-Federalists decried the notion that the federal courts might depart from the text of the Constitution and interpret the laws according to the spirit of that document. The Anti-Federalists regarded this as one of a number of risks so grave as to justify denying ratification altogether, while the Federalists viewed it as an approach not authorized by the Constitution and one, in any event, which would be curtailed by the threat of impeachment.

**\*13** Nearly fifty years later, Supreme Court Justice Joseph Story addressed similar concerns in his oft-cited work from 1833, *Commentaries on the Constitution of the United States*. In commenting on the propriety of judges altering established constitutional meaning in order to accommodate the changing views of public opinion or the perceived needs of a changing society, Story observed:

> Temporary delusions, prejudices, excitements, and objects have

irresistible influence in mere questions of policy. And the policy of one age may ill suit the wishes, or the views of another. The Constitution is not to be subject to such fluctuations. It is to have a fixed, uniform, permanent construction. It should be, so far at least as human infirmity will allow, not dependent upon the passions or parties of particular times, but the same yesterday, to-day, and for ever.

1 Joseph Story, *Commentaries on the Constitution of the United States*, at 410 (1833). Repeatedly emphasizing the ills of an evolving constitution in the hands of the judges, Story noted that courts were bound by the established meaning of the Constitution until the people availed themselves of the right to alter it through the amendment process:

No man in a republican government can doubt, that the will of the people is, and ought to be, supreme. But it is the deliberate will of the people, evinced by their solemn acts, and not the momentary ebullitions of those, who act for the majority, for a day, or a month, or a year. The constitution is the will, the deliberate will, of the people. They have declared under what circumstances, and in what manner it shall be amended, and altered; and until a change is effected in the manner prescribed, it is declared, that it shall be the supreme law of the land, to which all persons, rulers as well as citizens, must bow in obedience. When it is constitutionally altered, then and not until then, are the judges at liberty to disregard its original injunctions ....

....

The only means known to the constitution, by which to ascertain the will of the people upon a constitutional question, is in the shape of an affirmative or negative proposition by way of amendment, offered for their adoption in the mode prescribed by the constitution.

3 Joseph Story, *Commentaries on the Constitution of the United States*, at 473, 475 (1833). And in a sobering admonition, Story reminded judges of the difficulties attendant to fulfilling their duties on this point:

The truth is, that, even with the most secure tenure of office, during

good behaviour, the danger is not, that the judges will be too firm in resisting public opinion, and in defence of private rights or public liberties; but, that they will be too ready to yield themselves to the passions, and politics, and prejudices of the day. In a monarchy, the judges, in the performance of their duties with uprightness and impartiality, will always have the support of some of the departments of the government, or at least of the people. In republics, they may sometimes find the other departments combined in hostility against the judiciary; and even the people, for a while, under the influence of party spirit and turbulent factions, ready to abandon them to their fate. Few men possess the firmness to resist the torrent of popular opinion. Still fewer are content to sacrifice present ease and public favour, in order to earn the slow rewards of a conscientious discharge of duty; the sure, but distant, gratitude of the people; and the severe, but enlightened, award of posterity.

**\*14** *Id.* at 476-77.

In sum, the nature of, and differences between, the legislative and judicial powers makes it abundantly clear that altering the Constitution requires an exercise of the legislative power, not the judicial power. Moreover, simple deductive reasoning demonstrates that when the People exercise their authority to amend the Constitution under Article V, they are exercising the legislative power because that is the only one of the three powers of government retained by the People under Articles I, II, and III. And finally, authoritative sources from the first fifty years of our constitutional history roundly condemned the notion that judges could circumvent the amendment process by interposing their own views of what the Constitution should say and mean.

There can be no doubt that views on this topic have changed considerably since Justice Story penned his admonitions. With the passage of time it appears that the lawyers and the judges became discontented with the restraints placed

on their power by the Constitution. Undoubtedly many were motivated with good intentions to deal with societal problems that were not being addressed by other departments of government, and which they thought could be solved with a few minor adjustments to the established meaning of certain constitutional provisions. The trajectory of that change, and the risks associated therewith were aptly summarized by Professor Paul L. Gregg in his article, *The Pragmatism of Mr. Justice Holmes*, published at the height of World War II:

> Many there are among the followers of Holmes' philosophy, who do not take the Constitution seriously. Let it stand, they say, but let it be a tool and not a testament; let it be an instrument for affecting social reforms that the people want. This is, in brief, the tenor of such recent books as Mr. Justice Jackson's *The Struggle for Judicial Supremacy*, and Levy's *Our Constitution – Tool or Testament*, as well as countless other books and law review articles too numerous to catalogue here. Of many quotations which might be cited to show the temper of the new pragmatism in Constitutional law, one will suffice for our present purpose. It was written by Mr. Justice Frankfurter sometime before his elevation to the Supreme Court. He says:

> > "Whether the Constitution is treated primarily as a text for interpretation or as an instrument of government may make all the difference in the world. The fate of cases, and thereby of legislation, will turn on whether the meaning of the document is derived from itself or from one's conception of the country, its development, its needs, its place in civilized society."

> Felix Frankfurter, *Mr. Justice Holmes* 58 (1931).

> Before the weaving of pragmatism into the fabric of American jurisprudence, chiefly by Holmes and Pound, men had always assumed that the Constitution, by its very nature, is a document to be interpreted by reference to itself; that it is the deposit of the fundamental principles – absolute at least within the frame of our Constitutional system – by which the fate of cases and legislation should be determined; that it is the guarantee of substantial individual rights against encroachment by dominant

majorities or minorities. In short, the Constitution has until recently been thought of as the ultimate safeguard against what has aptly been call "an unbridled juristic impressionism buffeted by gusts of popular frenzy." But in the new juristic pragmatism there is no safeguard. The Constitution is to be interpreted in terms of current public policy and popular will.

> **\*15** History – recent history for that matter – shows that, in the absence of fixed principles of law and legal rights, the popular will soon dwindles into the will of the party in power, and the party will shrivels into the will of the party leader. Where there are no absolute principles of individual rights, there will soon be no democracy.

Paul L. Gregg, *The Pragmatism of Mr. Justice Holmes*, 31 Geo. L.J. 292-93 (1943) (some internal citations omitted).

Perceptive of the past, perhaps prescient of the future, Professor Gregg seemed to accurately grasp what Justice Story warned of a century earlier – the consequences of a judicial philosophy, well-intentioned though it may be, that disregards the nature of the Constitution and the powers of government conveyed therein as it was understood when conceived, and instead appropriates to the judges powers that were reserved exclusively to the People.

With these and other concerns in mind, the Supreme Court has undertaken efforts to prevent substantive due process from turning into a freewheeling exercise of judicial subjectivity that effectively amends the Constitution. First, when a court considers whether to recognize rights under substantive due process, such rights should be acknowledged only if there is an established history and tradition of protecting them, with the tradition stated at "the *most specific* level" of abstraction. *Michael H. v. Gerald D.*, 491 U.S. 110, 127 n.6 (1989) (Scalia, J., plurality opinion) (emphasis added); *see also Glucksberg*, 521 U.S. at 769-70 (Souter, J., concurring) ("When identifying and assessing the competing interests of liberty and authority, for example, the breadth of expression that a litigant or a judge selects in stating the competing principles will have much to do with the outcome and may be dispositive ... [j]ust as results in substantive due process cases are tied to the selections of statements of the competing interests."). And second, the *Dobbs* Court recently emphasized that the asserted right must be "fundamental to our scheme of ordered liberty" and "deeply rooted in this

Nation's history and tradition." *Dobbs*, 142 S. Ct. at 2246 (quoting *Timbs v. Indiana*, 139 S. Ct. 682, 686 (2019)).

### 1. Framing the asserted right at the most specific level of abstraction

Plaintiffs contend that Defendants' Policy infringes upon transgender people's fundamental rights (1) to "informational privacy," and (2) to "liberty, autonomy, and dignity." (Doc. 33 at 23.) Under the first theory, Plaintiffs contend that the constitutional right to informational privacy protects against involuntary disclosure of "information that is highly personal and intimate," such as a person's transgender status. (Doc. 41 at 30.) Plaintiffs allege that the "involuntary disclosure of a person's transgender status can ... cause significant harm, including by placing a person's personal safety and bodily integrity at risk," and deprives Plaintiffs of control over the circumstances around such disclosure. (*Id.* at 31.) Under the second theory, Plaintiffs contend that the "constitutional protections that shelter a person's medical decisions, bodily autonomy, dignity, expression, and personhood prohibit the government from interfering with the right to live in accordance with a person's gender identity." (*Id.*)

But these asserted rights are articulated in broad, general terms. Instead, "substantive due process" analysis "must begin with a *careful description* of the asserted right, for the doctrine of judicial self-restraint requires [courts] to exercise the utmost care whenever we are asked to break new ground in this field." *Reno v. Flores*, 507 U.S. 292, 302 (1993) (internal quotations and brackets omitted) (emphasis added). A careful analysis reveals that any right against involuntary disclosure of highly-sensitive and confidential medical information is not at issue in this case. Unlike in the cases Plaintiff relies upon, Plaintiffs are not alleging that Defendants involuntarily disclosed any information to anyone. [8] *See A.L.A. v. West Valley City*, 26 F.3d 989, 990 (10th Cir. 1994) (recognizing there is a constitutional right to privacy regarding disclosure by a police officer of the results of an arrestee's HIV test without the arrestee's knowledge or consent); *Herring v. Keenan*, 218 F.3d 1171, 1173 (10th Cir. 2000) (same); *Leiser v. Moore*, 903 F.3d 1137, 1141 (10th Cir. 2018) (discussing in dicta authority from the Second Circuit holding that there is a constitutional right to privacy regarding disclosure of an individual's transsexualism, but not expressly ruling on the issue because

it was not relevant to the case). These cases do not address what is distinctive about this lawsuit: Plaintiffs want to *compel* the government to amend its own records to reflect Plaintiffs' desired characteristics. However, the substantive component of the Due Process clause protects "substantive liberties of the person," *Planned Parenthood of SE Pa. v. Casey*, 505 U.S. 833, 853 (1992), and acts to substantively restrain the state from the "affirmative abuse of power," *DeShaney v. Winnebago Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 196 (1989) (quotation omitted). "Substantive due process rights do not encompass a right to compel a state to do something *for* someone not under some form of custody or restraint." *Doyle v. Okla. Bar Ass'n*, 998 F.2d 1559, 1568 (10th Cir. 1993) (emphasis in original). Thus, any fundamental right to informational privacy is not implicated in this case. *Cf. NASA v. Nelson*, 562 U.S. 134, 155-57 (2011) (holding that the government's mere collection of information did not violate an assumed privacy interest when the information was sufficiently protected against public disclosure).

**\*16** Nor is the broadly-defined right to "liberty, autonomy, and dignity" at issue in this case. At least not in the sense that Defendants are prohibiting Plaintiffs from bringing their bodies and gender expression into alignment with their respective gender identities. On the contrary, Plaintiffs are generally free to live, exist, and express themselves in conformance with their chosen gender identities. Defendants' Policy has imposed no restrictions on how Plaintiffs present themselves to society and the State has even allowed Plaintiffs to legally change their names and the sex designation on their drivers' licenses. As such, it is disingenuous to characterize Defendants' Policy as one broadly infringing upon Plaintiffs' medical decisions, bodily autonomy, dignity, expression, and personhood. *Compare with Lawrence v. Texas*, 539 U.S. 558, 578 (2003) (striking down a Texas statute criminalizing homosexual sodomy because the plaintiffs' "right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government").

The court thus rejects Plaintiffs' broad, general formulation of the rights at issue. At the most specific level of abstraction, Plaintiffs are asserting the right to amend the sex designation on their birth certificate to be consistent with their gender identity. *See Michael H.*, 491 U.S. at 127 n.6. Although this right has been recognized by a handful of other federal

courts, this right has never been recognized by the Supreme Court or the Tenth Circuit.

### 2. Analyzing whether the right is anchored in history and tradition

Because the asserted right does not have a sound basis in precedent, the court must instead turn to the history and tradition that map the essential components of our Nation's concept of ordered liberty to determine what the Fourteenth Amendment means by the term "liberty." This necessarily requires a "careful analysis" of the "historical support" of the right at issue. 🚩 *Dobbs*, 142 S. Ct. at 2246–47 ("*Timbs* and *McDonald* concerned the question whether the Fourteenth Amendment protects rights that are expressly set out in the Bill of Rights, and it would be anomalous if similar historical support were not required when a putative right is not mentioned anywhere in the Constitution."). For example, the Supreme Court in *Glucksberg* analyzed more than 700 years of "Anglo-American common law tradition" to determine whether the Due Process Clause confers the right to assisted suicide, and in *Timbs* the Court "traced the [asserted] right back to Magna Carta, Blackstone's Commentaries, and 35 of the 37 state constitutions in effect at the ratification of the Fourteenth Amendment." 🚩 *Dobbs*, 142 S. Ct. at 2246–47 (citing 🚩 *Glucksberg*, 521 U.S., at 711; 🚩 *Timbs*, 139 S. Ct. at 687–90). "Historical inquiries of this nature are essential whenever we are asked to recognize a new component of the 'liberty' protected by the Due Process Clause because the term 'liberty' alone provides little guidance." 🚩 *Dobbs*, 142 S. Ct. at 2247.

But here, Plaintiffs have failed to allege sufficient facts for the court to conclude that the right to amend the sex designation on their birth certificate has historically been protected. Plaintiffs allege that transgender people in Oklahoma had the right to amend their sex designation "from at least 2007 if not earlier, through most of 2021." (Doc. 41 at 12.) Even assuming this right existed somewhat prior to 2007, Plaintiffs point to no authority to suggest that it existed prior to 1908 [9] when Oklahoma first began filing birth records. Thus, the right certainly did not exist on July 9, 1868, when the Fourteenth Amendment was adopted. *See* 🚩 *Dobbs*, 142 S. Ct. at 2254 ("Not only are respondents and their *amici* unable to show that a constitutional right to abortion was established when the Fourteenth Amendment was adopted, but they have found no support for the existence of an abortion right that predates the latter part of the 20th century—no state constitutional provision, no statute, no judicial decision, no learned treatise.").

**\*17** In their brief, Plaintiffs offer little historical analysis concerning the law in other jurisdictions. But it appears that until recently, [10] there was little-to-no support in any American jurisdiction for a constitutional right to change the sex designation on a person's birth certificate. To the court's knowledge, no state constitutional provision presently recognizes such a right. And while Plaintiff contends that "47 states [currently] permit transgender people to correct their birth certificates to match their gender identity," Plaintiff offers no historical context for when the statutory protections were granted. (Doc. 33 at 21.)

Nor have Plaintiffs established that the asserted right is an essential component of ordered liberty. Plaintiffs cite *Obergefell* for the proposition that "individual dignity and autonomy," including the right "to define and express their identity," is a fundamental liberty interest. (Doc. 33 at 27.) But the *Obergefell* Court did not claim that this broadly-framed right was absolute. *See* 🚩 *Obergefell v. Hodges*, 576 U.S. 644, 703 (2015) (Roberts, J., dissenting) (noting that "the majority does not suggest that its individual autonomy right is entirely unconstrained"). While individuals are certainly free to think and to say what they wish about their identity, they are not always free to act in accordance with those thoughts. *See* 🚩 *Dobbs*, 142 S. Ct. at 2257; *see also* 🚩 *Pennekamp v. State of Fla.*, 328 U.S. 331, 351 (1946) (Frankfurter, J., concurring) ("[T]he Constitution [does] not allow absolute freedom of expression—a freedom unrestricted by the duty to respect other needs fulfillment of which make for the dignity and security of man.").

More importantly, an individual's freedom to act does not confer the right to *compel the government to act*. *See, e.g., Brown v. Cooke*, 362 F. App'x 897, 900 (10th Cir. 2010) ("[T]here is [no] fundamental right of citizens to compel the Government to accept a common-law name change and reform its records accordingly."); 🚩 *Doyle*, 998 F.2d at 1568 ("Substantive due process rights do not encompass a right to compel a state to do something for someone not under some form of custody or restraint ...."). Plaintiffs' freedom to define and express their identity may correspond to one of the many understandings of "liberty," but it is certainly not an integral component of "ordered liberty," as that term has

2023 WL 4010694

been defined by the Supreme Court. *See Dobbs*, 142 S. Ct. at 2257 ("License to act on the basis of such beliefs may correspond to one of the many understandings of 'liberty,' but it is certainly not 'ordered liberty.' ").

In sum, Plaintiffs fail to allege sufficient facts to conclude that there is a long history and tradition of protecting the right to amend the sex designation on a birth certificate, or that such right is fundamental to our scheme of ordered liberty. Because Plaintiffs are not asserting a fundamental right, Defendants' Policy will be upheld if it is rationally related to a legitimate government purpose. *See* Section III.D *infra*.

### C. Plaintiffs are not a suspect or quasi-suspect class under the Equal Protection Clause.

Next, Plaintiffs claim that Defendants' Policy violates the Fourteenth Amendment's Equal Protection Clause. Plaintiffs contend that Defendants' Policy engages in sex-based discrimination, which is subject to heightened scrutiny. (Doc. 33 at 12.) But Defendants argue that "transgender status is not, as a matter of law, a suspect classification under the Equal Protection Clause." (Doc. 24 at 17.) Defendants thus contend that Plaintiffs' claim should be analyzed under the rational basis framework.

**\*18** The Equal Protection Clause provides that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.A. It is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). But the guarantee of equal protection coexists, of course, with the reality that most legislation must classify for some purpose or another. *See Romer v. Evans*, 517 U.S. 620, 631 (1996). Thus, the Equal Protection Clause "does not forbid classifications. It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). When considering an equal protection claim, the court must first determine what level of scrutiny applies; then, the court must determine whether the law or policy at issue survives such scrutiny.

In determining what level of scrutiny applies to an equal protection claim, the court looks to the basis of the distinction between the classes of persons. *See generally United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4

(1938). "If the challenged government action implicates a fundamental right, or classifies individuals using a suspect classification, such as race or national origin, a court will review that challenged action applying strict scrutiny." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1109 (10th Cir. 2008). In such a case, "the government has the burden of proving that [its] classifications are narrowly tailored measures that further compelling governmental interests." *Id.* (quoting *Johnson v. California*, 543 U.S. 499, 505 (2005)).

"If, instead, the challenged government action classifies people according to a quasi-suspect characteristic, such as gender or illegitimacy, then [the] court will apply intermediate [or heightened] scrutiny." *Id.* at 1109-10. In those cases, the test would be whether the government can demonstrate that its classification serves "important governmental objectives" and is "substantially related to achievement of those objectives."

But if the challenged government action does not implicate either a fundamental right or a protected class, the court will apply rational basis review. *Carney v. Okla. Dep't of Public Safety*, 875 F.3d 1347, 1353 (10th Cir. 2017). Under the rational basis standard, Plaintiffs' claim will fail "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (citing *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).

The court begins by noting that the Fourteenth Amendment contains no language concerning "inherently suspect classifications," or, for that matter, merely "suspect classifications." *See* U.S. Const. amend. XIV. The familiar "tiers of scrutiny" is thus a judicially-created doctrine that can be traced back to the famous *Carolene Products* footnote. *United States v. Carolene Products Co.*, 304 U.S. 144, 152 n.4 (1938) (suggesting that "a more searching judicial inquiry" is warranted when prejudice against "discrete and insular minorities" undercuts the "operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry"). Over the years, the Court has developed a three-tiered system offering varying degrees of protection depending upon whether a group is designated as a suspect, quasi-suspect, or non-suspect class.

Because "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," the

starting point for evaluating the constitutionality of a law under the Equal Protection Clause has long been the rational basis test. *F.C.C. v. Beach Comm'c'ns, Inc.*, 508 U.S. 307, 313 (1993); *see also Metro. Cas. Ins. Co. v. Brownell*, 294 U.S. 580, 583 (1935). Thus, "[i]n areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Comm'c'ns, Inc.*, 508 U.S. at 313. "This standard of review is a paradigm of judicial restraint." *Id.* "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Vance v. Bradley*, 440 U.S. 93, 97 (1979).

**\*19** However, the Supreme Court has recognized that a more searching level of judicial inquiry is appropriate when a law discriminates based on "suspect" characteristics. Obviously, race is the paradigmatic suspect classification under the Fourteenth Amendment. *See Sugarman v. Dougall*, 413 U.S. 634, 649 (1973) (Rehnquist, J., dissenting) (citation omitted) ("The principal purpose of those who drafted and adopted the Amendment was to prohibit the States from invidiously discriminating by reason of race, and, because of this plainly manifested intent, classifications based on race have rightly been held 'suspect' under the Amendment."). The Supreme Court has expanded the list of suspect classes to also include national origin and alienage. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) (holding classification based on alienage is a suspect classification); *Oyama v. California*, 332 U.S. 633, 646-47 (1948) (holding classification based on national origin is a suspect classification). Laws that facially discriminate against a suspect class are subject to strict scrutiny and rarely survive judicial review. *See Cleburne*, 473 U.S. at 440 (explaining that the classifications of race, alienage, or national origin "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy ....").

Recognizing that not every classification was always inherently suspect, but that rational basis review was insufficient to protect against some types of invidious discrimination, the Supreme Court developed a third category, referred to as "quasi-suspect" classifications, which are subject to intermediate scrutiny. To date, the Supreme Court has only placed two classifications in this category: sex and illegitimacy. *See Reed v. Reed*, 404 U.S. 71 (1971) (holding classifications based on sex calls for heightened standard of review); *Trimble v. Gordon*, 430 U.S. 762, 767 (1977) (holding that classifications based on legitimacy were not inherently suspect but that "[i]n a case like this, the Equal Protection Clause requires more than the mere incantation of a proper state purpose").

Unfortunately, *Reed*, *Trimble*, and their progeny offer little guidance for determining whether intermediate scrutiny should apply to classifications based on characteristics beyond sex or illegitimacy.[11] There is at least superficial consensus that courts should be skeptical of—and should scrutinize more carefully—classifications involving politically powerless groups that have historically been discriminated against. But beyond this basic truism, much is unsettled. Indeed, the Supreme Court has not provided a carefully-crafted test or precisely-defined criteria for determining quasi-suspectness. *See* Marcy Strauss, *Reevaluating Suspect Classifications*, 35 Seattle U. L. Rev. 135, 138 (2011) ("Since the outcome of an equal protection case is largely determined by whether the group is designated as a suspect, quasi-suspect, or nonsuspect class, one may assume that the test for distinguishing between the three types of classes has been carefully crafted and precisely defined. But despite decades of case law on this specific issue, nothing could be further from the truth."). Instead, it has pointed to some vague and ill-defined considerations, including a history of discrimination, a circumstance of immutability, and political powerlessness.[12] *See generally Frontiero v. Richardson*, 411 U.S. 677 (1973) (Brennan, J., plurality opinion). Even when a Supreme Court majority has agreed on the correct characteristics of a suspect class, it has not settled on the required elements and the appropriate weight each element should receive.[13] *See* Susannah W. Pollvogt, *Beyond Suspect Classifications*, 16 U. Pa. J. Const. L. 739, 777 (2014).

**\*20** The Court's abstract quasi-suspect framework did not enjoy strong majority support and was subject to sharp criticism at the time. *See United States v. Virginia*, 518 U.S. 515, 567 (1996) (Scalia, J., dissenting) ("We have no

established criterion for 'intermediate scrutiny' either, but essentially apply it when it seems like a good idea to load the dice."); *Craig v. Boren*, 429 U.S. 190, 221 (1976) (Rehnquist, J., dissenting) (criticizing the components of intermediate scrutiny as "so diaphanous and elastic as to invite subjective judicial preferences or prejudices relating to particular types of legislation"); *Sugarman v. Dougall*, 413 U.S. 634, 657 (1973) (Rehnquist, J., dissenting) ("[U]nless the Court can precisely define and constitutionally justify both the terms and analysis it uses, these decisions today stand for the proposition that the Court can choose a 'minority' it 'feels' deserves 'solicitude' and thereafter prohibit the States from classifying that 'minority' different from the 'majority.' I cannot find, and the Court does not cite, any constitutional authority for such a 'ward of the Court' approach to equal protection.").

Because of this sharp divide, the Supreme Court has been reluctant to expand the scope of quasi-suspect classifications. In fact, since adding illegitimacy in 1977, the Supreme Court has declined every opportunity to recognize a new quasi-suspect class. *See, e.g.,* *City of Cleburne*, 473 U.S. at 445-46 (refusing to recognize mental disabilities as a quasi-suspect classification, as "it would be difficult to find a principled way to distinguish" that classification from "a variety of other groups"); *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (holding that age classifications are subject to rational basis review); *see also* *id.* at 319-20 (Marshall, J., dissenting) (noting that the Supreme Court "has apparently lost interest in recognizing further 'fundamental' rights and 'suspect' classes"); *Romer v. Evans*, 517 U.S. 620, 633 (1996) (avoiding the question of whether a classification based on sexual orientation merits heightened scrutiny); *Obergefell*, 135 S. Ct. at 2597-2604 (same).

As it currently stands, there is no indication that the Supreme Court is willing to extend heightened scrutiny to any other classifications. *See* Kenji Yoshino, *The New Equal Protection*, 124 Harv. L. Rev. 747, 757-58 (2011) (arguing that the Supreme Court has, in essence, closed the "heightened scrutiny canon," and thus no new groups will be added to the suspect or quasi-suspect categories). This includes, as is relevant here, classifications based on gender identity, either by recognizing transgender people as a distinct quasi-suspect class or by compressing transgender people into classifications based on sex.

Nor has the Tenth Circuit expressly indicated a willingness to extend heightened scrutiny to classifications based on transgender status either. The Tenth Circuit first addressed this issue in *Brown v. Zavaras*, 63 F.3d 967 (10th Cir. 1995). In that case, the court rejected a transgender inmate's claim that by denying estrogen treatment, the defendants violated the plaintiff's equal protection rights. The court relied on a Ninth Circuit case which held "that transsexuals are not a protected class ... because transsexuals are not a discrete and insular minority, and because the plaintiff did not establish that 'transsexuality is an immutable characteristic determined solely by the accident of birth' like race, or national origin." *Brown*, 63 F.3d at 971 (quoting *Holloway v. Arthur Andersen & Co.*, 566 F.2d 659, 663 (9th Cir. 1977)). The Tenth Circuit did discuss that "[r]ecent research may support reevaluating *Holloway*," but the court determined that the plaintiff's "allegations are too conclusory to allow proper analysis of this legal question." *Id.* Thus, the court decided to "follow *Holloway* and hold that [the plaintiff] is not a member of a protected class in this case." *Id.*

The Tenth Circuit had the opportunity to revisit this issue in 2015. But the court did not engage in any meaningful analysis. The court simply confirmed that, "[t]o date, this court has not held that a transsexual plaintiff is a member of a protected suspect class for purposes of Equal Protection claims," and analyzed the plaintiff's equal protection claim under rational basis. *Druley v. Patton*, 601 F. App'x 632, 635 (10th Cir. 2015) (citing *Brown*, 63 F.3d at 971).

**\*21** The court notes that there have been calls for the Tenth Circuit to revisit its holding in *Brown. See, e.g.,* *Griffith v. El Paso Cnty., Colo.*, 2023 WL 2242503, at \*9 (D. Colo. 2023) (stating that the court "has little trouble stating that the Tenth Circuit needs to revisit its holding in *Brown v. Zavaras*" because *Holloway* has since been overruled and the holding "is out-of-step with the 'many district courts' that 'have analyzed the relevant factors for determining suspect class status and held that transgender people are at least a quasi-suspect class' "). But until the Tenth Circuit does so, *Brown* remains good and binding law. For this reason, and because "courts have been very reluctant, as they should be in our federal system" to create new suspect classes, the court declines to expand the application of intermediate

Case 5:22-cv-00787-JD    Document 79-2    Filed 06/21/23    Page 19 of 23

scrutiny to a new quasi-suspect class. *See* Johnston v. Univ. of Pittsburgh of the Comm. Sys. of Higher Educ., 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015) (declining to recognize transgender status as a class entitled to heightened scrutiny because neither the Supreme Court nor the Third Circuit have ruled otherwise); *see also* Cleburne, 473 U.S. at 441 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.").

Moreover, the premature designation of suspect classifications would disrupt the necessary balance between the judicial branch and the democratic process. [14] Finding that transgender people are a quasi-suspect class would have implications that reach beyond the limited issue presented in this case (i.e., Plaintiffs' right to amend their birth certificates), as it would subject *all* future legislation concerning transgender people to heightened scrutiny. The legislature must have a certain amount of flexibility and freedom from judicial oversight in shaping and limiting their policies. As Justice Powell noted in *Frontiero*:

> There are times when this Court, under our system, cannot avoid a constitutional decision on issues which normally should be resolved by the elected representatives of the people. But democratic institutions are weakened, and confidence in the restraint of the Court is impaired, when we appear unnecessarily to decide sensitive issues of broad social and political importance at the very time they are under consideration within the prescribed constitutional processes.

Frontiero, 411 U.S. at 692 (Powell, J., concurring). Justice Powell's admonition is particularly instructive now, when Congress and legislatures across the country are struggling with a broad array of legislation to address the multitude of concerns and conflicts arising around the subject of transgender rights. *See, e.g.*, H.R. Res. 269, 118th Cong. (2023) ("Recognizing that it is the duty of the Federal Government to develop and implement a Transgender Bill of Rights to protect and codify the rights of transgender and nonbinary people under the law and ensure their access to medical care, shelter, safety, and economic security."); S.B. 613, 2023 Reg. Sess. (Okla., enacted May 1, 2023) (banning gender-affirming care for minors); S.B.23-188, 74th G.A. (Colo., enacted Apr. 14, 2023) (establishing gender-affirming care as "legally protected"); S.B. 180, 2023-24 Leg. Sess. (Kan., eff. July 1, 2023) (defining male and female based on sex assigned at birth and declaring that "distinctions between the sexes" in bathrooms and other spaces serves "the important governmental objectives" of protecting "health, safety and privacy").

**\*22** Accordingly, the court finds that Plaintiffs do not constitute a quasi-suspect class for equal protection purposes. *See* Brown, 63 F.3d at 971; Griffith, 2023 WL 2242503, at \*9.

**D. Defendants' Policy is rationally related to its stated purpose.**

Because Defendants' Policy does not infringe upon a fundamental liberty interest or implicate a suspect class, the challenged action is subject to rational basis review. Carney, 875 F.3d at 1353. Defendants argue that the Policy survives rational basis review, as it furthers at least two legitimate state interests: (1) protecting the integrity and accuracy of vital records, including documenting birth information and classifying individuals based on the two sexes; and (2) using those classifications to protect the interests of women. (Doc. 24 at 22-23.) While Plaintiffs primarily contend that Defendants' Policy is subject to heightened review, Plaintiffs contend that it fails even rational basis review. (Doc. 33 at 19.) According to Plaintiffs, Defendants' Policy "does not promote any interest in accuracy and, in fact, thwarts that interest." (*Id.* at 20.) Plaintiffs further contend that protecting women is not a legitimate interest, nor is Defendants' Policy rationally related to that interest. (*Id.* at 22.)

A law or policy complies with the Fourteenth Amendment's Due Process and Equal Protection Clauses under the rational basis test if there is a "rational relationship between the [policy] and the government's stated purpose." Bolden v. City of Topeka, 327 F. App'x 58, 61 (10th Cir. 2009). State actions subject to rational-basis review are "presumed

constitutional," and courts uphold the actions "if there is any reasonably conceivable state of facts that could provide a rational basis for" them. *Petrella v. Brownback*, 787 F.3d 1242, 1266 (10th Cir. 2015) (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012); *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). The Supreme Court has often indicated that rational basis review should not inquire into the actual purpose of the challenged classification. Those attacking the rationality of the state action thus have the burden "to negative every conceivable basis which might support it." *Beach Comm'c'ns*, 508 U.S. at 315 (citing *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

Here, there is a rational basis for a policy of categorically prohibiting the amendment of the sex designation on a birth certificate. Under Oklahoma law, the purpose of a birth certificate is to record "the facts of the birth." *See* 63 O.S. § 1-311(B). The legislature has delegated authority to the State Commissioner of Health "to protect the integrity and accuracy of vital statistics records." *Id.* § 1-321(A). Protecting the integrity and accuracy of vital records is obviously a legitimate state interest. *See, e.g.*, *Pavan v. Smith*, 137 S. Ct. 2075, 2079 (2017) (Gorsuch, J., dissenting) ("[R]ational reasons exist for a biology based birth registration regime, reasons that in no way offend *Obergefell*—like ensuring government officials can identify public health trends and helping individuals determine their biological lineage, citizenship, or susceptibility to genetic disorders."). And this interest is logically furthered by a law prohibiting subsequent alterations to the "facts of birth." *See* *MH v. First Judicial Dist. Ct. of Laramie Cnty.*, 465 P.3d 405, 412 (Wyo. 2020) (Kautz, J., concurring) ("[C]hanges to a birth certificate which seek to alter 'the facts of the birth' undermine the integrity and the accuracy of the birth certificate.").

*23 Plaintiffs contend that Defendants' Policy actually thwarts the government's interest in promoting accuracy because it promotes inconsistency under the law. (Doc. 33 at 20.) Notably, Oklahoma previously allowed other transgender people to change the sex designation on their birth certificates, while denying Plaintiffs that same opportunity. And Oklahoma currently still allows transgender people to change the sex designation on their driver's licenses, leading to transgender people having inconsistent identity documents. *See, e.g.*, *K.L. v. State, Dep't of Admin.*, 2012 WL 2685183, at *7 (Ak. Sup. Ct. 2012) (holding that the refusal to correct a transgender woman's driver's license failed to "further[ ] ... the state's interest in accurate document[s] and identification" and created a risk of "inaccurate and inconsistent identification documents").

However, neither the Due Process Clause nor the Equal Protection Clause demand logical tidiness. The fact that a law is imperfect does not make it irrational. *See* *Vance v. Bradley*, 440 U.S. 93, 108 (1979) ("Even if the classification involved here is to some extent both underinclusive and overinclusive, and hence the line drawn by Congress imperfect, it is nevertheless the rule that in a case like this perfection is by no means required."); *Murgia*, 427 U.S. at 314 (explaining that where rationality is the test, "perfection in making the necessary classifications is neither possible nor necessary"). Indeed, the government "must be allowed leeway to approach a perceived problem incrementally." *Beach Comm'c'ns*, 508 U.S. at 316. " '[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others.' " *Id.* (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489 (1955)) (finding a rational basis where the state made geographic distinctions to determine tax rates for slot machines).

Moreover, the court can readily conceive of reasons that a state might want to preserve the accuracy of the facts of a birth related to biological sex. By way of example, there is currently a debate raging across the country about the propriety of allowing biological men to participate in women's sports. *Compare* 70 O.S. § 27-106(E)(1) (2022) (prohibiting "students of the male sex" from participating on athletic teams designated for "females," "women," or "girls"); *with* Cal. Educ. Code § 221.5(f) (2014) ("A pupil shall be permitted to participate in sex-segregated school programs and activities, including athletic teams and competitions, and use facilities consistent with his or her gender identity, irrespective of the gender listed on the pupil's records."). Women fought for decades to achieve equality in sports, resulting in victories such as Title IX of the Education Amendments of 1972, which required equal opportunities for women to participate in athletics at federally-funded education institutions. *See* 20 U.S.C. § 1681. Now,

all of a sudden, it appears that some of those hard-won victories may be slipping away as biological men, who may not be particularly competitive in male sports, compete as transgender women and begin to displace women from the podiums in women's sporting events. As legislative bodies grapple with solutions to this problem and contemplate protections for women in women's sports, they might readily conclude that birth certificates provide a ready, reliable, non-invasive means of verifying the biological sex of participants in women's athletics should they choose to enact statutes that restrict participation by biological men.

It is not the role of the court to decide whether Defendants have chosen the best path, or the least restrictive means. *See Powers v. Harris,* 379 F.3d 1208, 1217 (10th Cir. 2004) (stating that, under the rational basis standard, "[s]econd-guessing by a court is not allowed"); *Beach Comm'c'ns, 508 U.S. at 313* ("[E]qual protection analysis is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). The court's role is limited to determining the constitutionality of Defendants' Policy. Under the Fourteenth Amendment, the State of Oklahoma is not required to make special accommodations for transgender people, so long as their actions toward such individuals are rational. *See Bd. of Trs. of Univ. of Ala. v. Garrett,* 531 U.S. 356, 367-68 (2001). The State "could quite hardheadedly—and perhaps hardheartedly"—hold to laws or policies "which do not

make allowance" for persons whose gender identity conflicts with that recorded at the time of their birth. *Id.*; *see also New Orleans v. Dukes,* 427 U.S. 297, 303 (1976) ("The judiciary may not sit as a super legislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...."). "If special accommodations for [transgender people] are to be required, they have to come from positive law and not through the Equal Protection Clause." *Garrett,* 531 U.S. at 357.

**\*24** Because there is a reasonably conceivable state of facts that provides a rational basis for Defendants' Policy, the court finds that the Policy does not violate the Fourteenth Amendment. Accordingly, Plaintiffs fail to state a cognizable claim under the Due Process or Equal Protection Clauses.

## IV. CONCLUSION
IT IS THEREFORE ORDERED that Defendants' motion to dismiss (Doc. 24) is GRANTED.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2023 WL 4010694

## Footnotes

1    As explained in Section I *infra,* Plaintiffs filed the second amended complaint (Doc. 41) after the motion to dismiss had been fully briefed. But the parties filed a joint stipulation indicating that this pleading only contains non-substantive changes and the parties asked the court to treat the pending motion to dismiss as applying equally to the second amended complaint. (Doc. 39.) The parties' request was granted by the then-assigned district court judge. (Doc. 40.) Accordingly, the court cites to the second amended complaint herein as it is the operative pleading.

2    In the second amended complaint, Plaintiffs refer to this as the "sex designation on their birth certificates, also known as a gender marker." (Doc. 41 at 2.) However, Plaintiffs allege that their Oklahoma birth certificates "currently indicate[ ]" that their "sex" is male or female. (*Id.* at 4.) Prior to April 2022, the Oklahoma statute and applicable regulations were silent on the official term, but the Oklahoma legislature has since clarified that the item is a "biological sex designation." *See* 63 O.S. § 1-321(H) (2022). Thus, based on Plaintiffs' allegations that their birth certificates list "sex" as opposed to "gender," the enactment of 63 O.S. § 1-321(H), and the fact that Plaintiffs are seeking prospective relief, the court finds that the proper term is "sex designation." *See also* 63 O.S. § 1-310(a) (providing that Oklahoma birth certificates "shall include as a minimum the items recommended by the federal agency responsible for national vital statistics"); Centers for Disease Control

and Prevention, *Model State Vital Statistics Act and Model State Vital Statistics Regulations*, Item 3, Page 1 (June 2021 Rev.) (recommending the "sex of the infant" be included in a birth certificate).

3   The allegations concerning Ray's court order are slightly different than the others. The second amended complaint alleges that the court "ordered, adjudged, and decreed that the gender marker on Mr. Ray's birth certificate be changed to male and that OSDH issue a new birth certificate consistent with the changes ordered." (Doc. 41 at 25.)

4   Plaintiffs do not directly challenge the applicable Oklahoma statute and regulations. Plaintiffs seem to contend that Oklahoma law has affirmatively granted transgender people the right to amend their sex designation on a birth certificate since at least 2007. However, Plaintiffs offer little more than a conclusory statement in a footnote to support this position. (*See* Doc. 33 at 10 n.1.) As explained above, the Oklahoma legislature only authorized the Commissioner of Health to amend birth certificates in the situations specifically set forth in the statute and the regulations. *Cf. Okla. Alcoholic Bev. Control Bd. v. Central Liquor Co.*, 421 P.2d 244, 249 (Okla. 1966) ("Certainly our Legislature was well aware of this widely employed practice and could easily have inserted language authorizing discounts based upon quantity had it intended such an exception to Section 536. It did not do so."). Neither the statute nor the regulations authorize the Commissioner to amend the sex designation. As such, Defendants' enforcement of Oklahoma law would only be unconstitutional if the underlying law is unconstitutional. Nevertheless, it does not appear that Plaintiffs are *required* to challenge the statute, so the court will refer to the challenged state action as the "Policy," as Plaintiffs have framed it in the second amended complaint. *See Veritext Corp. v. Bonin*, 2022 WL 1719271, at *3 (E.D. La. 2022) ("Many cases that include enforcement related injunctive relief do allege that the underlying state statute is unconstitutional or violates federal law, but this type of allegation does not appear to be a requirement.").

5   In some respects, Plaintiffs, who obtained state court orders directing OSDH to amend their birth certificates, are asking the court to enforce these orders. To the extent that Plaintiffs' claims are based on Defendants' violations of state court orders, they must seek enforcement from the court(s) that issued the orders, as this court generally does not have jurisdiction to enforce orders made by another court or to compel that court to take any action. *See Sameer v. Khera*, 2018 WL 4039964, at *1 (E.D. Cal. 2018) (citing cases); *LaBranche v. Becnel*, 2013 WL 12091147, at *2 (E.D. La. 2013) ("[F]ederal courts, as courts of original jurisdiction, do not sit as appellate courts to review, modify, nullify, or enforce the orders of the state courts.").

6   As noted, *supra*, the Oklahoma legislature has made it clear that the relevant information on the birth certificate is a biological sex designation. Thus, as a factual matter, Plaintiffs are simply wrong: to the extent the birth certificate conveys the government's viewpoint on the subject at all, it only conveys a viewpoint on Plaintiffs' biological sex, not any gender with which they might identify.

7   As President Lincoln once said: "We all declare for Liberty; but in using the same word we do not all mean the same thing." *Dobbs*, 142 S. Ct. at 2446 (quoting Address at Sanitary Fair at Baltimore, Md. (Apr. 18, 1864), reprinted in 7 The Collected Works of Abraham Lincoln 301 (R. Basler ed. 1953)).

8   Oklahoma law generally prohibits the government from providing a copy of a birth certificate to unauthorized individuals. *See* 63 O.S. § 1-323(A) (stating that it is unlawful to issue a copy of a birth certificate except to certain authorized individuals, e.g., the person subject to the birth certificate, parents, legal representatives, etc.).

9   *See* Okla. State Dep't of Health, *Birth Certificates* (2023), *available at* https://oklahoma.gov/health/services/birth-and-death-certificates/birth-certificates.html ("Oklahoma began filing birth records in October of 1908. It was not mandatory, however, that these records be filed until 1917. Because birth records were not required for identification as they are today, not all records prior to 1940 were placed on file consistently.").

2023 WL 4010694

10    The first court case recognizing the right as being protected by the U.S. Constitution was not decided until 1975. *See* 🚩*Darnell v. Lloyd*, 395 F. Supp. 1210 (D. Conn. 1975) (holding that the State Commissioner of Health's refusal to change the sex recorded on the applicant's birth certificate from male to female in order to reflect her sex reassignment surgery infringed on the applicant's equal protection rights).

11    In *Reed*, the Court did not perform any sort of suspect classification analysis, but simply determined that the sex classification lacked a rational relationship to the goal of the law. *See* 🚩*Reed*, 404 U.S. at 75-76 ("The Equal Protection Clause ... den[ies] to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute."); *see also* 🚩*id.* at 76 ("A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' ").

12    In a plurality opinion, the Supreme Court first examined these factors and concluded that they justify applying strict scrutiny to state action that discriminates against women. 🚩*Frontiero v. Richardson*, 411 U.S. 677, 684-88 (1973) (Brennan, J., plurality opinion) (discussing reasons why women constitute a suspect class). Later, however, the Court settled upon intermediate scrutiny as the standard for analyzing claims of sex-based discrimination. *See* 🚩*Craig v. Boren*, 429 U.S. 190 (1976).

13    For example, in *Plyler v. Doe*, the Court conceded that the formula for determining suspect status suffers from lack of specificity. 🚩457 U.S. 202, 216 n.14 (1982) (noting that "[s]everal formulations *might* explain our treatment of certain classifications as 'suspect,' " and then tentatively listing several factors (emphasis added)).

14    To the extent that Plaintiffs argue for application of the *Frontiero* factors, the court finds they do not support a finding that transgender people are part of a quasi-suspect class. Notably, the principal purpose underlying intermediate scrutiny into the realm of legislative judgment is directly related to the political power factor. Intermediate scrutiny is appropriate in those instances in which, because of the status of the group affected by the classification, the group has *no* effective means of redressing any discrimination through the normal political process. But here, the court is not convinced that transgender people are powerless to effectuate change through the normal democratic process. Indeed, as Plaintiffs point out, 47 states currently allow transgender people to amend their birth certificates. (Doc. 33 at 21.) It is unreasonable to assume that transgender people as a whole are simply incapable of effectuating change via the normal democratic process. *See* 🚩*Cleburne*, 473 U.S. at 440 ("[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic process.").

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

  © 2023 Thomson Reuters. No claim to original U.S. Government Works.